answer to summary of Judgment

Your Honor Judge Gregory M Sleet

In their motion for summary judgment, defendents state the standard for entering summary judgment is mandated after adequate time for discovery and upon motion. The court has previous stated all discovery is due August 23, 07.

This motion should be dismissed as I have not had adequate time to request or obtain discovery. I've requested council and because my request is still pending I should be especially afforded the opportunity to full advantage of the courts discovery schedule.

Sharon Shannon

Sharon Shannon

Your Honor Judge Gregory M Sleet

In their motion for summary judgment, defendants state the standard for entering summary judgment is mandated after adequate time for discovery and upon motion. The court has previous stated all discovery is due August 23, 07.

This motion should be dismissed as I have not had adequate time to request or obtain discovery.

I've requested council and because my request is still pending I should be especially afforded the opportunity to full advantage of the courts discovery schedule.

Sharon Shannon

Sharon Shannon

copies to be sent to
Schmittinger & Rodriquez

Certificate Of Service

I hereby certify that I have
caused copies of the following

Answer To Summary Judgment
Request For Discovery
Certificate Of Service

to be served upon
Schmittinger & Rodriguez
414 S. State Street
PO Box 497
Dover, De. 19903

by certified mail by mailing copies
to defendents at their attorneys address
listed above postage prepaid on
May 16, 07.

Sharon Shannon
239 Loon Court
Frederica, De 19946
302 335 5996

Sharon Shannon

Your Honor Judge Gregory M Sleet

In their motion for summary judgment, defendants state the standard for entering summary judgment is mandated after adequate time for discovery and upon motion. The court has previously stated all discovery is due August 23, 07.

This motion should be dismissed as I have not had adequate time to request or obtain discovery.

I've requested council and because my request is still pending I should be especially afforded the opportunity to take full advantage of the courts discovery schedule.

Sharon Shannon

Sharon Shannon

copie to be sent to Schmittinger & Rodriquez

I Sharon Shannon want
these documents filed in
case 1:06 — CV—522 GMS.

Sharon Shannon

I will send these copies to
Mr. Fletcher Jr.

Schmittinger Rodriguez

2007 MAY 16  PM 3:37

CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

I Sharon Shannon want
these documents filed in
case 1:06-cv-522 GMS.

Sharon Shannon

I will send these copies to
Mr. Fletcher Jr.

Schmittinger Rodriguez

2007 MAY 16 PM 3:37

DISTRICT OF DELAWARE
CLERK U.S. DISTRICT COURT

JOSEPH R. BIDEN, JR.
DELAWARE

201 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510-0802
(202) 224-5042
www.senate.gov/~biden

## United States Senate

JUDICIARY COMMITTEE

SUBCOMMITTEE ON
CRIME, CORRECTIONS AND VICTIMS' RIGHTS
RANKING MEMBER

FOREIGN RELATIONS COMMITTEE
RANKING MEMBER

CAUCUS ON INTERNATIONAL
NARCOTICS CONTROL
CO-CHAIRMAN

July 29, 2004

Ms. Sharon Shannon
239 High Point Park
Frederica, DE 19946

Dear Ms. Shannon:

Thank you for contacting me regarding your transportation to the Veterans Administration Health Care Center in Wilmington.

I understand there is an inquiry about the matter initiated through Senator Thomas R. Carper's office. As a matter of congressional courtesy, I must allow Senator Carper's office to respond to you. You may contact Senator Carper's Georgetown office at (302) 856-7690.

If there is anything else I may assist you with, please do not hesitate to contact me. Thank you for the opportunity to serve you.

Sincerely,

Joseph R. Biden, Jr.
United States Senator



Some of these documents you
may already have.
The ones I had
already sent I
had seperated +
but then
some how they
got mixed up
Sharon

1105 NORTH MARKET STREET
SUITE 2000
WILMINGTON, DELAWARE 19801-1233
(302) 573-6345

JOSEPH R. BIDEN, JR.
DELAWARE

www.biden.senate.gov

24 NORTH WEST FRONT STREET
WINDSOR BUILDING, SUITE 101
MILFORD, DELAWARE 19963-1440
(302) 424-6090

# United States Senate

JUDICIARY SUBCOMMITTEE
ON CRIME AND DRUGS
CHAIRMAN

FOREIGN RELATIONS COMMITTEE
CHAIRMAN

CAUCUS ON INTERNATIONAL
NARCOTICS CONTROL
CHAIRMAN

CONGRESSIONAL INTERNATIONAL
ANTI-PIRACY CAUCUS
CO-CHAIRMAN

ANTI-METH CAUCUS
CO-CHAIRMAN

March 20, 2007

Ms. Sharon Allen Shannon
239 Loon Court
Frederica, DE 19946

Dear Ms. Shannon:

Thank you for contacting me regarding your case in the United States District Court.
I am glad you took the time to share your concerns with me.

I understand you have contacted my office on July 29, 2004, April 11, 2006 and October
1, 2006 to discuss your experience with the Disabled American Veterans (DAV) Chapter in
Camden, Delaware. You conveyed your belief that the DAV discriminated against you. At that
time, my staff advised that you may pursue civil action and suggest you consult with an attorney.

Thank you again for contacting me, Mrs. Shannon. I appreciate the opportunity to serve
you.

Sincerely,

Joseph R. Biden, Jr.
United States Senator

1105 NORTH MARKET STREET
SUITE 2000
WILMINGTON, DELAWARE 19801-1233
(302) 573-6345

201 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510-0802
(202) 224-5042

THOMAS R. CARPER
DELAWARE

# United States Senate

WASHINGTON, DC 20510-0803

July 29, 2004

Ms. Sharon Shannon
239 High Point Park
Frederica, Delaware 19946

Dear Ms. Shannon:

Thank you for contacting me regarding the Disabled American Veterans Association (DAV). I have asked Mrs. Jymayce Wescott, a member of my staff, to look into this matter.

In order to proceed further, I ask that you send a letter detailing your concern. Please include your name, address and a phone number where you may be reached. You can forward you correspondence to Office of Senator Thomas R. Carper, Attn: Mrs. Wescott, 12 The Circle, Georgetown, DE 19947.

Please feel free to contact Mrs. Wescott if you have any questions. She can be reached in my Georgetown office at (302) 856-7690.

Sincerely,

Thomas R. Carper

Thomas R. Carper
United States Senator

THOMAS R. CARPER
DELAWARE

# United States Senate

WASHINGTON, DC 20510-0803

June 16, 2005

Ms. Sharon Shannon
239 High Point Park
Frederica, Delaware 19946

Dear Ms. Shannon:

Thank you for taking the time to visit my office regarding the Disabled American
Veterans (DAV). I have asked Mrs. Jymayce Wescott, a member of my staff, to look into this
matter.

In order to proceed further, I ask that you send a detailed letter about your concerns.
Please include your name, address and phone number. You may forward your letter to Office of
Senator Thomas R. Carper, Attn: Mrs. Wescott, 12 The Circle, Georgetown, DE 19947.

In the meantime, please feel free to contact Mrs. Wescott if you have any questions. She
can be reached in my Georgetown office at (302) 856-7690.

Sincerely,

Thomas R. Carper
United States Senator

*I changed my name back to Shannon so it will match my husbands head-stone in arlington National Cemetery*

*Sharon Shannon*

# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE

## IN AND FOR THE COUNTY OF KENT

IN RE:

SHARON M. ALLEN

TO

SHARON M. SHANNON

)
)
)
)
)
)
)
)
)
)

C.A. No. 04-01-0113NC

Petitioner(s) Date of Birth: __May 5,__ 1942

**CHANGE OF NAME**

## ORDER

This __4TH__ day of __FEBRUARY__, A.D., __2004__, the Verified Petition in this Matter having been heard and considered;

IT IS ORDERED that the Petitioner(s) from this day forward and for all purposes shall bear the name of __SHARON M. SHANNON__

JUDGE/COMMISSIONER



SUSSEX OFFICE
546 S. BEDFORD STREET
GEORGETOWN, DELAWARE 19947
TELEPHONE: (302) 856-5331



KENT OFFICE
805 RIVER ROAD
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4567

STATE OF DELAWARE
DEPARTMENT OF STATE
DIVISION OF HUMAN RELATIONS
820 N. FRENCH STREET
WILMINGTON, DELAWARE 19801
TELEPHONE: (302) 577-5050

OFFICE OF THE
DIRECTOR

July 13, 2004

Sharon Shonnon
239 Spring Valley
High Point MHP
Frederica, DE 19946

Re:    Public Accommodation Complaint
       HRIS: 3072

Dear Ms. Shonnon:

On July 12, 2004, you contacted our office expressing an interest in filing a complaint alleging Public Accommodations discrimination.

Please be informed that the statute of limitations for filing a complaint of discrimination is 90-day from the date of the alleged incident.

Enclosed, please find a public accommodation discrimination complaint form for you to complete and return to our office within five (5) days of receipt, if you would like our office to pursue your claim.

If you have any questions, please feel free to contact our office at (302) 577-5050.

Sincerely,

Juana Fuentes-Bowles, Director
Division of Human Relations

RLP:aah

Xc:    File

Enclosures

SUSSEX OFFICE
546 S. BEDFORD STREET
GEORGETOWN, DELAWARE 19947
TELEPHONE: (302) 856-5331



KENT OFFICE
805 RIVER ROAD
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4567

STATE OF DELAWARE
DEPARTMENT OF STATE
DIVISION OF HUMAN RELATIONS
820 N. FRENCH STREET
WILMINGTON, DELAWARE 19801
TELEPHONE: (302) 577-5050

OFFICE OF THE
DIRECTOR

August 27, 2004

Ms. Sharon Shannon
239 Spring Valley
Frederica, Drive 19946

RE: Intake Public Accommodations Discrimination Complaint

Dear Ms. Shannon:

We have reviewed the public accommodations discrimination complaint that you filed with our office. Please be advised the Division of Human Relations administratively enforces the Equal Accommodation Act which prevents discrimination in places of public accommodation against any person because of race, age, marital status, creed, color, sex, handicap or national origin. A place of public accommodation means any establishment which caters to or offers goods or services or facilities to, or solicits patronage from the general public.

After carefully reviewing the information you provided in your claim and gathered during a preliminary investigation, there does not appear to be discrimination under the jurisdiction under the Equal Accommodation Act. Therefore, the Division of Human Relations cannot accept your complaint for further processing because it lacks jurisdiction to proceed under the law.

If you have any questions, please contact us.

Sincerely,

Valerie W. Venable
Human Relations Supervisor
Division of Human Relations

/vwv

DEPARTMENT OF DELAWARE
P.O. BOX 407
CAMDEN, DE 19934
SEPT 1, 2004

THE EXECUTIVE MEETING WAS CALLED TO ORDER BY COMMANDER H. MARK
WISCHMANN ON SEPT 1, 2004 AT 7:30 P.M.

OPENING CEREMONY BY COMMANDER WISCHMANN AND WE WERE LED IN
PRAYER BY CHAPLAIN THOMAS TENNEY.

ADJUTANT PAUL V. LARDIZZONE CALLED THE ROLL CALL OF OFFICERS. THERE
WERE 16 MEMBERS PRESENT. CHAPTERS 7 & 9 WERE ABSENT. A QUORUM WAS
PRESENT.

COMMANDER WISCHMANN STATED TO THE EXECUTIVE COMMITTEE THAT WE
WERE HAVING A PROBLEM WITH ONE OF THE AUXILLARY MEMBERS. THIS
MEMBER, SHARON SHANNON RIDES IN THE DAV VAN TO ELSMERE FOR HER
MEDICAL APPOINTMENTS. SHE SAYS SHE NEEDS TO SIT IN THE FRONT SEAT AND
ON OCCASIONS HAS ASKED A VETERAN TO MOVE TO THE BACK. SHE HAS SAID
SOME DEROGATORY REMARKS AGAINST THE DAV. SHE HAS CAUSED TROUBLE
WITH THE SEAFORD VAN IN THE PAST AND HAS CAUSED PROBLEMS WITH THE
VA . THE VA IS IN THE PROCESS OF WRITING HER A LETTER BANNING HER FROM
THE VAN. THIS PROBLEM HAS BEEN DISCUSSED WITH NATIONAL DAV AND
THERE RECOMMENDATION WAS TO CUT ALL TIES WITH HER TO AVOID ANY
CONTACT PHYSICALLY OR BY PHONE. IN ORDER TO DO THIS IT WAS SUGGESTED
TO THE EXECUTIVE COMMITTEE THAT SHE BE BANNED FROM THE PROPERTY,
ANY DEPARTMENT MEETINGS OR CONVENTIONS..JIM WYATT THE REGIONAL
NSO SAID THAT THIS WOULD BE APPROPRIATE. SHE MAY ATTEND HER UNIT
MEETINGS. COMMANDER WISCHMANN ASKED FOR A MOTION TO TAKE THIS
ACTION. MOTION WAS MADE BY SGT AT ARMS PAUL PRICE. SECONDED BY DEPT
JUDGE ADVOCATE PDC REESE PHILLIPS.(APPROVED)

COMMANDER WISCHMANN STATED THAT THE LAST MEETING MINUTES WERE
HANDED OUT AT THE DEPARTMENT CONVENTION.

COMMANDER WISCHMANN STATED THAT TREASURER'S REPORT WAS HANDED
TO EVERYONE AND TREASURER DAVE BALCERAK WOULD ANSWER ANY
QUESTIONS. ADJUTANT LARDIZZONE STATED THAT ALL TRUSTEES AND PDC
DON PENN WOULD NEED TO ARRIVE 1 HOUR EARLY NEXT MEETING TO AUDIT
THE BOOKS. PDC DON PENN ASKED WHAT WE HAD MADE ON THE CONVENTION
AD BOOK. COMMANDER WISCHMANN STATED THAT WE WERE STILL WAITING
ON SOME PAYMENTS FOR THE AD BOOK AND THAT WE SHOULD HAVE THE
FIGURES NEXT MEETING. COMMANDER WISCHMANN STATED THAT ALL THE

Judge G.M.S.

DEPARTMENT OF DELAWARE
P.O. BOX 407
CAMDEN, DE 19934
OCT 6, 2004

THE EXECUTIVE MEETING WAS CALLED TO ORDER BY COMMANDER H. MARK
WISCHMANN ON OCT 6, 2004 AT 7:30 P.M.

OPENING CEREMONY BY COMMANDER WISCHMANN AND WE WERE LED IN
PRAYER BY CHAPLAIN THOMAS TENNEY.

ADJUTANT PAUL V. LARDIZZONE CALLED THE ROLL CALL OF OFFICERS. WE HAD
A QUORUM

COMMANDER WISCHMANN STATED THAT THE LAST MEETING MINUTES WERE
MAILED. A MOTION TO ACCEPT THE MINUTES WAS MADE BY SGT AT ARMS PAUL
PRICE. IT WAS SECONDED BY TRUSTEE CHARLES MCKINNEY. (APPROVED)

TRUSTEE VICTOR RAMAGE ASKED IF PROBLEM WITH LADY ON THE VAN WAS
SETTLED. COMMANDER WISCHMANN SAID THAT THE EXECUTIVE COMMITTEE
VOTED TO BAN HER FROM THE BUILDING AND ANY DEPARTMENT FUNCTIONS
TO INCLUDE THE CONVENTION. A CERTIFIED LETTER WAS SENT TO HER AND SHE
HAD TRANSFERRED TO UNIT 3. COMMANDER WISCHMANN STATED THAT SHE
CAN ATTEND HER UNIT MEETINGS BUT SHE COULDN'T ATTEND ANY
DEPARTMENT FUNCTIONS. NATIONAL DAV SAID WE SHOULD NOT HAVE ANY
CONTACT WITH HER. IT WAS ALSO STATED THAT SHE IS BEING TRANSPORTED
TO THE VA BY THE SEAFORD VAN.

TREASURER'S REPORT WAS HANDED TO EVERYONE .TRUSTEE RAMAGE
NOTICED THAT CHECK #5469 SHOULD HAVE BEEN IN THE AMOUNT OF $200.00,
INSTEAD OF $100.00 AS PRINTED AND CHECK #5470 SHOULD HAVE BEEN $160.00
INSTEAD OF $100.00 AS PRINTED. AFTER REVIEW OF THE GENERAL FUND BOOK
CHECK #5470 WAS CORRECT FOR $100.00. AND CHECK #5469 WAS FOR $200.00. A
REVISED TREASURER'S REPORT WILL BE SENT WITH THE MINUTES. TRUSTEE
VICTOR RAMAGE MADE A MOTION TO WAIT UNTIL NEXT EXEC. MEETING TO
APPROVE FINANCIAL REPORT AFTER IT IS CORRECTED. SECONDED BY JR VICE
RONNIE REVELS. (APPROVED).

COMMANDER WISCHMANN STATED THAT DURING LAST MONTH'S READING OF
THE TREASURER'S REPORT A QUESTION WAS ASKED ABOUT HOW MUCH WE
HAD MADE AT CONVENTION. THE TOTAL INCOME OF FUNDS FOR THE
CONVENTION WAS $10,954. TOTAL EXPENSES WAS $11,060.55. DIFFERENCE WAS
-$106.55. COMMANDER WISCHMANN STATED THAT NEXT YEAR THE COST OF ADS
IN THE AD BOOK WILL GO UP. HE ALSO ASKED THAT IF WE COULD GET MORE



SUSSEX OFFICE
546 S. BEDFORD STREET
GEORGETOWN, DELAWARE 19947
TELEPHONE: (302) 856-5331

KENT OFFICE
805 RIVER ROAD
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4567

STATE OF DELAWARE
DEPARTMENT OF STATE
DIVISION OF HUMAN RELATIONS
820 N. FRENCH STREET
WILMINGTON, DELAWARE 19801
TELEPHONE: (302) 577-5050

OFFICE OF THE
DIRECTOR

October 29, 2004

Sharon Shannon
239 Spring Valley
Frederica, DE 19946

Re:    Shannon v. Lardizonne, Department of Delaware Disabled American
       Veterans Assoc., Wischmann, & Kastner
       Case No.: K-PA-630-04

Dear Ms. Shannon:

Please find enclosed your copy of the amended complaint in the above-referenced case.

Should you have any questions, please give me a call.

Thank you.

Sincerely,

Sharese C. McGhee
Human Relations Representative II

SCM:aah

Enclosure

By certified mail: 7004 1350 0001 1254 2744



SUSSEX OFFICE
546 S. BEDFORD STREET
GEORGETOWN, DELAWARE 19947
TELEPHONE: (302) 856-5331

KENT OFFICE
805 RIVER ROAD
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4567

STATE OF DELAWARE
DEPARTMENT OF STATE
DIVISION OF HUMAN RELATIONS
820 N. FRENCH STREET
WILMINGTON, DELAWARE 19801
TELEPHONE: (302) 577-5050

OFFICE OF THE
DIRECTOR

November 9, 2004

Sharon Shannon
239 Spring Valley
Frederica, DE 19946

Re: Shannon v. Lardizonne, DE Disabled American
Veterans Assoc., Wischmann, & Kastner
Case No.: K-PA-630-04

Dear Ms. Shannon:

This letter will confirm the rescheduling of the Hearing in the above-referenced matter.
Please be advised that the rescheduled date is as follows:

DATE: December 2, 2004
TIME: 6:00 p.m.
CONFERENCE ROOM: State Personnel Conference Room
LOCATION: Paradee Building
Rte 113 & Bay Road (left of DOT)
Dover, DE

Please be advised that the proceedings in this matter will be conducted with
confidentiality and you may feel free to contact me should you have any questions.

Sincerely,

Sharese McGhee
Human Relations Representative II

SCM:aah

Case 1:06-cv-00522-GMS    Document 26-3    Filed 05/17/2007    Page 14 of 80



STATE OF DELAWARE
DEPARTMENT OF STATE
DIVISION OF HUMAN RELATIONS
820 N. FRENCH STREET
OFFICE OF THE                    WILMINGTON, DELAWARE 19801
DIRECTOR                         TELEPHONE: (302) 577-5050

March 21, 2005

Sharon Shannon
239 Spring Valley
Frederica, DE 19946

Dear Ms. Shannon:

    Re:   Shannon v. Lardizonne, Dept. of DE Disabled American
           Veterans Assoc., Wischmann, & Kastner
           Case No.: K-PA-630-04

    Pursuant to 29 Delaware Code, Section 10128, enclosed in the FINAL ORDER of the State Human Relations Commission, in reference to the above-noted complaint, which was filed on September 20, 2004 and heard on December 2, 2004. Also please find the revised and restated Equal Accommodations Regulations effective July 1, 1966.

    Please be advised that if you wish to seek RECONSIDERATION in accordance with Rule #27 of the Human Relations Commission Regulations, you must do so in writing within five (5) business days after receipt of the Final Order. The RECONSIDERATION must briefly and distinctly state the grounds therefore and submitted in five (5) copies to the Division of Human Relations, where the complaint was filed. The filing of such RECONSIDERATION shall not extend the statutory time limit for the filing of an appeal

    You are hereby notified that you have the right to APPEAL this FINAL ORDER to the Superior Court of the State of Delaware in and for the county in which the complaint was filed. Pursuant to 29 Delaware Code, Section 10142(b), an APPEAL must be filed within 30 days of the day the notice of the decision was mailed.

                            Sincerely,

                            Juana Fuentes-Bowles, Director
                            Division of Human Relations

SCM:aah

Xc:   File

Enclosure: Final Order

1:06-CU- 522 Judge G.M

Public Accommodation
Discrimination **AMENDED**

THE STATE HUMAN RELATIONS COMMISSION
STATE OF DELAWARE

PLEASE TYPE OR PRINT THIS FORM - DO NOT WRITE IN THE SHADED AREAS

THIS SECTION IS FOR STATE USE ONLY.

NUMBER: K-PA-630-04  Jurisdiction: ☐ Yes ☐ No ☐ Additional Info

FILING DATE

1. Name of aggrieved person or organization (last name, first name, middle initial)(Mrs. Miss. Ms.)
Shannon, Sharon

| Home Phone | Business Phone |
|---|---|
| (302) 335-2981 | (302) 335-2981 |

Street Address (city, county, state, and zip code)
239 Spring Valley, Frederica, Sussex, DE 19946

Name of Contact Person (last name, first name, middle initial) (Mrs. Miss, Ms.)

| Home Phone | Business Phone |
|---|---|
| ( ) | ( ) |

Street Address (city, county, state, and zip code)

2. Against whom is this complaint being filed? Name (last name, first name, middle initial)
Lardizonne, Paul

Phone Number
(302) 697-9061

Street Address (city, county, state, and zip code)
183 South Street, Camden, DE 19934

Check the applicable box or boxes which describe(s) the party named above:
☐ Employee ☐ Owner ☐ Lessee ☐ Proprietor ☐ Supt. Or Manager ☐ Agent ☒ Other  Adjutant

☒ If you named an individual above who appeared to be acting for a place of Public Accommodations in this case, check this box and write the name and address of the place of Public Accommodations in this space:

Name:Dept. of DE  Disabled American Veterans | Address: 183 South Street, Camden, DE 19934/Reg. Agent: Corporation Trust Company
1209 Orange St., Wilmington, DE 19801

Name and identify others (if any) you believe violated the law in this case:
Wischmann, Mark (Commander), Kastner, Dorothy

3. What did the person you are complaining against do? Check all that apply and give the most recent date these act(s) occurred in block No. 6b below.
☒ Were you refused, withheld or denied accommodations, facilities, advantages, or privileges or a place of public accommodations?
☐ Did the person against whom the complaint was filed directly or indirectly publish, issue, circulate, post or display any radio communication, notice or advertisement indicating that public accommodation in the classes listed in block No. 4 below is not welcomed, desired, or solicited?
☐ Did someone assist, induce or coerce another person to commit any discriminatory public accommodations practice prohibited by the Equal Accommodations law.

4. Do you believe that were discriminated against because of your race, age, color, marital status, creed, national origin, sex, handicap? Check all that apply:
☒ Race or Color ☒ Black ☐ White ☐ Other | ☐ Age (Specify) | ☐ Sex ☐ Male ☐ Female | ☐ Handicap ☐ Physical ☐ Mental | ☐ Religion (Specify) | ☐ Marital Status (Specify) | ☐ National Origin (Specify) | ☐ Creed (Specify)

5a. What kind of business establishment or facility was involved
☐ Restaurant ☐ Department Store ☐ Bank
☐ Supermarket ☒ Other (Specify) Disabled American Veterans

5b. Do you wish to utilize the goods, products, or services of this facility?
☒ Yes ☐ No

6a. Summarize in your own words what happened. Use this space for a brief and concise statement of facts (who, what, when, where, how). Additional details may be submitted on an attachment. The Division of Human Relations will furnish a copy of the complaint to the person or organization against whom the complaint is made.

SEE ATTACHED

6b. When did the act(s) check in Item 3 occur? (Include the most recent date if several dates are involved) 6/25/04

7. I declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.
Signature and Date:

File Date: 9/20/04
(Date Complaint was filed)

FORM 202:04

Attachment to State Complaint
Shannon v. DE Disabled American Veterans Association
Page 2

6a. Summary:

I feel I have been discriminated against because I am not welcome in the building if I happen to call, they (Mark Wischmann) hang up on me. I have been refused to ride on a van for DAV to my appointment to Elsemere VA Medical Center. I received a certified letter from Mark and Paul informing me that I have been restriction from the property of the Delaware Disabled American Veterans. I have been called names. I have transferred my membership to Unit 3 in Wilmington for DAVA. I have different people that are willing to give me statements. I was married to a black man who was killed in Vietnam – these people and others hold that against me. I defended a black man, Ronnie Revels in the DAV van – and people turned against me. Another black patient on the van, I had a problem with. He started calling F-W-B and was cussing me out for no reason. I took enough of his talk, and finally, I told him "well, let me tell you one thing, Boy, I'm a good one" in the presence of the driver, Ron Revels. Ronnie Revels informed the patient advocate in VA Hospital Elsemere, Delaware, how I was treated by Ed White a patient in the van that called me names. I gave a statement to Ronnie revels about what Ray Stanfield, a white man said. I believe I was treated this way due to my association with my deceased husband who is Black.

_Sharon M. Shannon_
Signature

_Oct 26, 64._
Date

## BEFORE THE HUMAN RELATIONS COMMISSION
## OF THE STATE OF DELAWARE\

Sharon Shannon,                           )
                                          )
    v.                                      )        Charge No. K-PA-630-04
                                          )
Delaware Disabled Veterans Association  )

### DECISION AFTER HEARING

This matter came before the Human Relations Commission for a hearing on December 2, 2004, in Dover, Delaware.

The panel members hearing the case were Marian Harris (Chair), Wallace Dixon, and Gail Launay. Sharese McGhee was the Human Relations Representative from the Division of Human Relations assigned to assist the Panel. Deputy Attorney General Frederick H. Schranck acted as counsel to the Commission.

Ms. Shannon was represented by Kester I.H. Crosse, Esquire. The Delaware Disabled Veterans Association (DAV) was represented by Kevin Howard, Esquire.

All parties were sworn and testimony was received from both sides. The panel then recessed the hearing and reconvened at a later date to conduct its deliberations.

### FINDINGS AND ORDER:

The panel's initial findings are dispositive of the case before it. The evidence provided by both sides showed that the operations of the DAV shuttle van service run were not open to the public. Instead, use of the DAV van (and, in fact the other DAV facilities such as its clubhouse in Kent County, Delaware) is limited to DAV members, veterans, family members of veterans, and invited guests. Ms. Shannon, for example, is a widow of a Vietnam-era Marine, which qualified her to use the DAV van when she did.

Under these circumstances, Ms. Shannon's complaint about her treatment by the DAV does not implicate the provisions of 6 Del.C. Chapter 45, the Delaware Equal Accommodations Law. This statute is enforced against organizations and other entities offering fully public access. See Section 4502(1). The parties' factual agreement as to the limitations of the DAV service thus takes the case out of the Commission's jurisdiction.

Therefore, this action must be dismissed.

Nonetheless, the Commission Panel members must also note for the record that they were disturbed at some of the hearing evidence, presented over several hours. Some of the attitudes and comments made by the parties and witnesses showed a distressingly immature approach to maintaining good relations with others. In addition, the Panel notes that the DAV services provided in this instance with the cooperation and coordination of the U.S. Departmen of Veterans Affairs may also implicate Title VI of the Civil Rights Act of 1964 with respect to those parts of the law relating to discrimination in programs supported by Federal expenditures. Any decision to bring this matter to the attention of the Federal authorities is, of course, up to either of the parties, and not the Commission.

SO ORDERED THIS _10th_ DAY OF _March_____ , 2005.

Marian R. Hann
Marian Harris, Chair

Gail Launay, Panel

Wallace Dixon, Panel

1:06-CU-522  Judge G.M.S.

## WILLIAMS & CROSSE
### ATTORNEYS AT LAW
1214 KING STREET
WILMINGTON, DELAWARE 19801

LEONARD L. WILLIAMS - RETIRED
KESTER I. H. CROSSE

TELEPHONE NUMBERS:
(302) 652-3141
(302) 658-3488
FAX (302) 652-3034

March 31, 2005

Ms. Sharon Shannon
239 Spring Valley
Fredericka, Delaware  19946

   Re:  **Shannon v. Lardizonne, Dept of DE Disabled American
     Veterans Assoc., Wischmann, & Kastner
     Case No.: K-PA-630-04**

Dear Ms. Shannon:

   Enclosed is a copy of the decision of the Human Relations Commission. It seems that they have decided that the DAV and their facilities are a private club.

   There are some rights to appeal. We must discuss your options.

Very truly yours,

Kester I. H. Crosse

KIHC/ihb

Enclosure

**U.S. Department of Justice**

Civil Rights Division

---

*Coordination and Review Section-NYA*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

Doc #231491

JUN  1 2005

Ms. Susan McHugh
Deputy Assistant Secretary for Diversity
  Management and Equal Opportunity
Office of Equal Employment
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Room 282
Washington, DC  20420

Dear Ms. McHugh:

Enclosed for your review is a letter received by the
Coordination and Review Section of the Civil Rights Division of
the Department of Justice.  The matter does not appear to be
within the jurisdiction of our office.

However, the issues raised may fall within the jurisdiction
of your agency and, therefore, we are referring it to you for
appropriate disposition.  The writer has been notified of the
referral.

Thank you for your assistance in this matter.

Sincerely,

Merrily a. Friedlander

Merrily A. Friedlander
Chief
Coordination and Review Section
Civil Rights Division

Enclosure

273 883

U.S. Department of Justice

Civil Rights Division

---

*Coordination and Review Section-NYA*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

JUN 1 2005

Doc #231491

Ms. Sharon M. Shannon
239 Spring Valley
Frederica, DE  19946

Dear Ms. Shannon:

Your letter was received by the Coordination and Review Section of the Civil Rights Division of the Department of Justice.  We have considered carefully the information you have provided, but the matter does not appear to be within the jurisdiction of our office.

However, by the enclosed letter, we have referred the matter to the agency that is most likely to assist you.  While I do not know if they are in a position to intervene in this matter, your position should be brought to their attention.  If you have any questions, please contact the U.S. Department of Veterans Affairs at (202) 273-5888.

Sincerely,

Merrily a Friedlander

Merrily A. Friedlander
Chief
Coordination and Review Section
Civil Rights Division

Enclosure

106 -CU- 522 Judge G.M.S.

U.S. Department of Justice
Civil Rights Division
*Coordination and Review Section*



## COMPLAINT FORM

The purpose of this form is to assist you in filing a complaint with the Coordination and
Review Section. You are not required to use this form; a letter with the same information
is sufficient. However, the information requested in the items marked with a star (*) must
be provided, whether or not the form is used.

1.* State your name and address.

Name: Sharon M. Shannon

Address: 239 Spring Valley

Frederica  De.  Zip 19946

Telephone No: Home:(302) 335 2981 Work:(   )

2.* Person(s) discriminated against, if different from above:

Name: _____

Address: _____

_____ Zip_____

Telephone No: Home:(   )_____ Work:(   )_____

Please explain your relationship to this person(s).

_____

3.* Agency and department or program that discriminated:

Name: Department of Delaware Disabled American Veterans

Any individual if known: Paul Gardizonne -3026740282 - Mark W ischmar
302 736 69 44 - Dorothy Kashner -302697335 3335
Address: _____
     PO Box 467 - Camden, De.
     or Located at 183 South St.  Zip 19934

Telephone Number: (302 697 9061

4A.* Non-employment: Does your complaint concern discrimination in the delivery of
services or in other discriminatory actions of the department or agency in its treatment of
you or others? If so, please indicate below the base(s) on which you believe these
discriminatory actions were taken (e.g., "Race: African American" or "Sex: Female").

__ Race/Color: My deceased husbands race, African
__ National origin: _____
                                           American
__ Sex: _____
__ Religion: _____
__ Age: _____
__ Disability: _____

OMB No. 1190-0003
Expires: 02/29/04

:06 - C U - 522   Judge G.M.S.

4.* Employment: Does your complaint concern discrimination in employment by the department or agency? If so, please indicate below the base(s) on which you believe these discriminatory actions were taken (e.g., "Race: African American" or "Sex: Female").

__ Race/Color: _____

__ National origin: _____

__ Sex: _____

__ Religion: _____

__ Age: _____

__ Disability: _____

5. What is the most convenient time and place for us to contact you about this complaint?

Am - Monday through Friday

6. If we will not be able to reach you directly, you may wish to give us the name and phone number of a person who can tell us how to reach you and/or provide information about your complaint:

7177371572

Name: M.S. June Foldi         Tel. No. (302 656 8879 or

2324 Market St Camp Hill, Pa. 17011         717-737-1572

7. If you have an attorney representing you concerning the matters raised in this complaint, please provide the following:

Name: Mr. Kester I.H. Crosse _____

Address: 1214 King Street _____

Wilmington, Delaware Zip 19801

Telephone Number: (302 658 3488 or 3026523141 - 302652303

fax

8.* To your best recollection, on what date(s) did the alleged discrimination take place?

Earliest date of discrimination: was 6-25-04 - convention held

(Probably 2-18-04                                    in Dover, Dc.

Most recent date of discrimination: 8-27-04

In 8-9-04 I was excluded from Van the UA Hospital

9. Complaints of discrimination must generally be filed within 180 days of the alleged discrimination. If the most recent date of discrimination, listed above, is more than 180 days ago, you may request a waiver of the filing requirement. If you wish to request a waiver, please explain why you waited until now to file your complaint.

I filed with Division of Human Relations,

Hearing was Dec. 2 04, the decision

was ordered March 10, 05. I received

March 31, 05.

I had started a complaint back in July

of 04. with Division of Human Relations.

:06 - CU - 522  Judge GMS.

0.* Please explain as clearly as possible what happened, why you believe it happened, and how you were discriminated against. Indicate who was involved. Be sure to include how other persons were treated differently from you. (Please use additional sheets if necessary and attach a copy of written materials pertaining to your case.)

Please see complaint form from The State Human Relations Commission State Of Delaware. I beleive bacause I defended Ronnie Revels driver of DAV Van, this could have started the discrimination - I had a hip replacement in April of — and in 8-9-04 being excluded from the van I missed a lot of appointments in the PT Clinic, in fact I'm still in the PT Clinic, this could possibly be partially the problem. I am 62 years old and I have never been restricted from any place in my life, not even the Greyhound Bus Station in 1965 in Petersburg, Va., when my husband & I discussed what side we would go on - Toeat we, rather he decided to be on my side & we didn't have any problem.

11. The laws we enforce prohibit recipients of Department of Justice funds from intimidating or retaliating against anyone because he or she has either taken action or participated in action to secure rights protected by these laws. If you believe that you have been retaliated against (separate from the discrimination alleged in #10), please explain the circumstances below. Be sure to explain what actions you took which you believe were the basis for the alleged retaliation.

ne of The DAV employees said that I demanded the front seat of the van, well I was usually the first patient the driver picked up so I would sit in the front. Needless to say it was easier for me get in the van - there was times the front seat was not vacant and the Veteran offered me his seat which I always acknowledged how nice it was of him & how I appreciated this and thanked him.

1106-CU-522  Sudge  G.M.S.

.2. Please list below any persons (witnesses, fellow employees, supervisors, or others), if known, whom we may contact for additional information to support or clarify your complaint.

Name _____ Address _____ Area Code/Telephone Numbers

June Fotti  2324 Market St. W:( )  (H):(717 737 1572  or
            Camp Hill, Pa.  W:( )  (H):( )  302 6336879
_____ W:( )  (H):( )
Virginia Taylor 240 n. Derby W:( )  (H):( )
      Pond Rd. Dover, De. 19904 W:( )  (H):( ) 302 697 9101
_____ W:( )  (H):( )
Donald H Inskip
120 Blubl Dr. Southwood  W:~~302~~  (H):(302 335 9899
magnolia, De. 19962  acres  W:( )  (H):( )

13. Do you have any other information that you think is relevant to our investigation of your allegations?

The DAU said I caused trouble on the Van and I didn't. The man (Mr. White) that called me FWB never was restricted from the Van, and foul language is not permitted. The African American man I defended on the Van was our driver—and it was awful what a white man said to him.

14. What remedy are you seeking for the alleged discrimination?

I am seeking to be reinstated with Unit #1 in which I have been excluded, use of the facility, use of the Van from Camden area, a written apology, compensate for my humilation and a written statement, forbidding the Unit in Camden De. From discriminating against a member because of the race of his or her spouse.

15. Have you (or the person discriminated against) filed the same or any other complaints with other offices of the Department of Justice (including the Office of Justice Programs, Federal Bureau of Investigation, etc.)?

Yes _____ No __✓__

- 4 -

, so, do you remember the Complaint Number? _____

Against what agency and department or program was it filed?

_____

Address:

_____

City, State, and Zip Code:

_____

Telephone Number: (___) _____

Date of Filing: _____ DOJ Agency: _____

Briefly, what was the complaint about? _____

_____

_____

What was the result? _____

_____

16. Have you filed or do you intend to file a charge or complaint concerning the matters raised in this complaint with any of the following?

_____ U.S. Equal Employment Opportunity Commission

_____ Federal or State Court

__✓__ Your State or local Human Relations/Rights Commission

_____ Grievance or complaint office

17. If you have already filed a charge or complaint with an agency indicated in #16, above, please provide the following information (attach additional pages if necessary):

Agency: Division Of Human Relations   Date filed: 9 - 20 - 04

Case or Docket Number: K - PA - 630 - 04   State Human Relations Commission   Date of Trial/Hearing: 12 - 2 - 04

Location of Agency/Court: Paradee Building - State Personal Conference

Name of Investigator: Mrs. Sharese C. McGhee   Room

Status of Case: Dismissed because of 6 Del. C. Chapter 45 - Section 4502(1)

Comments: This hearing was in progress from 6:00PM until 11:10PM - there was evidence that was never heard. I guess time was a factor. I started with Division of Human Relations back in July 04 and in Oct 04 the complaint was filed.

'06 - CU - 522 Judge C.M.S.

18. While it is not necessary for you to know about aid that the agency or institution you are filing against receives from the Federal government, if you know of any Department of Justice funds or assistance received by the program or department in which the alleged discrimination occurred, please provide that information below.

I beleive the Vans are because of
(State Funding) , Gou plate (license.
Commission OF Veterans Affains gives $40,000 toward
DAV Vans, I think Federal Government pays for main

19.* We cannot accept a complaint if it has not been signed. Please sign and date this tenance complaint form below.
of Vans

*Sharon M. Shannon*    4 -14 - 05
(Signature)                          (Date)

Please feel free to add additional sheets to explain the present situation to us.

We will need your consent to disclose your name, if necessary, in the course of any investigation. Therefore, we will need a signed Consent Form from you. (If you are filing this complaint for a person whom you allege has been discriminated against, we will in most instances need a signed Consent Form from that person.) See the "Notice about Investigatory Uses of Personal Information" for information about the Consent Form. Please mail the completed, signed Discrimination Complaint Form and the signed Consent Form (please make one copy of each for your records) to:

> Coordination and Review Section - NYA
> Civil Rights Division
> United States Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Washington, D.C. 20530
>
> Toll-free Voice and TDD:  (888) 848-5306
>                           (202) 307-2222
>                     TDD:  (202) 307-2678

20. How did you learn that you could file this complaint? Division OF
Human Relations and Mr. Kester
Crosse, my attorney.

21. If your complaint has already been assigned a DOJ complaint number, please list it here: _____

If a currently valid OMB control number is not displayed on the first page, you are not required to fill out this complaint form unless the Department of Justice has begun an administrative investigation into this complaint.

- 6 -

:06-CU-522 Judge G.M.S.

. **Department of Justice**
/il Rights Division
Coordination and Review Section



## COMPLAINANT CONSENT/RELEASE FORM

Your Name: Sharon M. Shannon

Address: 239 Spring Valley

Frederica, Delaware 19946

Complaint number(s): (if known)_____

*Please read the information below, check the appropriate box, and sign this form.*

I have read the Notice of Investigatory Uses of Personal Information by the Department of Justice (DOJ). As a complainant, I understand that in the course of an investigation it may become necessary for DOJ to reveal my identity to persons at the organization or institution under investigation. I am also aware of the obligations of DOJ to honor requests under the Freedom of Information Act. I understand that it may be necessary for DOJ to disclose information, including personally identifying details, which it has gathered as a part of its investigation of my complaint. In addition, I understand that as a complainant I am protected by DOJ's regulations from intimidation or retaliation for having taken action or participated in action to secure rights protected by nondiscrimination statutes enforced by DOJ.

## CONSENT/RELEASE

☑ CONSENT - I have read and understand the above information and authorize DOJ to **reveal my identity to persons at the organization or institution under investigation. I hereby authorize the Department of Justice (DOJ) to receive material and information** about me pertinent to the investigation of my complaint. This release includes, but is not limited to, personal records and medical records. I understand that the material and information will be used for authorized civil rights compliance and enforcement activities. I further understand that I am not required to authorize this release, and do so voluntarily.

☐ CONSENT DENIED - I have read and understand the above information and do not want **DOJ to reveal my identity to the organization or institution under investigation, or to review, receive copies of, or discuss material and information about me, pertinent to the investigation of my complaint.** I understand this is likely to impede the investigation of my complaint and may result in the closure of the investigation.

Sharon M Shannon                    4-14-05

SIGNATURE                    DATE

106 - CU - 522   Judge  GM.S.

U.S. Department of Justice
Civil Rights Division
Coordination and Review Section
To Whom It May Concern
I would like to make two
corrections on my complaint

I was fortunate to have had
Mr. Kester Crosse represent me
on my complaint with Division Of
Human Relations, however Mr.
Crosse is not representing me on
this complaint.

On question 14 this complaint
I would like to be reinstated
with Unit I not Unit 3.

Thank You
Sharon M. Shannon

Fax 302 652 3034
Mr. Kester Crosse

office number is
302 658 4131
302

302 652 3141
302 658 3488

1:06-CV-522 Judge G.M.S.

This was sent to
Maria M. Pedrow
National Adjutant
I never received a response          May 13, 05

Dear Madam Adjutant,

I hope you are having a very nice day and I dislike bothering you with my problem.

I have been restricted from unit I any meetings or functions by the Dept of De. DAV and the Dept of De. DAV Convention. I have never caused trouble of any kind in the DAV or Auxiliary as you and I have discussed. I was never asked my side and I never received a hearing.

I am a active member in Unit 3 (I transfered from Unit I) so I would like to attend our State convention in June.

I'm requesting a written statement from you that I may attend.

Thank You Very Much,

Sharon M. Shannon



**M. JANE BRADY**
**ATTORNEY GENERAL**

### STATE OF DELAWARE
#### DEPARTMENT OF JUSTICE

| | | |
|---|---|---|
| **NEW CASTLE COUNTY** | **KENT COUNTY** | **SUSSEX COUNTY** |
| **Carvel State Building** | **102 West Water Street** | **114 E. Market Street** |
| **820 N. French Street** | **Dover, DE 19901** | **Georgetown, DE 19947** |
| **Wilmington, DE 19801** | **Criminal Division (302) 739-4211** | **(302) 856-5352** |
| **Criminal Division (302) 577-8500** | **Fax: (302) 739-6727** | **Fax: (302) 856-5369** |
| **Fax: (302) 577-2496** | **Civil Division (302) 739-7641** | **TTY: (302) 856-4698** |
| **Civil Division (302) 577-8400** | **Fax: (302) 739-7652** | |
| **Fax: (302) 577-6630** | **TTY: (302) 739-1545** | |
| **TTY: (302) 577-5783** | | |

Consumer Protection Unit – (302) 577-8600 - 1-800-220-5424

**PLEASE REPLY TO :**

October 28, 2005

Sharon Shannon
239 Spring Valley
Frederika, DE  19946

**RE:**
### File No. CAS-136271
(Please refer to this file number when communicating with our office)

Dear Ms. Shannon,

Thank you for your recent communication describing your concerns about the above-named business. We have entered the information you have given us into our computer system to track any pattern of problems with this business. Information received from consumers such as you is important to Attorney General Jane Brady's work to protect consumers.

If you would like the Consumer Protection Unit to contact the business on your behalf, please complete the enclosed complaint form and return it to the address given on the complaint form. Please include **copies** of documents such as receipts or correspondence that relate to your dispute. Do not send any original papers. When we receive your complaint form, we will evaluate the issues and, if appropriate, send the business your complaint and ask for a response. Our ability to successfully mediate consumer concerns may depend on our being able to share your information with the business. However, if you would prefer that we not send your complaint to the business, you may so indicate on the second page of the complaint form.

We contact businesses about consumer complaints so that we can try to resolve the consumer's problems through informal mediation. If such mediation proves unsuccessful we may advise you that we cannot pursue the matter further.

By way of background, this office is charged with enforcement of the provisions of the Delaware Consumer Fraud and Deceptive Trade Practices Acts, along with other consumer protection laws. We have formal jurisdiction for enforcement only over cases of consumer fraud or cases involving violations of certain other statutes. Generally, Delaware law does not authorize us to take formal action in cases of poor workmanship, defective products, breach of contract, or disputes as to prices charged for goods or services.

Please be advised that the Attorney General's office cannot act as your private attorney and that you may wish to pursue a private remedy in court. Please be aware of *statute of limitations* issues so that delay does not jeopardize your access to the courts.

Thank you again for contacting us. If you have any questions about the complaint form or the complaint process, please call us at (302) 577-8600 or (800) 220-5425. We look forward to being of service to you and all Delaware consumers.

Sincerely,

Karen Robbins
Intake Investigator

Enclosure



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
Washington DC 20420

JUN 1 0 2005

Ms. Sharon Shannon
239 Spring Valley
Frederica, DE 19946

Dear Ms. Shannon:

This is to acknowledge receipt of your complaint regarding problems you have encountered in obtaining appropriate transportation services from the Department of Delaware Disabled American Veterans to your local VA medical facility. The Department of Justice referred your complaint to the Department of Veterans Affair and it was subsequently referred to this office.

The Office of Resolution Management processes complaints of employment discrimination within the Department of Veterans Affairs and, therefore, does not have the authority to investigate your complaint.

The Veterans Health Administration (VHA) is responsible for processing complaints involving services at VA medical centers and clinics. We are referring your letter to VHA and are requesting that they respond to you concerning your complaint. Any further questions you have concerning this matter may be addressed to:

> Veterans Health Administration
> Management Support Office (10A2E)
> 810 Vermont Avenue, NW
> Washington, DC 20420

They can also be reached by calling (202) 273-8907.

If we can be of further assistance, please don't hesitate to contact us.

Sincerely yours,

Tyrone M. Eddins
External Affairs Program
Manager

/500



**DEPARTMENT OF VETERANS AFFAIRS**
Veterans Health Administration
Washington DC 20420

AUG  8 2005

In Reply Refer To: 10A2E

•

## NOTICE OF RECEIPT OF CIVIL RIGHTS COMPLAINT

Ms. Sharon Shannon, Complaint No. 05-101-004
239 Spring Valley
Frederica, DE 19946

Dear Ms. Shannon:

This letter is to acknowledge receipt of your complaint on June 13, 2005, in this office from the Office of Resolution Management (ORM) in Washington, D.C. The official filing date of your complaint is September 20, 2004. This date is based on the day you filed your complaint with the State of Delaware Division of Human Relations in Wilmington, Delaware.

An initial review of your complaint is being made in order to determine whether it is acceptable for investigation under VHA Directive 2002-037, that prohibits discrimination on the basis of race, color, national origin, reprisal, age, sex, or disability in programs receiving VA Federal financial assistance.

Specifically, you allege that on February 12, 2004, and on August 9, 2004, you were excluded from a DAV (Disabled American Veterans) van that transports you from your residence to the VA Medical Center in Wilmington, Delaware. You believe that you were excluded from the van due to your race or racial affiliation (White married to a Black deceased soldier), and this action violated your civil rights. If your complaint, or any allegation contained therein, is dismissed, you will receive a decision from me, explaining the reasons for the dismissal, and advising you of your right to appeal that dismissal.

If your complaint is accepted, it will be investigated. You will be provided with a summary of the investigative report upon completion and you will be advised, if necessary, of your appeal rights.

You must keep this office advised of any change of address. Failure to do so could lead to dismissal of your complaint. You must also immediately advise this office, in writing, of the name, address, and telephone number of any representative you may designate to represent you in this matter. If you advise us of representation, copies of all complaint-related correspondence and documents will be provided to your representative, unless you advise us in writing that you are no longer represented by that individual.

Enclosed is a copy of our Complainant Consent/Release form concerning the Privacy Act of 1974 and the Freedom of Information Act. Please review this form and decide whether you wish to release your identity. By giving consent, you agree that your identity as a complainant and personal information about you may be revealed in the course of the investigation, and that the civil rights office may receive personal information concerning you. If you do not agree to release your identity, this decision may limit or prevent any investigation or action and, thus, will result in the closure of your complaint. Please complete the form and return it to this office within 15 days of your receipt of this letter.

You should note that the Department's investigation represents the interests of the VA and the Department does not represent you individually. Our primary goal is to ensure nondiscrimination and remedial action will be negotiated principally with this goal in mind.

You should be aware that no one may intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone because he or she has either taken action or participated in an action to secure rights protected by the nondiscrimination statutes we enforce. Any individual alleging such harassment or intimidation may file a complaint with VHA. We would investigate such a complaint if the situation warrants.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that we receive such a request, we will seek to protect, to the extent provided by law, personal information which, if released, could constitute an unwarranted invasion of privacy.

If you have any questions, please contact Mr. Arthur Goff, Civil Rights Advisor, the investigator assigned to this case at (202) 273-8907, or write him at the following address:

> Veterans Health Administration
> Civil Rights Section (10A2E)
> 810 Vermont Avenue, NW
> Washington, DC 20420

Please reference the complaint number cited above in all future correspondence or contact with this office.

Sincerely,

Nevin M. Weaver

Nevin M. Weaver, FACHE
Director, Management Support Office

Enclosures

Mr. Arthur Goff
202 273 888 1
888 3
888 2

202 2738967
Mr. Arthur Goff

06 - CV - 522 Judge G.M.S.

## COMPLAINANT CONSENT/RELEASE FORM

Your Name: Sharon M. Shannon

Address: 239 Spring Valley, Frederica, De. 19946

Complaint number(s): (if known) 05 – 101 – 004

*Please read the information below, check the appropriate box, and sign this form.*

I have read the Notice of Investigatory Uses of Personal Information by the Veterans Health Administration (VHA). As a complainant, I understand that in the course of an investigation it may become necessary for VHA to reveal my identity to persons at the organization or institution under investigation. I am also aware of the obligations of VHA to honor requests under the Freedom of Information Act. I understand that it may be necessary for VHA to disclose information, including personally identifying details, which it has gathered as a part of its investigation of my complaint. In addition, I understand that as a complainant I am protected by VHA's regulations from intimidation or retaliation for having taken action or participated in action to secure rights protected by nondiscrimination statutes enforced by VHA.

## CONSENT/RELEASE

[X] CONSENT — I have read and understand the above information and authorize VHA to reveal my identity to persons at the organization or institution under investigation. I hereby authorize VHA to receive material and information about me pertinent to the investigation of my complaint. This release includes, but is not limited to, personal records and medical records. I understand that the material and information will be used for authorized civil rights compliance and enforcement activities. I further understand that I am not required to authorize this release, and do so voluntarily.

[ ] CONSENT DENIED — I have read and understand the above information and do not want VHA to reveal my identity to the organization or institution under investigation, or to review, receive copies of, or discuss material and information about me, pertinent to the investigation of my complaint. I understand this is likely to impede the investigation of my complaint and may result in the closure of the investigation.

_Sharon M. Shannon_
SIGNATURE

8 – 13 – 05
DATE

1:06 - CU - 522 - Judge G.M.S.



**DEPARTMENT OF VETERANS AFFAIRS**
Veterans Health Administration
Washington DC  20420

OCT 2 1 2005

In Reply Refer To:  10A2E

## NOTICE OF ACCEPTANCE OF CIVIL RIGHTS COMPLAINT

Ms. Sharon Shannon, Complaint No. 05-101-004
239 Spring Valley
Frederica, DE 19946

Dear Ms. Shannon:

This Notice is to advise you of the acceptance of your civil rights complaint of discrimination filed on September 20, 2004, under VHA Directive 2002-037, Nondiscrimination in Federally-Conducted and Federally-Assisted (External) Programs. This Directive is designed to eliminate discrimination on the basis of race, color, national origin (limited English proficiency), age, sex, handicap, or reprisal, in any program or activity that receives Federal financial assistance from VA.  The precise issues accepted for investigation are as follows:

On February 12, 2004, and on August 9, 2004, you were excluded from a DAV (Disabled American Veterans) van program that provided transportation to you from your residence to the VA Medical Center in Wilmington, Delaware.

On August 27, 2004, because of your alleged conduct and remarks to the dispatcher and drivers, the DAV in Camden, Delaware issued a letter to you that restricted you from their property, any meetings or functions, and the Delaware DAV Convention.

You believe that you were excluded from the van program and restricted from the DAV chapter due to your race (racial affiliation, White married to a Black deceased soldier), and these actions violated your civil rights.

1:06 - CU - 522  Judge  GMS.

Mr. Arthur Goff will be assigned to attempt informal resolution your complaint, and he will contact staff at the facilities you identified in order to obtain any information or evidence which they may wish to offer. The scope of the investigation will be limited to the issues accepted above. The investigator is not authorized to inquire into any other matters. If you have other matters you wish to complain about, you must forward them immediately to:

    Mr. Arthur Goff, Civil Rights Advisor (10A2E)
    Veterans Health Administration
    810 Vermont Avenue, NW
    Washington, DC 20420

Unless stated, an investigation of the above-accepted matters does not constitute an express or implied waiver by VA of any time limits prescribed by civil rights regulations for the filing of this complaint.

You must keep this office advised of any change of address. Failure to do so could lead to dismissal of your complaint. You must also immediately advise this office, in writing, of the name, address, and telephone number of any representative you may designate to represent you in this matter. If you advise us of representation, copies of all complaint-related correspondence and documents will be provided to your representative, unless you advise us in writing that that individual no longer represents you.

You will receive a copy of a summary of the report of investigation of your complaint within 180-calendar days of the date you filed your formal complaint of discrimination.

You should note that VHA's investigation represents the interests of the United States and VHA does not represent you individually. Our primary goal is to ensure nondiscrimination by recipients of financial assistance from the Department and remedial action will be negotiated principally with this goal in mind. This relief may not be consistent with your interests; however, you may wish to consult with private counsel of your choosing to determine what, if any, relief you may be entitled to receive through private litigation.

You should be aware that no one might intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone because he or she has either taken action or participated in an action to secure rights protected by the nondiscrimination statutes we enforce. Any individual alleging such harassment or intimidation may file a complaint with VHA. We would investigate such a complaint if the situation warrants.

2

: 06- CU- 522   Judge  C.M.S.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that we receive such a request, we will seek to protect, to the extent provided by law, personal information, that, if released, could constitute an unwarranted invasion of privacy.

Mr. Arthur Goff, the investigator assigned to this case, will be contacting you in the near future to schedule an interview with you by telephone. We will keep you informed of the progress of our investigation. If you have any questions, please contact Mr. Goff at (202) 273-8907.

Please reference the complaint number cited above in all future correspondence or contact with this office.

Sincerely,

Nevin M. Weaver

Nevin M. Weaver, FACHE



**DEPARTMENT OF VETERANS AFFAIRS**
Veterans Health Administration
Washington DC 20420

OCT 2 1 2005

In Reply Refer To: 10A2E

## NOTICE OF INVESTIGATION AND REQUEST FOR DATA

October 18, 2005

Certified Mail

Mr. Paul V. Lardizzone, Adjutant
Disabled American Veterans
Department of Delaware
P.O. Box 407
Camden, DE 19934

RE: Ms. Sharon Shannon, Complainant
Complaint No. 05-101-001

Dear Mr. Lardizzone:

This letter is to notify you that the Veterans Health Administration's Equal Opportunity Office has received a complaint against your chapter, alleging discrimination on the basis of race. The complainant, Ms. Sharon Shannon, alleges that the chapter discriminated against her. The precise issues accepted for investigation are as follows:

On February 12, 2004, and on August 9, 2004, she was excluded from a DAV (Disabled American Veterans) van program that provided transportation from her residence to the VA Medical Center in Wilmington, Delaware.

On August 27, 2004, because of her alleged conduct and remarks to the dispatcher and drivers, the DAV in Camden, Delaware issued a letter to her that restricted her from their property, any meetings or functions, and the Delaware DAV Convention.

38 CFR, Chapter 1, Subpart A, Part 18, and VHA Directive 2002-037, Nondiscrimination in Federally-Conducted and Federally-Assisted (External) Programs applies. The regulation prohibits discrimination on the basis of race, color, national origin (limited English proficiency), age, sex, disability, and reprisal and provides guidance to investigate the complainant's allegations. A desk investigation of this complaint will be conducted within the next few weeks.

In investigating complaints, the assigned investigator will attempt to negotiate voluntary compliance if a violation is found. VHA regulation also provides for the use of alternative means of dispute resolution, where appropriate, including settlement negotiations and conciliation.

In order to facilitate the investigation, I am sending you an initial Data Request. The investigator will review and analyze your response. In order to facilitate our investigation, I request that you submit a position statement responding to the allegations listed above, within 15 days of the date of this letter. Please include any pertinent documents, records, names of witnesses, list as appropriate to support your statement.

I am obligated to inform you that no one may intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone because he or she has either taken action or participated in an action to secure rights protected by the civil rights laws we enforce. Any individual alleging such harassment or intimidation may file a complaint with VHA. We would investigate such a complaint if the situation warrants.

Under the Freedom of Information Act, I am providing you with Ms. Shannon's Complainant Consent/Release Form so you may disclose related correspondence and records upon request. In the event that we receive a disclosure request, we will seek to protect, to the extent provided by law, personal information that, if released, could constitute an unwarranted invasion of privacy.

If you or your staff wishes to discuss this matter, please feel free to contact Mr. Arthur Goff, the investigator at (202) 2738907. Thank you for your cooperation.

Sincerely,

Nevin M. Weaver

Nevin M. Weaver, FACHE

Enclosure



## Department of Delaware
# DISABLED AMERICAN VETERANS
### P.O. Box 407 - Camden, DE  19934 - (302) 697-9061

October 31, 2005

Mr Arthur Goff
Department of Veterans Affairs
Veterans Health Administration
Washington, DC 20420

RE: Notice of Investigation and Request for Data
    Ms Sharon Shannon, Complainant
    Complaint No. 05-101-001

Dear Mr Goff:

This position statement is in response to your Notice of Investigation and Request for Data dated Oct 18, 2005, concerning the allegations of discrimination made by Ms Sharon Shannon, aka Sharon Allen, against the Disabled American Veterans, Department of Delaware. Ms Shannon, who is a Caucasian female, alleges that the chapter discriminated against her. She alleges that on February 12, 2004 and August 9, 2004, she was excluded from a DAV van program that provided transportation from her residence to the VA Medical Center in Wilmington Delaware. On February 12, 2004, Ms Shannon was transported to the VAMC by the Dover DAV van. Mr Ronnie Revels was the driver and she was picked up at the Magnolia Delaware Fire Department at 7:30 A.M. On August 9, 2004, Ms. Shannon was not transported no 1 because there were six veteran patients that were scheduled to ride in the van. The van used is a 1998 Ford Windstar which is a seven passenger vehicle. That means the driver and six patients. As you can see there was no room to accommodate this day. When there is a need to "bump" a patient off because of the seating veterans are given the priority. Ms Shannon is using the VA under CHAMPVA, therefore since she is not a veteran she had no seat. Ms Shannon was told by the dispatcher that the drivers would pick her up at the Magnolia Fire Department which is a designated pickup and drop off point for patients. Ms Shannon said she needed to be picked up no 2 at her home and the dispatcher told her the only patients authorized to be picked up at their residence are blind veterans and veterans who can not drive due to health reasons, neither of which applies to Ms. Shannon. Ms Shannon was last transported by the Dover DAV van on no 3 August 5, 2004, since then she has been transported by the Seaford DAV van as recently as

no 4

September 28, 2005. Ms Shannon would schedule a ride with the Dover Van and on several occasions would cancel at the last minute because she either had a ride with another organization or she did not want to ride with a certain driver. During this time we had 5 volunteer drivers who were going to resign if Ms Shannon was to be transported. On one occasion she had a veteran no 5 who was recovering from a stroke move to a different seat because she said she needed to sit in the front seat. The driver was very upset over her actions with this veteran and refused to drive her again. In order to keep the DAV Transportation Network running smoothly Ms Shannon was no 7 told that the Seaford Van would transport her.

Ms Shannon would also become verbally abusive with the dispatcher and drivers. These personnel are all volunteers and should not have to receive this kind of treatment. These actions no 9 were brought up to our State Executive Committee and it was unanimously voted by the governing body of the Department of Delaware DAV that Ms Shannon be banned from the DAV property, any department meetings or functions and the DAV state convention. She was and still no 11 is allowed to attend her unit meetings of the DAVA.

Ms Shannon has not been banned from the DAV vans statewide. She continues to use the Seaford van and therefore is not being discriminated against because of her actions when she was being transported by the Dover van.

H. Mark Wischmann
Department Commander
Disabled American Veterans

Paul V. Lardizzone
Paul V. Lardizzone
Department Adjutant
Disabled American Veterans

Page 1 These 3 pages are my
version of letter to Mr. Goff from
Mr. Paul V. Landizzone

c 1 Aug 4-04 - Gladys Bishop (dispatcher)
Scheduled me to ride on van prior
to Aug 4-04 - Ronnie Revels stopped
by my home Aug 8-04 and said "They
won't let me carry you up there any-
more." I asked who - Ronnie said
Mark + Paul. While discussing with
Gladys before Aug 3-04 Gladys
mentioned I was one of three pati-
ents going on Aug 9th 04.

NC 2 The only time I asked was April 19
04 - I was very dizzy due to a fall
in the commissary, Dover Air Base,
Dr at Kent General Hospital April
14 04 Said I couldn't drive. The
appointment April 19, 04 was for
a MRI at CNMRI in Dover. Mark
had come to pick me up in a red or gray van
that said DAV on the door. This was
not the red white + blue van that
says DAV on it. The appointment
lasted approximately thirty five min-
utes and a fifteen minutes both ways,
during the driving time I had to
listen about his, I beleive 14 yr. old
daughter being raped at 2:30 Am on
Highway 13 in Dover, De.

no. 2  After my hip Sugerg I was not allowed to drive until Drs at Baltimore UAMC said OK. So I had Started going back to UAMC in Wilmington De., and asked to be picked up at home, for a few appointments.

no. 3 — Last time I was on van from Camden was Aug 3, 04. At that time I contacted Mrs Ruth McBride in Seaford, De. 302 629 6879. I read her the letter the DAL' had sent to me, + Ruth called Paul + told him she didn't want any trouble out of any one + that she was taking me to the UAMC, also that I never gave anyone in Seaford problems on that VAN in the past.

no. 4 — I had to cancel one time because I had a lower intestinal ~~virus~~ Virus, and it was imposable for me to keep my appointment. I have never rode with any ~~oth~~ other organization then DAU when I was given the note by Margot Brennan in the UAMC on July 26th. I went to see Mrs. Cavanaugh in Vol. Ser., at that time she was trying to help me but

nothing

4. followed through. Ronnie Revels drove me every time to the VA MC with one exception aug 3-04 and her name was Maureen. Mr Revels was the only driver they had, and he was driving every Mon + Wed of every Week

5- aug 3-04 - Mr Isaiah insisted I sit in the front seat, Maureen was the driver - I had never rode with her before - this day was last ride on van from Camden. When we arrived at the UAMC I thanked her for the ride, Later I was told by
    Ronnie Revels
that Maureen had given Marget Brennan a statement about me

6 Please refer to the statement Mr. Donald Inskip wrote for me. Also Mr. Inskip was at the hearing on my behalf.

7 I was the one who contacted Mrs McBride in Seaford, DCDady in Camden helped.

8 I have never been anything but nice to drivers + Dispatchers. In the hearing the DAU could not produce anyone to say different about me + they didnt have any statements.

4.

No 9- According to the laws & by laws
the Unit in Camden does not have
the right to restrict me, it has to
come from nationals.

10- I attended the convention (state)
um June 04 and 05, and they
didn't call the Police.

11- The only reason DAV says I can
attend my Unit meetings is because
June Foldi had me ~~transfer~~
transferred to her unit, of course
the DAV (mark & Paul) didn't like
that.

12 The only reason I'm not banned from
DAV vans statewide is because of
Mrs. Ruth McBride, because she
defended me to Paul and said
I never gave them any problems
in Seaford van, and that she
would see that I ride if there
was room.

I ~~really~~ really should be ridding
on van from Camden because
alot of times Van in Seaford
is full. Also I have ~~a lot~~ a lot
of PT appointments coming up
~~after~~ after Feb 9 — 06

5

Back in 04 I talked to Mr.
Chad Moos, assit to Mr.
Ed Hartman of vol. ser. in
Washington DC. Mr Moos said I had
every right to ride the Van.

Mr Goff, aug 3 04 being the
last time on Van from Camden
Please note the letter from
Ross Groosi, P.T. Aug 4, 04.

I hope this clears some things
up - please forgive my
printing I'm very sleepy.

Thank you
Sharon Shannon

Also - If I was banned from
the van for calling Ed White
a boy how come he's never been
banned for calling me a m7wB

Between Feb 12, 04 and Aug 9 04
I had many appointments at the
UAMC and rode Van out of
Camden.



**DEPARTMENT OF VETERANS AFFAIRS**
**Veterans Health Administration**
**Washington DC 20420**

APR 19

In Reply Refer To: 10A2E

## CERTIFIED MAIL

Ms. Sharon Shannon, Complaint No. 05-101-004
239 Spring Valley
Frederica, DE 19946

Dear Ms. Shannon:

Enclosed is a copy of my final decision for the Under Secretary for Health regarding your civil rights discrimination complaint against the DAV (Disabled American Veterans) in Camden, Delaware, on the basis of your racial affiliation (White, married to a deceased African-American Marine).

VHA (Veterans Health Administration) Directive 2002-037, Nondiscrimination in Federally-Conducted and Federally-Assisted (External) Programs, is an in-house policy that prohibits discrimination in Agency programs and activities. Claims regarding benefits, entitlements, or compensation are not covered under these programs. Our primary goal is to ensure nondiscrimination and take remedial action when necessary. Therefore, if you are dissatisfied with this Decision, the process does not provide for a higher-level appeal procedure.

The investigator vigorously pursued all leads that you provided to him, and several times he extended finalizing the attached report in order to contact additional witnesses you provided, or to receive information from them. The weight of the evidence fails to support a finding that you were discriminated against due to your race (racial affiliation). None of your witnesses had first hand, convincing knowledge of the allegations that gave weight to your allegations. In addition, the DAV official was able to refute the allegations in an articulate manner.

There are no corrective actions for VHA to take in this matter. However, I am concerned that for years the issues continues to fester without having closure in the near future. I am recommending that you and DAV officials seek mediation to resolve your disagreements and foster good relations.

1:06 - CU - 522    Judge GMS.

Page 2

Ms. Sharon Shannon, Complaint No. 05-101-004

Good luck in your future endeavors.

Sincerely,

Nevin M. Weaver

Nevin M. Weaver, FACHE
Chief Management Support Officer

Enclosure

cc: ORM (08)

Mr. Goff informed me he did not
discuss this case with Virginia Taylor
a DAUA member for 3? years.
I don't beleive Mr. Goff spoke with
Gladys Bishop, either.

To my knowledge he talked to the
three defendents + Ms. Jane Foldi.

## DECISION

### I. Introduction

Ms. Sharon Shannon (Complainant hereinafter), Complaint Number 05-101-004, filed a civil rights complaint with the State of Delaware Division of Human Relations in Wilmington, Delaware, on September 24, 2004, against the DAV (Disabled American Veterans) in Camden, Delaware. The complainant alleged that on February 12, 2004, and on August 9, 2004, she was excluded from a DAV (Disabled American Veterans) van that transports her from her residence to the VA Medical Center in Wilmington, Delaware. The Complainant believed that she was excluded from the van due to her race (racial affiliation, White married to a Black deceased soldier), and this action violated her civil rights.

On March 21, 2005, the State of Delaware Division of Human Relations issued a Final Order dismissing the Complainant's case due to lack of jurisdiction.

On April 22, 2005, the Complainant filed her complaint with the U. S. Department of Justice (DOJ). On June 1, 2005, due to lack of jurisdiction, DOJ forwarded the complaint to the Department of Veterans Affairs (VA). On June 10, 2005, VA forwarded the complaint for processing to the Veterans Health Administration (VHA) EEO/Affirmative Employment Office.

VHA Directive 2002-037, Nondiscrimination in Federally-Conducted and Federally-Assisted (External) Programs, prohibits discrimination on the basis of race, color, national origin, sex, age, disability (mental and physical) and reprisal in programs that receive Federal financial assistance from VA.

38 CFR Chapter 1, Subpart A, effectuate the provisions of Title VI of the Civil Rights Act of 1964, to the end that no person in the United States shall, on the ground or race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving Federal financial assistance from VA. The DAV is a recognized national veteran organization that receives Federal financial assistance from VA.

The following report summarizes findings with respect to the allegations raised by this complaint:

## II.    Allegations

The Complainant states that she defended a Black DAV van driver which could have started the discrimination. A white patient on the van joked about dragging the black driver behind the van. The Complainant took offense to the statement and associated it with a recent similar incident that occurred in Texas which resulted in the death of a black man. The Complainant states that she was married to a black man who was killed in Vietnam and that people hold that against her. The Complainant alleges that she had a problem with a black patient on the van; he began cursing her for no reason. He allegedly called her a fucking white bitch, she finally told him, "boy, I am a good one". The Complainant states she is not welcome in the DAV building, they hang up on her when she calls, she has been denied riding on the DAV van to keep her appointments at the VA medical center in Wilmington, and she transferred her DAV auxiliary membership from a hostile unit in Camden to one more friendly in Wilmington.    The Complainant's specified allegations accepted for investigation are that:

> A. .On February 12, 2004, and on August 9, 2004, she was excluded from a DAV (Disabled American Veterans) van program that provided transportation to from her residence to the VA Medical Center in Wilmington, Delaware;

> B. On August 27, 2004, because of her alleged conduct and remarks to the dispatcher and drivers, the DAV in Camden, Delaware issued a letter to her that restricted her from their property, any meetings or functions, and the Delaware DAV Convention. Associated with this allegation is the issue of the Complainant's membership in the DAV Auxiliary.

## III.    Corrective Action Requested

The Complainant seeks the following corrective actions:

- A. Reinstatement with the DAV Auxiliary Unit 3 in Camden, Delaware.
- B. Use of the DAV facility.
- C. Use of the DAV van from Dover, Delaware.
- D. A written apology.
- E. Compensation for being humiliated.
- F. A written statement forbidding the DAV in Camden, Delaware from discriminating against a member due to the race of his/her spouse.

2

## IV.       Methodology

This investigation was conducted by a desk audit.  The complaint case file was reviewed, telephonic interviews were conducted with witnesses, and correspondence was mailed to the Responsible Agency Official and some witnesses.  In addition, the Complainant was interviewed via telephone to clarify her issues, provide additional information, or names of witnesses.  Also, completing this was extended several times in to order to permit witnesses provided by the Complainant time to respond to this investigator's inquiries.

## V.        Position of the Responsible Agency Official

The formal position of the Responsible Agency Official (RAO), the Department Adjutant, DAV, is that he denies discriminating against the Complainant.

## VI.       Findings of Fact

The facts pertaining to the allegations are set forth in the following responses:

A.  Response
In a written response to the first allegation, the RAO stated that on February 12, 2004, the Complainant was transported by the Dover DAV van to the VA Medical Center in Wilmington.  The RAO stated further that on August 9, 2004, the Complainant was not transported due to full capacity of the van; six veteran patients were scheduled to ride in the van.  Veterans receive priority for transportation over non-veterans. The Complainant is entitled to DAV van transportation as a dependant.  The Complainant was last transported by the Dover DAV van on August 5, 2004, since then she has been transported by the Seaford DAV van.  The RAO stated that the Complainant would schedule a ride with the Dover van and on several occasions would cancel at the last minute because she either had a ride with another organization or she did not want to ride with a certain driver.  The RAO stated that during this time five volunteer drivers were going to resign if they had to transport the Complainant in the Dover van, and to keep the DAV Transportation Network running smoothly, the Complainant was informed that the Seaford van would transport her.

B. Response

> In response to the second allegation, the RAO stated that the
> Complainant would become verbally abusive with the dispatcher
> and van drivers. The RAO stated that these actions were brought
> to the attention of the DAV State Executive Committee where it was
> unanimously voted by the governing body of the Department of
> Delaware DAV that the Complainant be banned from the DAV
> property, any department meetings or functions, and from the DAV
> state convention. The RAO stated that the DAV was not involved
> with the Complainant's transfer from the DAV auxiliary in Camden,
> Delaware, her original unit. The Complainant voluntarily transferred
> to a unit she considered less hostile. Therefore, the decision to
> take the Complainant back lies with the Camden DAV auxiliary.
> The Complainant still attends meetings of the DAV auxiliary in
> Wilmington, Delaware which is an hour and a half drive by car.

## VII.    Analysis and Recommended Determination

The Complainant is entitled to use the DAV van as a dependent under
CHAMPVA; the DAV did not eliminate her from the van program. To "keep the
transportation network running smoothly", DAV transferred the Complainant from
the Dover van to the Seaford van. The Complainant continues to utilize her van
entitlement even though it may not be the van of her choice. DAV alleges that
the Complainant wanted to be picked up at her residence instead of a designated
pickup and drop off point, and she wanted to sit in the front seat. The
Complainant stated that she only requested being picked up at her residence
during the time she was recuperating from hip surgery, and requested the front
seat because it was difficult getting to a rear seat due to her surgery. This was
verified by one of the Complainant's witnesses.

Another witness for the Complainant stated that she overheard a conversation
at the DAV building when the RAO stated that it was awful that the Complainant
was married to a black man, and they were not going to have anything to do with
her. This witness also stated that the RAO stated that the Complainant should
not be allowed to ride on the van to the medical center because she remarried
after her husband died in Vietnam, he was black, and that she was not a veteran.
Less weight is given to this witness's testimony than to the RAO's testimony
because the Complainant was not dropped from the van program.

DAV stated that it has no authority over auxiliary units; membership is
determined by each local unit. The RAO stated that the Complainant voluntarily
transferred from the DAV Auxiliary Unit 1 in Camden, to DAV Auxiliary Unit 3 in
Wilmington. Wilmington is about an hour and a half from the Complainant's
home.

4

The results of this desk audit reveal no basis for a finding that the Complainant was discriminated against on the basis of her racial affiliation (white, married to a deceased African-American Marine). Based on the investigation, interviews with the Complainant and the RAO, and witnesses, a determination of "no violation" is made with respect to the allegations raised.

The Complainant provided no witnesses to support a finding that the RAO's actions were motivated by racial bias. Accordingly, the weight of the evidence fails to support a finding that Complainant was discriminated against due to her race. None of the witnesses had first hand knowledge of the allegations that gave weight to the Complainant's allegations. The witnesses who cooperated with this investigation were only able to provide hearsay information which they received from the Complainant or from DAV members. Interviews were conducted with the Complainant's friends or associates, employees of the VA medical center, the Complainant's former attorney, and staff of the State of Delaware Office of Human Relations. Some witnesses did not want to be involved with the investigation and refused to cooperate, some hesitantly cooperated, and others wished the matter would go away. Others stated that they did not care that the Complainant was previously married to an African-American, that they would not have known it had she not talked about it.

## VIII. Proposed Corrective Action/Remedial Action

The results of this investigation reveal no basis for a finding of violation and thus no reason to propose any corrective or remedial action. After several hours of hearings, on March 21, 2005, due to a lack of jurisdiction, the State of Delaware Division of Human Relations (DHR) dismissed the Complainant's case regarding these same issues. The observations made by DHR at that time remained just as relevant during this investigation. DHR observed, "The Commission panel members must also note for the record that they were disturbed at some of the hearing evidence, presented over several hours. Some of the attitudes and comments made by the parties and witnesses showed a distressingly immature approach to maintaining good relations with others." We too echo this observation regarding the relationship between a VA dependent and a service organization.

# aclu delaware

April 12, 2006

Ms. Sharon Shannon
239 Spring Valley
Frederica, DE 19945

Dear Ms. Shannon:

The ACLU of Delaware has received your request for assistance. I regret to inform you that we are unable to offer you legal assistance in this matter. Our decision is not a judgment on the legal merits of your case; rather, it is a realistic judgment based on our limited staff and resources.

The ACLU is not a general legal services clinic. We are a private, non-profit organization with limited resources; therefore, we must be very selective in choosing our cases. We generally handle cases that deal with issues of constitutional law, seeking to advance and preserve basic rights and principles spelled out in the state and federal constitutions. Even among those types of cases, we can take only a small percentage of the many meritorious complaints that we receive.

Please understand that our inability to represent you is not a judgment on the merits of your case. We simply do not have the resources to assist you. Another agency or attorney might be in a better position to assist you. We suggest you contact the Legal Help Link for an appropriate referral, at 302-478-8850. In Kent and Sussex Counties, the number is 1-800-773-0606.

We are sorry that we cannot be of assistance to you, and we hope that you will be able to resolve this matter satisfactorily. Thank you for contacting the ACLU.

Sincerely,

Diane Winters
Intake Representative
ACLU Delaware

# aclu delaware

May 8, 2006

Ms. Sharon Shannon
239 Spring Valley
Frederica, DE 19945

Dear Ms. Shannon:

Please be assured that all copies that you faxed to this office regarding your case were returned to you. As a matter of office practice, a copy of the decision after hearing and the amended complaint were retained for our files so that we could maintain a record that you had contacted us. Your information will not be used for any other purpose. Our office opens a file for each individual who seeks our assistance whether we are able to assist them or not.

As promised, I enclose a copy of our "How to File a Complaint with the ACLU of Delaware" form for your reference.

Thank you for contacting the ACLU of Delaware.

Sincerely,

Julia Graff
Staff Attorney
ACLU of Delaware

Disab.ed American Veterans
Department of Delaware

*Please notice when I was given this note on July 26-04 - July 10 04 had already passed*

**MARGOT BRENNAN**
Hospital Service Coordinator

VA Medical & Regional
Office Center
1601 Kirkwood Hwy.
Wilmington, DE 19805

1-800-461-8262
Ext. 5414
302-633-5414

*Mr White had appointments on these 2 dates. And and also . Mr. White had an appointment on the 10th of every month.*

To : Sharon Shannon

m : Margot Brennan

ect: Availability

*There are two days to that importation is unavailable :*

*Wednesday 28 July 2004 and*

*Tuesday 10 July 2004 ss-Notice.*

*Please make a note of this your records as you may need change appointment dates & times.*

1:06-CV-522 Judge GMS

## DISABLED **AMERICAN** VETERANS

## VOLUNTEER SERVICES VOUCHER

DATE: 8 / 9 / 04          # HOURS: 9

RONNIE REVEL
VOLUNTEER NAME                    SOCIAL SECURITY #

_____          _____
TELEPHONE NUMBER                 VETERAN TRANSPORTED

_____          _____
VOLUNTEER'S ORGANIZATION         SERVICE PERFORMED

SERVICE BEGAN AT _____ ENDED AT _____

BEGAN/END ADDRESS: _____

This voucher may authorize the herin named individual performing the said services to the V.A. volunteer liability coverage as per FTCA, 28 USC, SEC. 2671-2680

Upon receipt of this reinbursement the payee agrees not to accept payment or donations for service from any other organization or individual.

_____ x 0.12 = $ _____   $ _____
MILEAGE                                        TOLLS

_____          _____
AUTHORIZED BY                    RECEIVED BY

COMMENTS:

SHARON SHANNON
239 Spring Valley
FREDERICA, De 19946
9:00AM - PT                    SSN: 9447
Pickup @ Magnolia Firehouse

Gladys Bishop 302 734 1684
gave me this paper Sunday
8-8-04 this is the date
Sunday I was refused any
more rides on van out of Camden.



## DISABLED AMERICAN VETERANS
Building Better Lives for America's Disabled Veterans

# The DAV Transportation Network

Travel benefit cuts left many vets with no way to get to Department of Veterans Affairs (VA) medical facilities for needed treatment. They're men and women who answered our country's call in times of war. Many lost limbs, sight, hearing, or good health. They may live a great distance from a VA hospital. And so many exist on small fixed incomes, finding the cost of transportation to a VA hospital is just too high. They're left with two choices. They could go without the treatment they need, or skimp on food or other necessities to pay for transportation.

Vet's disabled in our nation's service should never face such dire options. So DAV and Auxiliary volunteers responded, driving vets to and from VA hospitals and clinics. Other grateful Americans are helping too. It's all part of the DAV Transportation Network, administered by DAV Hospital Service Coordinators (HSCs) at the VA's 172 medical centers. The DAV has also donated vans, where needed, to make the program work.

### All DAV van drivers are volunteers and do not receive payment for the services they provide.

The following Rules and Regulations have been established by the VA and DAV National Headquarters - **Not by the volunteer drivers**.

- The DAV van driver is not to lift or attend medically to any patient
- The DAV van driver is only permitted to stop the van for rest stops and/or emergencies and to pickup and discharge passengers. Passengers should not request the driver to make side trips to take care of their personal business.
- Passengers are not permitted to smoke, chew tobacco, drink alcohol, use foul language or bring weapons, drugs, or any illegal substance on the van. Further, the van driver may not provide transportation to any veteran who is intoxicated, abusive or poses a threat to the driver or other passengers on the van.
- Passengers should not engage in any activity that will distract the drivers attention.
- Passengers should wear seat belts at all times. Any passenger refusing to buckle-up will be denied transportation on the van.
- All trash must be placed in the proper trash receptacle
- Individuals other than the veteran will be permitted to ride in the van with the veteran in only two cases. Any exceptions to this policy must be authorized by the patients attending physician:
    1. a veteran's spouse who has a "Spouse Permission to Travel" slip from the patients doctor, or
    2. a caregiver who is authorized by the VA to provide the veteran with "Aid and Attendance"
- Patients being discharged or granted passes may be transported on a DAV van during the van's trip back to its home city only if space is available. The patient must be ready to leave when the van departs the VA Medical Center.
- Patients should be dressed and ready to leave for the hospital at the time specified.

1:06-CV-522

Judge G.M.S.

DISABLED AMERICAN VETERANS AUXILIARY    008073753D    060215    2070031

3725 Alexandria Pike • Cold Spring, Kentucky 41076
(859) 441-7300 • www.dav.org

KEEP THIS RECEIPT PORTION FOR YOUR RECORDS

**ANNUAL MEMBER DUES REMINDER**

| | |
|---|---|
| Membership Code | 07003807375 3 |
| Member Name | Sharon M Shannon |
| Membership Year | 2006-2007 |
| Statement Date | 02/23/2006 |
| Pay This Amount | $10.00 |
| Request Number | 1 |

I..IIII..I.I..I..I..I..I..II...I..II..II.I...III
*********AUTO**MIXED AADC 450
2  134  32375
Sharon M Shannon 07003807375 3
239 Spring Valley
Frederica, DE  19946-9702

*Start your Life Membership with a $40 down payment now and save!*

<u>Life Rates effective July 1, 2005</u>

Age 71 or older - $140
Age 61 - 70 - $180
Age 46 - 60 - $200
Age 31 - 45 - $230
Age 18 - 30 - $250

FORT SILL NATIONAL BANK
FORT SILL, OKLAHOMA 73503
(800) 749-4683

**PROOF OF PURCHASE**
NO REFUND OR REISSUE
WITHOUT THIS COPY

SAVE THIS COPY
FOR YOUR RECORDS

**NOT NEGOTIABLE  136959**

The customer procuring the Personal Money Order form, corresponding in number and amount to that shown thereon, agrees to inset thereon in ink, the date, payee, his signature and address and assumes responsibility for all events made possible by his failure to do so.

DATE: 4/13/05

REMITTER: SHARON SHANNON

TO:

| BRANCH: | 2003 |
| ORIGINATOR: | SALITTLE |
| TIME: | 11:37:53 |
| CK AMT: | $10.00 |
| FEE AMT: | $.00 |
| TOTAL: | $10.00 |

**MONEY ORDER**



**DISABLED AMERICAN VETERANS AUXILARY**
3725 Alexandria Pike • Cold Spring, Kentucky 41076
(859) 441-7300 • www.dav.org

0060737530      0500210      2070031

**ANNUAL MEMBER DUES REMINDER**

KEEP THIS RECEIPT PORTION FOR YOUR RECORDS

| | |
|---|---|
| Membership Code | 070038073753 |
| Member Name | Sharon M A len |
| Membership Year | 2005-2006 |
| Statement Date | 03/31/2005 |
| Pay This Amount | $10.00 |
| Request Number | 1 |

**************AUTO**3-DIGIT 197
1 18 4468
Sharon M Allen 070038073753 Sharon M
239 Spring Valley                    Shannon
Frederica, DE 19946-9702

*Start your Life Membership with a $25 down payment now and save!*

| Life Rates through June 30, 2005 | Life Rates effective July 1, 2005 |
|---|---|
| Age 71 or older - $75 | Age 71 or older - $140 |
| Age 61 - 70 - $100 | Age 51 - 70 - $180 |
| Age 41 - 60 - $125 | Age 46 - 60 - $200 |
| Age 18 - 40 - $150 | Age 31 - 45 - $230 |
| | Age 18 - 30 - $250 |

Page 1

This statement is prepared
to the best of my knowledge
of the statement I have writt-
en for Bonnie Reaves.
Feb 12-04 - coming back from
VA Medical Center in DAV Van -
Bay Stanfield (patient) mentioned
he would have room to take some
riders to convention in Atlantic
City New Jersey. Bonnie Reaves
our volunteer driver replied
he would like to catch a ride.
Bay said yea Ronnie, I'll
tie you up to my bumper &
drag you there.
So I said, What did you say?
Bay said Ronnie knows when
I'm kidding, Ronnie replied
no I don't.
So I added, that really
happened to a man in Texas
and he died & there are

2

supposed to be two or three
white men doing time for
that hate crime.

In Continuing
I was told nobody bel-
ieved me until Paul
questioned other patients
in the van.   Ronnie told me.
The next thing I know I
was told I would receive
a letter of appoligy.
When I did I wrote re-
fused on it and returned
it by mail to bldg in
Camden.

this letter was for incident
with Mr. Ray Stanfield.
This is what I gave to Mr.
Ron Bevels.

Sharon Shannon

# Surgical Information

Apr 23, 2004

| | |
|---|---|
| DATE OF SURGERY: | 04/15/2004 |
| WARD NO: | |
| CASE NO: | 257012 |
| | |
| ATTENDING PHYSICIAN: | STERLING, ROBERT |
| ASSISTANT: | NGU, BONAVENTURE |
| FIRST ASSISTANT: | |
| SERVICE: | |

SURGEON'S SIG:                                          APR 23, 2004 13:29
SHANNON, SHARON M                                       AGE: 61    ID#:
WARD: LR 2PM&R                                           ROOM-BED: 2-C18A-X9276
VAMC: BALTIMORE MD VAMC                                 REPLACEMENT FORM 516

---

MEDICAL RECORD                              OPERATION REPORT        PAGE 2

---

J-206193

SURGEON: Dr. Robert Sterling.

PREOPERATIVE DIAGNOSIS: Left hip degenerative joint disease.

POSTOPERATIVE DIAGNOSIS: Left hip degenerative joint disease.

PROCEDURE PERFORMED: Left total hip arthroplasty.

COMPONENT IMPLANTS: DePuy Tri-Lock, standard 10 mm stem, a +1.5 28 mm
head ball, a 60 mm acetabular shell, a neutral Marathon liner, and three
screws.

ESTIMATED BLOOD LOSS: 250 cc.

FLUID GIVEN: 11 cc of Hespan, 3000 cc of lactated Ringer's and two units
packed red blood cells.

URINE OUTPUT: 480 cc.

ANESTHESIA: General endotracheal.

INDICATIONS: The patient is a 20-year-old woman with progressively
worsening left knee pain that is no longer responsive to nonoperative

---

| PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| SHANNON, SHARON | |
| 239 SPRING VALLEY | |
| FREDERICA, DELAWARE    19946 | Printed at BALTIMORE MD VAMC |

1:06

APPOINTMENTS FOR: SHANNON,SHARON M      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 PRINTED: 7/26/2004@10:22

Jul 26, 2004  9:00 AM (30 MINUTES)  PT CLINIC (A)

Jul 28, 2004  9:00 AM (30 MINUTES)  PT CLINIC (A)

Aug 03, 2004  9:00 AM (30 MINUTES)  PT CLINIC (A)

Aug 05, 2004  9:00 AM (30 MINUTES)  PT CLINIC (A)

Oct 22, 2004  9:40 AM (20 MINUTES)  PRIM CARE NAIRN

*some of these and few more*

*Hip replacement april 15, 04*

*Baltimore VA Hospital*

APPOINTMENTS FOR: SHANNON,SHARON M        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 PRINTED: 8/9/2004@09:22

Aug 09, 2004  8:30 AM (30 MINUTES)  PT CLINIC (A)

Aug 16, 2004  8:30 AM (30 MINUTES)  PT CLINIC (A)

Aug 18, 2004  8:30 AM (30 MINUTES)  PT CLINIC (A)

Aug 23, 2004  8:30 AM (30 MINUTES)  PT CLINIC (A)

Aug 25, 2004  8:30 AM (30 MINUTES)  PT CLINIC (A)

Aug 30, 2004  8:30 AM (30 MINUTES)  PT CLINIC (A)

Sep 01, 2004  8:30 AM (30 MINUTES)  PT CLINIC (A)

Oct 22, 2004  9:40 AM (20 MINUTES)  PRIM CARE NAIRN

*I had to miss some of these appointments because of being restricted from the DAV Van.*

**DEPARTMENT OF VETERANS AFFAIRS**
**Medical and Regional Office Center**
**1601 Kirkwood Highway**
**Wilmington DE 19805**

This statement was Faxed to Camden stud. building after I hurt myself trying to get in van aug 3. o 8-04-04 leaurng the VAMC.

In Reply Refer To:

To Whom it may concern:

Please allow Ms. Sharon Shannon access to the front seat of the vehicle for her trips to the Wilmington VA Hospital.

This is necessary because of her recent hip surgery and possible injuries that could result from pathological motion and positions with attempts to access more remote seating in the vehicle.

Thank you for your consideration.

Ross Grossi, PT
994-2511  x4024

This Statement was
Written by Mr. Donald Inskip

actually happened Aug 3 04
on Van 18

OCT 1 2004

I AM WRITING THIS
STATEMENT AS TO WHAT
TRANSPIRED ON THE
DAV BUS THAT WAS TRANSPOTING
SHARON MYSELF + ISRIA
TO THE WILMINGTON VA
FOR OUR DR'S APPOINTMENTS
SHARON AND I WERE
WAITING FOR THE BUS AT THE
MAGDOLIA FIRE HOUSE.
WHEN THE BUS ARRIVED
ISAIA WAS IN THE FRONT
SEAT. WHEN SHARON AND
MYSELF WENT TO BOARD THE
BUS ISAIA INSITED THAT
SHARON SIT IN THE FRONT
SEAT AND HE WOULD RIDE
WITH ME IN THE BACK
WHEN WE WERE DONE
WE WERE WAITING FOR THE
BUS DRIVER TO BRING THE

1:06-CU- 522 Sudge G.M.S.

BUS AROUND FOR THE
RETURN TRIP. WHEN
SHE PULLED UP THERE WAS
ANOTHER WOMAN IN THE
FRONT SEAT WHOM WORKED
IN SOME CAPACITY FOR THE
VA. AS SHARON WAS GETTING
READY TO GET ON THE BUS
IN THE FRONT SEAT THE LADY
WAS VERY BELIGERAT AND
TOLD SHARON THAT SHE
HAD RUN THE SHOW LONG
ENOUGH AND THAT SHE
WAS NOT IN CHARGE AT
THAT SHE (THE WOMAN) WAS
AND THAT THERE WAS
NOTHING WRONG WITH HER
AND THAT SHE WAS TO
RIDE IN THE BACK AND
THAT ISAIA WAS TO RIDE
IN THE FRONT. SHARON
HAD AN EXTREMLY HARD

3

GETTING IN THE BACK OF
THE BUS DUE TO HER
RECENT SURGY. THE
WOMAN KEPT INSISTING
THERE WAS NOTHING WRONG
WITH SHARON. I KNOW
THAT SHARON HURT HERSELF
GETTING IN THE BACK.
SHARON AT NO
TIME INSISTED SHE
RIDE IN THE FRONT SEAT.
MR ISAIA GAVE HER HIS
SEAT OF HIS OWN CHOICE
THE BUS DRIVER NOT
ONLY GOT LOST BUT
RAN A STOP SIGN ON THE
AIRBASE. WE ALL HAD TO
INFORM HER HOW TO GET
BACK TO THE FIRE HALL.
I HOPE THIS WILL CLEARLY
THE SITUATION
DONALD HINSKIP

302 335 1599   for Mr. Inskip

p.p.
Vpof I
These are my notes —
I'm not sure if you already
have them. Sharon Shannon
5-26-05
Feb 11-04 — DAV Van to VA Hosp
in Elsmere, incident w/ Ed White,
(patient) Feb 12 04 — incident with
Ray Stanfield (patient/driver) +
Jon Bevels returning from VA
Hospital.
Margot Brennan (in DAV office in
VA Hosp) started calling me saying
I had to apologize to Ed White. I
I said never, and probably ten
conversations the next few months
about this issue, I still still
said no.
I believe in March, possibly
late February I gave a statement
to Ron Ravels about incident on the
Van with Ray Stanfield, for the
NAACP — ACLU — possibly to Nation
als & Mr. Jim Wyatt, I also made
phone calls on his behalf to all
listed above. I presented this
issue in our prayer meeting
at Second Baptist Church, I

IV

with Pastor Bagley (present.
June 25th comments being made
about me being married to a black
deceased Veteran, Camden bldg.
July 19th margot Brennon said
office in VA Hosp - that I have to
apologize to Ed White & that I had
to sit in the back of Van. I said
no as I was leaving her office, &
June Fieldi was in hallway & heard
me say, I'm 62 years old, you
and no body else tells me
what to do.
July 23rd margot called me again
& said I have to do this, I
still said no, & she said do this
as a Christian, I still said no.
July 26th margot gave me a note.
During convention (after July 31st to 8
I started receiving many phone
calls from Gregg Bishop
(dispatcher) in Camden bldg. about

Aug 3 - The last time I rode van from Camden. If the DAV is complaining about my conduct on the van, why not exclude me from the van only and not the DAV building, convention etc. I think the van was a good excuse. I was not on Camden van Aug 9 - 04

Gladys gave me her home phone number 734/684 - plus cell - but don't call after 10:00PM. Margot cell 3997777

Mark & Paul, Gladys stated they didn't like like the way she was doing the job, she was going to put me on the van. Mark & Paul said no. Gladys said she told Mark & Paul if you don't like the way I'm doing this job get someone else to do this M & job. According to Mark & Paul I was not to be on the van with Ron Revels. Gladys has told me that Mark called me Niggie Lover.

Aug 3 - Mark & Paul away at convention Gladys put me on the van - drove Maureen to be picked up Magnolia Fire Dept. When the van arrived I went to get on & was told by Isaiah sitting in front seat to come up there, I asked Isaiah are you sure, because you got long legs, he said yes - so I escaped & thanked him. Upon arriving

the white van was called when he called me & admitted the B word . . . during hearing . . . S . . .

#

W

to VA Hosp - I told Maureen
thank you for the ride, When
getting ready to leave I was
standing in the back ground
while Don & Isaiah were
closer to the Van as it
arrived, Margot jumped out of van
& told me you have run this
show long enough, you are rid
ding in the back, I replied
I can't because of my hip.
Margot took Isaiah by the
hand & arm and said said come
on Isaiah you are ridding in
the front, you are more dis
abled then she is.
I tried to get in on passenger
side back - Margat said go
to other side, I hurt myself
trying to get in.
Maureen didn't even off Rt 1
to the right place - so she

JB

✓

erased
up on Air Base Housing, she
ran a stop sign & I said
it to her right away — she
never acknowledged my comment.
She was driving a few more
blocks — she asked a man
working for directions, he
told her to go back north —
finally I asked her are you
trying to get to Magnolia Fire
Dept; she yes — I said
go back out the gate & exit
south and Isaiah & Don
agreed. Ariving @ the Fire House
I asked Don if he would like
a ride home, he replied
yes. go to page 6 — last
paragraph
After I got home I called
Janet Robbins A team nurse),
told her what happened — she
said put cold pack & take
mussel relaxer & lay down



If I went to hosp I would put more stress on my hip I was hurting for about a week & a half.
Aug 4 - letter was faxed to DAV for Gladys & from PT @ VA Hosp -
Gladys said she made 3 Coppies
Aug 5 - I called bldg for Gladys Mark answered, he just hung up.

Before Mark & Paul get back -
Gladys - told me I would be good to go for appt on Aug 9 + 11 because Ed White's appt was Aug 10

VII

Aug 6 — Virginia Taylor and I went
to see Tony Davila AM @ Veterans Affairs
Dover — we had a nice talk. Tony said
he would talk to Paul that afternoon.
When we left VA bldg - we drove
to the bldg in Camden, just went &
turned around, when we drove in
the parking lot Mark & Gladys
had gone inside, Virginia went
to all three doors they were locked.
at the north end of the bldg Virginia
talked through the window to Mark
he said I don't want anything to do
with her & I don't want to talk
to her. I heard Virginia reply I
didn't know that. I came by the
bldg to get my personal medical
letter that had been faxed.
Aug 8 or 9 — called Paul @ home
on a three way call — blocking the
number — I said Paul this is
Sharon Shannon — he hung up.

VIII

Gladys met me @ the bldg in
Camden Aug 8 Sunday afternoon
and gave me my papers but I
know she kept the original from
VA Hosp.

Aug 8 - Bonnie stopped by to tell
me they say I can't carry you or up
there any more, also to say Mauser
wrote a statement that I asked
Isaiah to give up his seat Aug 30th,
I'm not sure of the date but I contact-
ed Ruth McBride in Seaford, after
I received letter Sept 3 - from
Mark & Paul. I read the letter
to Ruth. Ruth said she called
Paul; and said she didn't want
any problems from anyone up
there because she was bringing
SS up to Elsmere, She also told
me she had said I don't want
to know whats going on up there
but SS has never given me any or us
any problems in the past.

IX

the drivers from Seaford were taking me, every thing was fine, last therphy date was Sept 22-04

Ruth told me that Margot had asked to ride back 9-22-04 & that she said no because she didn't want any friction

Because of all these issues I have missed alot of appointments for therphy & really need these because of total hip replacement @ Beebe W.P.

A statement from Ruth Mc Bride, I haven't received yet. Mrs. Gull Mc Bride is 4th in district commander in the State American

I Sharon Shannon want this
transcript filed in case 1:06
cv-522 – Division of Human Relations
Dec. 2-04–

Sharon Shannon

2007 MAY 16  PM 3: 37
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

I Sharon Shannon want
these documents filed in
case 1:06 - CV - 522 GMS.

Sharon Shannon

I will send these copies to
Mr. Fletcher Jr.

Schmittinger Rodriquez

scanned
2007 MAY 16 PM 3:3
DISTRICT OF DELAWARE
U.S. DISTRICT COURT



*Mary C. Zajaczkowski*

805 W. 13th Street
New Castle, Delaware  19720

Federal I.D. 52-2033496

**TO:**       **Sharon Shannon**

**DATE:**     **July 11, 2006**

| | |
|---|---|
| **Petitioner:** | Sharon Shannon |
| **Respondent:** | Paul Lardizzone; H. Mark Wischmann, Dorothy Kashner |
| **IAB#:** | K-PA-630-04 |
| **Date of Hearing:** | 12/2/04 |

**Number of pages:**    142 pages at $4.00/page      $568.00

**TOTAL**                            **$568.00**

**THANK YOU**

_____
                    **Mary C. Zajaczkowski**

## THE STATE HUMAN RELATIONS COMMISSION
## OF THE STATE OF DELAWARE

SHARON SHANNON         )

                                )     Complaint # K-PA-630-04

       VS.                )

                                )

PAUL V. LARDIZZONE     )     Hearing:     12/2/2004

H. MARK WISCHMANN    )

DOROTHY KASHNER      )


State Human Relations Commission
Dover, Delaware

BEFORE:           COMMISSIONER MARIAM HARRIS, Hearing Officer
                     COMMISSIONER WALLACE DICKSON
                     COMMISSIONER GAIL LAUNAY
                     SHARESE McGHEE, Human Relations Repr.
                     FREDERICK SCHRANCK, Deputy Attorney General

APPEARANCES:      MR. KESTER CROSSE, Esq. for Complainant
                     MR. KEVIN HOWARD, for Respondents

                     SHARON SHANNON, Claimant

Witnesses:          Ronald Redels
                     Donald Inskip
                     Ms. McBride
                     Ms. Foldi
                     Mr. White
                     Dorothy Kashner
                     Paul Lardizzone
                     H. Mark Wischmann

TRANSCRIPT OF HEARING

Sharon Shannon vs. Paul V. Lardizzone, H. Mark Wischmann, Dorothy Kashner
Hearing No.:  K-PA-630-04

## CONTENTS

FIRST REPORT OF INCIDENT: 10/26/04

COMPLAINT: RACE DISCRIMINATION

DATE OF HEARING:  12/2/2004

AWARD

APPEAL

DEPOSITION(S)

EXHIBIT(S)

1.    Petitioner's Exhibit #1 (Notice to Ms. Shannon 8/27)
2.    Respondent's Exhibit #1 (Written Statement by Mr. White concerning events)
3.    Petitioner's Exhibit #2 (Document dated 4/4 from physical therapist re: Sharon Shannon)

# INDEX

Page No.

Direct Exam of Ronald Redels – Mr. Crosse .......................................................... 1

Cross Exam of Ronald Redels – Mr. Howard ........................................................ 6

Redirect Exam of Ronald Redels – Mr. Crosse ................................................... 12

Recross Exam of Ronald Redels – Mr. Howard .................................................. 13

Redirect Exam of Ronald Redels – Mr. Crosse ................................................... 14

Recross Exam of Ronald Redels – Mr. Howard .................................................. 15

Direct Exam of Mr. Inskip – Mr. Crosse .............................................................. 18

Cross Exam of Mr. Inskip – Mr. Howard .............................................................. 23

Direct Exam of Ms. McBride – Mr. Crosse........................................................... 23

Direct Exam of Ms. Foldi – Mr. Crosse ............................................................... 25

Cross Exam of Ms. Foldi – Mr. Howard ............................................................... 29

Redirect Exam of Ms. Foldi – Mr. Crosse ........................................................... 32

Recross Exam of Ms. Foldi – Mr. Howard ........................................................... 33

Direct Exam of Mr. White – Mr. Howard .............................................................. 34

Respondent's Exhibit #1
    Written Statement by Mr. White ...................................................................... 41

Cross Exam of Mr. White – Mr. Crosse ............................................................... 41

Direct Exam of Ms. Kashner – Mr. Howard.......................................................... 47

Cross Examof Ms. Kashner – Mr. Crosse............................................................ 52

Direct Exam of Mr. Lardizzone – Mr. Howard ..................................................... 55

Cross Exam of Mr. Lardizzone – Mr. Crosse ...................................................... 64

Redirect Exam of Mr. Lardizzone – Mr. Howard ................................................. 62

Recross Exam of Mr. Lardizzone – Mr. Crosse ................................................... 95

Direct Exam of Mr. Wischmann – Mr. Howard .................................................. 111

Cross Exam of Mr. Wischmann – Mr. Crosse .................................................... 121

Petitioner's Exhibit #2
    Document dated 4/4 from physical therapist re: Sharon Shannon ............... 125

THE STATE HUMAN RELATIONS COMMISSION

OF THE STATE OF DELAWARE


Dover, Delaware



TO THE HONORABLE JUDGES OF THE SUPERIOR COURT IN

AND FOR KENT COUNTY, STATE OF DELAWARE, I

hereby certify that this is a true and correct copy of the record in

the case of Sharon Shannon vs. Paul V. Lardizzone, H. Mark

Wischmann, Dorothy Kashner.


DELAWARE DEPARTMENT OF
HUMAN RELATIONS
STATE OF DELAWARE


By _____
                    ADMINISTRATOR



DATE: _____

*I was first — then Virginia*

1

| | |
|---|---|
| 1 | MR. CROSSE: Mr. Redels, state your name |
| 2 | again for us please sir. |
| 3 | MR. REDELS: My name is Ronald Edward |
| 4 | Redels. |
| 5 | MR. CROSSE: And where do you live sir? |
| 6 | MR. REDELS: 149 Magnolia, Delaware. |
| 7 | MR. CROSSE: And how long have you lived in |
| 8 | this area? |
| 9 | MR. REDELS: Going on about 6 years, 6 or 7 |
| 10 | years. |
| 11 | MR. CROSSE: Are you a member of the |
| 12 | Disabled American Veterans? |
| 13 | MR. REDELS: I've been a member since I was, I |
| 14 | mean '97. |
| 15 | MR. CROSSE: And you are a member because |
| 16 | you were injured in the army? |
| 17 | MR. REDELS: Yes sir. Dessert Storm, '91. |
| 18 | MR. CROSSE: And do you know Ms. Shannon? |
| 19 | MR. REDELS: Yes I do. |
| 20 | MR. CROSSE: Is it also true that you volunteer |
| 21 | at the DAV? |

2

1        MR. REDELS:              Yes I do.

2        MR. CROSSE:              And does your volunteering work

3    involve driving the van?

4        MR. REDELS:              Yes it is.

5        MR. CROSSE:              And have you ever driven Ms.

6    Shannon from I guess Camden, Dover to Elsmere.

7        MR. REDELS:              Yes I have.

8        MR. CROSSE:              Were you present at the matter

9    that she described where there was a problem with Mr. White?

10       MR. REDELS:              Yes I was.

11       MR. CROSSE:              How much of that confrontation

12   did you see and could you tell us what you heard and what happened?

13       MR. REDELS:              Well, I carried her up to

14   Wilmington, it was me and her. And when she pulled the [inaudible] I pulled the

15   van around and Ms. Allen come out. I told her to go ahead and get in the van

16   and I would be right back, you know, so I went inside and I didn't, I didn't know

17   Mr. White, I mean, you know, I didn't know him before then. And I saw Mr.

18   White in the hallway, and he said well, I'm, are you the driver from Dover? And I

19   said yes. He said he wanted to catch a ride back to Dover because he used to

20   [inaudible] I told him okay, you can go ahead outside and I'll be out in a minute,

21   and so I went, I done something, I think I went to the bathroom or something and

3

1     then when I come back he was in the van, I mean, Mr. White was in the van,

2     and Sharon Allen was in the van.  And so I got in the van and buckled

3     everybody up, and you know, Mr. White was cursing her out you know and

4     calling her bitches and all of that.  And so that, so I didn't say nothing, you know,

5     so Sharon Allen said she wanted to go get some donuts, you know, so I said I'll

6     ride you up to get some donuts.  So I carried her to get some donuts and she

7     got out and like I said about five or ten minutes later she come back and there

8     was nothing else said the whole ride to Dover.  And that was it.

9            MR. CROSSE:              Did   you   hear   her   use   any

10    profanity to Mr. White?

11           MR. REDELS:              She called him a boy.

12           MR. CROSSE:              I see.  So you consider that a

13    profanity?

14           MR. REDELS:              I  don't  know.   I  didn't  thought

15    nothing of it, a boy, you know.

16           MR. CROSSE:              She didn't use any curse words.

17           MR. REDELS:              Not as I heard of.

18           MR. CROSSE:              How often have you driven her?

19           MR. REDELS:              Many times.

20           MR. CROSSE:              Had  she  ever  been  abusive  to

21    you as a driver?

1        MR. REDELS:                    No not really because I try to get

2    along with everybody.  I mean I treat it like you know you respect me and I'll

3    respect you.  That is the way I am, I mean I don't you know curse them out or

4    misuse them or mistreat them.  So I don't have no problems.  I try to treat

5    everybody fair.

6        MR. CROSSE:                    Now I believe in some of the

7    minutes they indicate that she may have been abusive to dispatchers.  Have you

8    ever seen or heard of her abusing a dispatcher?

9        MR. REDELS:                    I don't know, I don't work in that

10   department.

11       MR. CROSSE:                    Now sir, have you heard any

12   conversations regarding the race of her former husband?

13       MR. REDELS:                    What do you mean by that?

14       MR. CROSSE:                    Any  persons  in  the  chapter

15   speaking about the fact that she was married to an African American.

16       MR. REDELS:                    I guess a lot, I guess she told

17   them, a lot of people know that she was married to a black because I guess she

18   told you know that she was married to a black man.

19       MR. CROSSE:                    So    you    have    heard

20   conversations.

5

1        MR. REDELS:                    Yes, that she was married to a

2     black.

3        MR. CROSSE:                    And did she ever tell you she was

4     married to a ...

5        MR. REDELS:                    Yes.

6        MR. CROSSE:                    Have    you    ever    heard    a

7     conversation similar to what was related by Ms. Taylor?

8        MR. REDELS:                    Well I don't know nothing about it

9     because we got two sections, the women got their section back there and we

10    got our section up here, we don't, you know, we all don't sit in the same you

11    know, know what they do, what we do what we do.

12       MR. CROSSE:                    Just one second.   Have you Mr.

13    Rebel, did anyone ever tell you that you couldn't drive Ms. Shannon to the VA

14    hospital?

15       MR. REDELS:                    Yes, they told me that I couldn't

16    drive her no more.

17       MR. CROSSE:                    And when was that?

18       MR. REDELS:                    I don't know, I guess after we

19    come back from the convention, I think Mark told me that we couldn't carry her

20    no more.

1    MR. CROSSE:                Did they give you a reason for

2    why she couldn't be carried anymore?

3    MR. REDELS:                They said up there to the

4    convention that Dover van couldn't carry her no more.  You know I didn't

5    question them and I told her because she asked me.  I said well he said I can't

6    carry you no more.  And I just let it go.

7    MR. CROSSE:                Who gave you that order?

8    MR. REDELS:                Well Mark told me that we

9    couldn't carry her up there no more.

10   MR. CROSSE:                And so you never carried her up

11   there since then?

12   MR. REDELS:                No.  She had asked me but I said

13   you know I don't want, you know, no I don't carry her no more.  I think she rides

14   with the Seaford van.  I couldn't see why you know what different that make,

15   DAV van, DAV van, I mean you know, but I didn't carry her no more.

16   MR. CROSSE:                That is all I have of this witness.

17   MR. HOWARD:                I have a few questions.  Mr.

18   Redels, good evening.

19   MR. REDELS:                Good evening.

20   MR. HOWARD:                I want to talk about something

21   that I think you were involved in.  And I'll call it the incident with Mr. Stansfeld.

7

| 1 | MR. REDELS: | Yes. |
|---|---|---|

1        MR. REDELS:              Yes.

2        MR. HOWARD:              Alright, and you were involved n

3    that.

4        MR. REDELS:              Yes.

5        MR. HOWARD:              Mr. Stansfeld apparently made

6    inappropriate comments to you.

7        MR. REDELS:              Yeah he did.

8        MR. HOWARD:              And my review of the history is

9    that Mr. Stansfeld wrote an apology to you.  That is true isn't it?

10       MR. REDELS:              Well after about three or four

11   months.

12       MR. HOWARD:              I'm not saying he was right or

13   well behaved, but you got an apology?

14       MR. REDELS:              Yeah, somewhat.

15       MR. HOWARD:              And   you   got   that   apology

16   because the people sitting up here who run that organization directed him to

17   write it or he would be disciplined.

18       MR. REDELS:              Well, but a couple, well he didn't

19   really take a hold of it, he thought I was lying about the whole situation, and then

20   after a while, it was me, Sharon Allen and Mr. White in the van, you know, and

21   Sharon was telling them that Ms. Stanfield say that to me but they didn't really

1    believe until they went and asked Mr. White and then they believed and then Mr.

2    Paul made Mr. Stanfield to write me a letter and then Mr. Paul wrote me a letter.

3                    MR. HOWARD:              That is right.    Because they

4    determined that it was inappropriate and you deserved an apology.

5                    MR. REDELS:              Yes.

6                    MR. HOWARD:              And they did the same thing for

7    Ms. Shannon.  You called her Ms. Allen a couple of times, but you mean Sharon

8    Shannon, right?

9                    MR. REDELS:              I mean I can't say that what he

10   done to her for her because I you know, I don't know.

11                   MR. HOWARD:              But you know that you got a letter

12   of apology.

13                   MR. REDELS:              Yes.

14                   MR. HOWARD:              And n your association with Ms.

15   Shannon driving her in the van, does the fact that she was at one point in her life

16   married to a black man affect the way you treated her?

17                   MR. REDELS:              I mean it didn't really make no

18   difference if she was married to a yellow man, I mean I don't, I treat her like I

19   told you, I treat everybody the same.

20                   MR. HOWARD:              Okay.

1          MR. REDELS:                    I mean I try not to you know

2     discriminate against nobody.  If she was married to a black man, so what?  I

3     mean you know it didn't make me no different to carry her.  I carried her and she

4     done what she had done and I brought her back home.  And all after that I didn't

5     get into it.

6          MR. HOWARD:                    Have you at any point in time

7     heard anybody sitting here at this table with me say something derogatory about

8     Ms. Shannon because she was formerly married to an African American?

9          MR. REDELS:                    I can't say I did.  I mean ...

10         MR. HOWARD:                    You also, you were involved in,

11    and I'll call it a racially charged event, you felt, you were offended by comments

12    an insensitive white man made.

13         MR. REDELS:                    Well I was offended by it because

14    it, the only thing I was offended is because he should have had sense enough to

15    know that that happened about three or four months down the road, he should

16    have not made that comment.

17         MR. HOWARD:                    I agree with you.  But that is not

18    the point.  My point is that you were involved in that event, an event that came to

19    the attention of the people who run the lodge, you were directed involved in that.

20    Right?

1           MR. REDELS:           Well I was involved in it, yeah,

2    okay.

3           MR. HOWARD:           And people talked with you about

4    that event, people that are sitting at this table, they wanted to know about that

5    event. Right?

6           MR. REDELS:           Yeah.

7           MR. HOWARD:           Now, no one in those

8    conversations ever identified Ms. Shannon by the fact that she was at one point

9    in her life married to an African American.  Nobody made reference to that,

10    didn't they?

11           MR. REDELS:           Not that I know, I mean, you

12    know.

13           MR. HOWARD:           Now, you are not the only driver

14    that volunteers are you?

15           MR. REDELS:           Well I was for a while, about five

16    or six months, but now I'm not, we got more drivers.

17           MR. HOWARD:           Alright.  In your time in driving

18    Ms. Shannon back and forth to the hospital, were there other times when there

19    events on your van between her and other patients?

20           MR. REDELS:           Not that I know of.  I mean you

21    know like I said, they don't give me no problems.

1    MR. HOWARD:                    They don't give you no problems,

2    but you hear patients...

3    MR. REDELS:                    I, you know, why I said they don't

4    give me no problems they don't like get on the van and start arguing and you

5    know because what they are arguing for? We are doing them a favor of carrying

6    them up there? I mean why should they get on the van and start arguing and

7    the only answer that I have with Sharon Allen and Mr. White and I told them I

8    even went and told them, they need to get over and they need to grow up. I

9    mean they need to squash that. They need to apologize to one another. But,

10   you know, everybody, you know, they don't want to apologize. They got the

11   eagle. We wouldn't be here today if some, if one of them, well I'm sorry, Sharon

12   Allen or I'm sorry Mr. White to her, I mean it would have been over with. I've

13   been preaching that and preaching that. They should apologize and move on.

14   We should not be here doing this crap in my opinion.

15   MR. HOWARD:                    And in your opinion, this has

16   nothing to do with Sharon Shannon at one time in her life being married to a

17   black man.

18   MR. REDELS:                    No, I mean not to me, I mean,

19   you know, like I said I don't care who she married.

20   MR. HOWARD:                    This is about egos and tension,

21   isn't it?

1       MR. REDELS:                I mean well they should have

2    squashed this a long time ago, my opinion, you know.

3       MR. HOWARD:                Squash what?

4       MR. REDELS:                This animosity or, you know, they

5    should apologize.

6       MR. HOWARD:                Animosity between whom?

7       MR. REDELS:                Him and her.  I mean you know

8    that is what mostly come up about.  You know, through the ranks, it come up

9    through that, it come up through Mr. Stansfield calling me a boy and it has been

10   going ever since.  I mean to me, you know, what I feel.

11      MR. HOWARD:                Okay.  I don't think I have any

12   more questions for Mr. Redels.

13      COMMISSIONER:             Any rebuttal?

14      MR. CROSSE:                Mr.    Redels,   you    were    not

15   involved in the official decision to restrict her from the clubhouse, the van, or

16   other DAV activity?

17      MR. REDELS:                I was commander of that for two

18   years, but I didn't, there was an executive, there was the department who made

19   that decision.

20      MR. CROSSE:                Who made that decision?

13

1    MR. REDELS:                The department.   The heads of

2    the department I guess.

3    MR. CROSSE:                So you didn't have ....

4    MR. REDELS:                No, I didn't have nothing to do

5    with that.

6    MR. CROSSE:                Did you have any input on that at

7    all?

8    MR. REDELS:                No.

9    MR. CROSSE:                Alright.  I have nothing else.

10   MR. HOWARD:                This  gives  rise  to  one  more

11   question.   Do you regularly attending meetings?

12   MR. REDELS:                Ever since I been there.

13   MR. HOWARD:                Good,  good.    In  all  of  those

14   meetings that you ever attended, have you ever heard one member or officer

15   say something derogatory directed at Ms. Shannon or about Ms. Shannon as it

16   relates to her marriage to an African American?

17   MR. REDELS:                Not that I know of.

18   MR. HOWARD:                It never happened.

19   MR. REDELS:                Well I don't, to my knowledge.

20   MR. HOWARD:                Yeah, well you are somebody at

21   those meetings interacting with these people.

1             MR. REDELS:          I can't say because I don't get

2     involved in that he said she said.

3             MR. HOWARD:        I know that, but have you, let me

4     make it simple. Have you ever heard any body say anything like that?

5             MR. REDELS:          I mean you know, to the best of

6     my knowledge, no.

7             MR. HOWARD:        Okay.  Thank you.

8             MR. CROSSE:        Mr. Redels, just to follow that line,

9     if you are looking at you, you like me are a black man or an African American.

10    Correct?

11           MR. REDELS:          Yes.

12           MR. CROSSE:        So if somebody is going to say

13    something derogatory about this woman's black husband, do you think they are

14    going to say it in front of you?

15           MR. REDELS:          I don't think so.

16           MR. CROSSE:        So then it is not unusually that

17    you as a black member of this organization haven't heard it because they won't

18    say it in front of you.

19           MR. REDELS:        They ain't going to come up to

20    me and say well, I think she was married to a black man, I don't like her, I mean,

21    as a matter of fact, I was, for the last four years, I was the only active member,

1    black member in the organization.  So I mean they won't come to me and say

2    look Sharon Allen is a white woman and she married a black man, I mean you

3    know, they don't want to do that.  I mean I don't guess they would.

4              MR. CROSSE:              That is all.

5              MR. HOWARD:              I have a few questions.  May I?

6    Mr. Redels, how long have you been driving the van voluntary?

7              MR. REDELS:              Well I've been about, I don't know

8    about a couple, three years I think, a couple of years, something like that.

9              MR. HOWARD:              Do you regularly transport people

10   of color in the van?

11             MR. REDELS:              Yes.

12             MR. HOWARD:              Has anybody ever said or done

13   anything that would give you an indication that that was a problem for the

14   organization that people of color be transported in the van?

15             MR. REDELS:              No.   I have carried all color

16   people, I mean all nationalities, I mean, we never have a problem.

17             MR. HOWARD:              As  you  understand  it,  the

18   organization's mission, that is encouraged, I mean nobody ever considers race

19   when it comes to providing that service, do they?

1       MR. REDELS:                I mean they don't tell me who to

2    carry.  They don't say Ron, you can't carry this white man, or Ronnie you can't

3    carry that black woman.

4       MR. HOWARD:                It  is  any  veteran  or  eligible

5    person.  You don't even have to be ….

6       MR. REDELS:                Any veteran, it is for veterans.  I

7    mean for veterans.   We don't care what color they is.   It is a veteran's

8    organization.

9       MR. HOWARD:                And in fact the practice is to carry

10   any veteran or other eligible person like Ms. Shannon in the vans.

11      MR. REDELS:                That is right.

12      MR. HOWARD:                You do not to be a member of the

13   disabled veteran's chapter either do you?  Just a veteran.

14      MR. REDELS:                Yeah,  just  a  veteran,  yeah  or

15   wife.

16      MR. HOWARD:                Or spouse.

17      MR. REDELS:                Or like in her case, you know.

18      MR. HOWARD:                And at no point in your career or

19   association of this organization has anybody ever suggested out loud or in

20   writing that certain people, certain classes of people can't ride on the van.

1      MR. REDELS:              No, we don't play that.  I mean I

2   don't play that.

3      MR. HOWARD:              You wouldn't stand for it if they

4   did, wouldn't you?

5      MR. REDELS:              No.  I mean I treat people right,

6   but you can't, everybody, veterans, that is the organization for veterans.

7      MR. HOWARD:              Now     you     understand     my

8   confusion when the claim is, this lady claims that she is being discriminated

9   against because she was formerly married to an African American some 30

10  years ago, but at the same time the organization allows and considers it its duty

11  to carry any veteran, black or otherwise on those vans fro services.  Do you

12  understand my confusion about that?

13     MR. REDELS:              That  is  the  only,  it  ain't  got

14  nothing to do with me.

15     MR. HOWARD:              Thank you.

16     BOARD:                   In there, Ms. Shannon was told

17  you could not carry Ms. Shannon to Elsmere, right?

18     MR. REDELS:              Yes.

19     COMMISSIONER:            And just for clarity sake, it is my

20  understanding that the conversations that Ms. Shannon testified about, were you

    in the room when she testified?

18

| | |
|---|---|
| 1 | MR. REDELS: |
| 2 | COMMISSIONER: |

1    MR. REDELS:                    About what?

2    COMMISSIONER:                  Actually it wasn't Ms. Shannon it

3    was Ms. Taylor, yes Virginia Taylor was discussing the fact that she attended

4    meetings where Ms. Shannon was spoken about at the meetings and clams that

5    those were meetings of the women's part of the organization.  So when you are

6    being asked here about the meetings, you were not in the women's meetings,

7    correct, you were in the men's meetings?

8    MR. REDELS:                    See  what  it  is,  no,  it  is  two

9    different things.

10   COMMISSIONER:                  So you wouldn't have reason to

11   hear the conversation.

12   MR. REDELS:                    No,  no.    We got the auxiliary

13   there, the women are the auxiliary.  The women come to us, we don't come into

14   the women's.

15   COMMISSIONER:                  It's    got    to    be    that    was

16   somewhere.  Anymore cross?  You may be excused.

17   MR. CROSSE:                    Mr.  Inskip,  same  questions  for

18   you.  State your name again for us.

19   MR. INSKIP:                    Donald H. Inskip.

20   MR. CROSSE:                    And sir where do you live?

19

| 1 | MR. INSKIP: | 120 Bluebell Drive, Magnolia, |
| 2 | Delaware. | |
| 3 | MR. CROSSE: | And how long have you lived in |
| 4 | the Magnolia, Dover area? | |
| 5 | MR. INSKIP: | Approximately three years. |
| 6 | MR. CROSSE: | Are you a member of the DAV? |
| 7 | MR. INSKIP: | No sir. |
| 8 | MR. CROSSE: | Did you ride on their van? |
| 9 | MR. INSKIP: | Yes I did. |
| 10 | MR. CROSSE: | Are you familiar with Ms. |
| 11 | Shannon? | |
| 12 | MR. INSKIP: | Yes I am. |
| 13 | MR. CROSSE: | Now were you a passenger on |
| 14 | the van on or around August the 3rd? | |
| 15 | MR. INSKIP: | Yes. |
| 16 | MR. CROSSE: | And this was a trip up to the VA |
| 17 | and back. | |
| 18 | MR. INSKIP: | That is correct. |
| 19 | MR. CROSSE: | Could you tell the ladies and |
| 20 | gentlemen on the panel how that went? | |

1     MR. INSKIP:     We had to meet the van at the

2 Magnolia firehall. I had a ride down there. I didn't have any transportation. A

3 lady took me down there and I waited for the van. Ms. Shannon, I pulled her car

4 around back. I didn't know she was waiting for the van. Eventually I walked

5 back and I asked her if she was waiting for the van, the DAV van, to go to

6 Wilmington, and she said yes. And it was raining that day and so she asked me

7 she said why don't you get in? So I sat in the car and then finally I said to her, I

8 said I believe the van must be parked out front in front of the firehouse. And she

9 said well, the van always picks me up back here. So I got out and I walked up

10 and sure enough the van was there, and the lady who was driving I told her, I

11 said we are in the back back here. So she said I'll bring the van back and we'll

12 pick you up. I said alright. So she came back, Sharon got out of the car and

13 started for the back of the van, though there was somebody sitting in the front

14 seat, there was a colored gentleman Isaiah sitting the front seat, and she started

15 to get in the back, I was on one side and she was on the other and Isaiah got up

16 and said here, get in the front, it will be easier for you and he came around back

17 and sat next to me in the back. We rode up to Wilmington, doctors'

18 appointments all done. Everybody together. The driver went to get the van. In

19 the meantime, the driver brings the van back and there is somebody else in the

20 front seat of the van. So I didn't think anything of it. I said I'm just going to get

21 shoved further back in the van. But anyway a lady that worked there at the VA, I

1       don't know who she was, she got out of the front seat and Sharon started

2       because Isaiah was getting in on the side that he had rode with me coming,

3       going up there, and she was going to get up in the front and this lady told her,

4       she said no you are not. She said you are not running the show here. She said

5       I am. She said there is nothing wrong with you. You get in the back of that van.

6                    MR. CROSSE:                    So now that lady was speaking to

7       who?

8                    MR. INSKIP:                    Was speaking to ...        .

9                    MR. CROSSE:                    Sharon?

10                   MR. INSKIP:                    Sharon. And they, Sharon didn't

11      say anything she said I have a problem with my hip, and it hurts me to get in the

12      back of the van. And that she was not taking the place, the seat from Isaiah that

13      Isaiah had voluntarily gave that seat up to her when we came up to Wilmington.

14      And that was exactly how it went. Anyway, she was insistent that Shannon, Ms.

15      Shannon ride in the back of that van. So Isaiah finally got up front, she insisted

16      that Isaiah get up front, he got up front, and I know he was embarrassed about

17      it. And then I tried to help her into the van but not knowing the condition of her

18      hips, she said let me do this myself. So I went around and got in my side of the

19      van and she eventually got in and she turned to me and she said I've hurt my

20      hip. And the lady was still there, and she said oh, you didn't hurt anything

22

1  because there is nothing wrong with you.  And then we shut the doors and we

2  took off.

3            MR. CROSSE:                    Who was driving that day?

4            MR. INSKIP:                    There was a lady driving, I don't

5  know who it was.

6            MR. CROSSE:                    Do you recall if Ms. Shannon was

7  at all abusive to the driver?

8            MR. INSKIP:                    Not at all.

9            MR. CROSSE:                    I believe that lady from Elsmere

10  was a dispatcher?  Do you know what her position was?  Do you know what her

11  job was?

12            MR. INSKIP:                    The lady from Elsmere was a

13  dispatcher?  No, I don't know what her position was, no.  I only, see the reason I

14  had to go to Wilmington and take the van was because I had to go up there for a

15  CAT scan.  I normally get my medical treatment done in Seaford, and I have

16  another means of transportation, the home of the free, the home of the brave

17  transports me to Seaford.

18            MR. CROSSE:                    Did you, in that conversation that

19  Ms. Shannon had with the lady that told her to get in the back, was she ever

20  cursing that lady or being abusive to that lady?

1          MR. INSKIP:          No she didn't say anything to the

2    lady.  She just said you don't know my condition.  That was all.  I know she said

3    you don't know what my condition is.

4          MR. CROSSE:          That is all I have of this witness.

5          MR. HOWARD:          This lady is an employee of the

6    hospital in Elsmere?

7          MR. INSKIP:          No, that is my assumption, she is

8    an employee, she had a uniform and she had the tag on her ...

9          MR. HOWARD:          Okay.    And    Isaiah,    as    I

10    understand it, is an African American gentleman.

11          MR. INSKIP:          That is correct.

12          MR. HOWARD:          Okay, so in the context of this

13    particular event, the employee of the veteran's hospital in Elsmere, not a

14    member of the Camden chapter of the disabled American veterans, made the

15    Caucasian lady get in the back and an African American gentleman get in the

16    front.

17          MR. INSKIP:          That is correct.

18          COMMISSIONER:          Mr. Crosse?

19          MR. CROSSE:          Nothing further.

20          MR. CROSSE:          Ms. McBride, where do you live

21    ma'am?

24

| | | |
|---|---|---|
| 1 | MS. MCBRIDE: | I live in Seaford. |
| 2 | MR. CROSSE: | And how long have you lived |
| 3 | there? | |
| 4 | MS. MCBRIDE: | Eleven years. |
| 5 | MR. CROSSE: | Are you a member of the DAVA? |
| 6 | MS. MCBRIDE: | No. |
| 7 | MR. CROSSE: | Do you volunteer for them? |
| 8 | MS. MCBRIDE: | No, I'm a driver for the DAV. |
| 9 | MR. CROSSE: | Have you ever driven Ms. |
| 10 | Shannon? | |
| 11 | MS. MCBRIDE: | Yes. |
| 12 | MR. CROSSE: | About how many occasions? |
| 13 | MS. MCBRIDE: | Many occasions. |
| 14 | MR. CROSSE: | Did she call you and ask you to |
| 15 | assist her in getting to Elsmere after she was put off the van here? | | |
| 16 | MS. MCBRIDE: | Yes. |
| 17 | MR. CROSSE: | Has she been abusive to you or |
| 18 | used profanity as far as you know? | | |
| 19 | MS. MCBRIDE: | No. |
| 20 | MR. CROSSE: | And this is since she joined you, |
| 21 | she used to ride up with you before? | | |

*anita & Karen*
*Before June*

25

| | | |
|---|---|---|
| 1 | MS. MCBRIDE: | No, she rode with Camden |
| 2 | before. | |
| 3 | MR. CROSSE: | And you've had no problems with |
| 4 | her. I have nothing further. | |
| 5 | MR. HOWARD: | I don't have any questions. |
| 6 | MR. CROSSE: | A question that I asked didn't get |
| 7 | on the record. I asked was she ever abusive to you as you volunteered as a | |
| 8 | driver for DAV? | |
| 9 | MS. MCBRIDE: | No, she was never abusive to |
| 10 | me. | *Before June* |
| 11 | MR. CROSSE: | Alright. That is all I have. |
| 12 | MR. CROSSE: | Ms. Foldi, where do you live? |
| 13 | MS. FOLDI: | 2324 Camp Hill, Pennsylvania. |
| 14 | MR. CROSSE: | And so that is far from Kent |
| 15 | county, is it? | |
| 16 | MS. FOLDI: | Yes it is. |
| 17 | MR. CROSSE: | Did you live in Kent County some |
| 18 | time ago? | |
| 19 | MS. FOLDI: | No, I worked in Wilmington |
| 20 | construction and when I joined the DAV. | |

| 1 | MR. CROSSE: | And which DAV chapter are you |
| 2 | a member? | |
| 3 | MS. FOLDI: | I am a member and commander |
| 4 | of Chapter 3, unit 3. | |
| 5 | MR. CROSSE: | This chapter here? |
| 6 | MS. FOLDI: | No, this is chapter, unit 1, chapter |
| 7 | 1. | |
| 8 | MR. CROSSE: | So you are a member of the |
| 9 | Wilmington chapter. | |
| 10 | MS. FOLDI: | Right. |
| 11 | MR. CROSSE: | And are you familiar with Sharon |
| 12 | Shannon? | |
| 13 | MS. FOLDI: | I met her in June at a convention. |
| 14 | MR. CROSSE: | Were you ever present to hear |
| 15 | any conversations involving discussions of her? | |
| 16 | MS. FOLDI: | At a convention, they were |
| 17 | treated roughly and when I asked about them, we had one member state that | |
| 18 | she was married to a black man. | |
| 19 | MR. CROSSE: | Let me get you, you said at your |
| 20 | convention she was treated roughly. | |
| 21 | MS. FOLDI: | Roughly. |

27

1      MR. CROSSE:                    When you say she was treated

2  roughly, what does that mean to the people that weren't there?

3      MS. FOLDI:                     They weren't even allowed to pull

4  their chairs up to sit with their people from their unit.  So they chose to sit with

5  our delegates from unit 3.

6      MR. CROSSE:                    Now did you ask why these two

7  DAV members were being treated this way?

8      MS. FOLDI:                     No, no I didn't because I knew

9  one.

10     MR. CROSSE:                    Okay.  You knew ....

11     MS. FOLDI:                     Virginia Taylor.

12     MR. CROSSE:                    And    did    you    make    any

13  determination as to why these people weren't allowed to sit with their group?

14     MS. FOLDI:                     Just  by  the  actions  of  Dorothy

15  and some other members, they just didn't make them feel welcome.

16     MR. CROSSE:                    Did  you  make  any  complaint  or

17  did anybody make any complaint?

18     MS. FOLDI:                     No    we    didn't    make    any

19  complaints, it doesn't do any good.  But I did ask who Shannon was, who she is

20  at that time.

21     MR. CROSSE:                    And who did you ask that?

1    MS. FOLDI:                    I asked Dot.

2    MR. CROSSE:                   And what did Dot say?

3    MS. FOLDI:                    At that time she said she was

4    married to a black man.  And then she went on and she accused I believe it was

5    Virginia of taking little chocolate candy, a little chocolate candy.

6    MR. CROSSE:                   Is  Dot  an  officer  in  which

7    chapter?

8    MS. FOLDI:                    She is a, she is state, it was a

9    state convention.

10   MR. CROSSE:                   Is she a member of unit one?

11   MS. FOLDI:                    Unit one?

12   MR. CROSSE:                   Does she hold an official position

13   in unit 1?

14   MS. FOLDI:                    I don't know.

15   MR. CROSSE:                   But....

16   MS. FOLDI:                    She holds, she is our adjudicate

17   and treasurer.

18   MR. CROSSE:                   But you do recall her saying that.

19   MS. FOLDI:                    Yes.

20   MR. CROSSE:                   Sharon is being treated this way

21   because ...

| 1 | MS. FOLDI: | No, no, no, not be treated that |
| 2 | way.  I just asked who she was. | |
| 3 | MR. CROSSE: | Oh, you asked who is that |
| 4 | woman. | |
| 5 | MS. FOLDI: | Right. |
| 6 | MR. CROSSE: | And the response was? |
| 7 | MS. FOLDI: | She was married to a black man, |
| 8 | was married to a black man. | |
| 9 | MR. CROSSE: | That is all I have. |
| 10 | MS. FOLDI: | And that was it. |
| 11 | MR. HOWARD: | Ma'am, is that the only thing that |
| 12 | you were told? | |
| 13 | MS. FOLDI: | Basically yes, that is it. |
| 14 | MR. HOWARD: | Virginia Taylor told us that you |
| 15 | were present at meetings with her where chit chat was taking place and this | |
| 16 | subject was a recurring theme.  Is that true? | |
| 17 | MS. FOLDI: | I'm sure it was but I just don't |
| 18 | listen to all the idle gossip because that is what they do, it is idle gossip. | |
| 19 | MR. HOWARD: | You don't attend unit 1. |
| 20 | MS. FOLDI: | No I don't. |
| 21 | MR. HOWARD: | Meetings, do you? |

30

| 1 | MS. FOLDI: | No, state meetings. |
|---|---|---|
| 2 | MR. HOWARD: | Well   Ms.   Taylor   when   she |

3   suggested at Unit One meeting, you were present during these conversations,

4   that is just...

| 5 | MS. FOLDI: | I am not Unit 1. |
|---|---|---|
| 6 | MR. HOWARD: | So she is wrong about that. |
| 7 | MS. FOLDI: | Unless she is talking about State. |

8   I am part of the State committee.

| 9 | MR. HOWARD: | Is Ms. Taylor a par to the state |
|---|---|---|

10   committee?

| 11 | MS. FOLDI: | She comes once in a while. |
|---|---|---|
| 12 | MR. HOWARD: | Have   you   ever   attended   a |

13   meeting at Unit 1?

| 14 | MS. FOLDI: | No. |
|---|---|---|
| 15 | MR. HOWARD: | That is all. |
| 16 | BOARD: | But   the   meeting   that   she   was |

17   asked, the question was at the state meeting...

| 18 | MS. FOLDI: | That was at our state convention. |
|---|---|---|
| 19 | BOARD: | Where   she   described   the   wall |

20   and this kind of thing?

1       MS. FOLDI:                    No, this was at the Sheraton

2       where they could not sit with their delegation even though they could have

3       squeezed two more chairs to accommodate them, but they didn't.

4                       BOARD:                    Tell me just so I understand the

5       time frame so that maybe that will help us a little bit. I guess you know, your

6       unit, you can have frequent meetings, maybe weekly or monthly or whatever,

7       but when you have a state meeting, how often are those?

8       MS. FOLDI:                    Our state meetings is once a

9       month and I don't attend them all. And unit meetings are once a month. We

10      basically have ten a year.

11                      BOARD:                    And when you have those like the

12      state meetings, is that what a convention is?

13      MS. FOLDI:                    No, that is in June.

14                      BOARD:                    Okay.  So the convention would

15      be like a once a year even where everybody kind of gets together and people

16      kind of sit with their group.

17      MS. FOLDI:                    Right.

18                      BOARD:                    My confusion is that where Ms.

19      Taylor heard the over say of the conversation that was going on behind the wall,

20      was that in the state meeting or the unit meeting?

1       MS. FOLDI:                What Virginia had gotten to that,

2   it was two part of our convention.  One was down at the state building on a

3   Friday night, we all packed in, and the rooms are separated like she said.  And I

4   don't mean to disgrace the bible.  The men would meet here and that is where

5   we would have our dinner.  And then over here is the office, an office and a copy

6   machine, I believe, I don't know what all is n there, and then our room sits like

7   this right across from it and there is a wall between where we are eating and

8   where the men meet, and Virginia from what I understand and the way she told

9   it, she was standing right by the door to either go into a meeting or pick up her

10   purse or whatever, in the women's side and they were talking in the office.

11       BOARD:                Now that was the convention

12   meeting in the unit building?

13       MS. FOLDI:                That is, well wait a minute.  That

14   is the state building.

15       BOARD:                Okay.  There is a difference

16   between the state building and the unit building?

17       MS. FOLDI:                No, I believe they just use it for

18   the unit and chapter meetings.

19       ~~MR. CROSSE:~~                Just so I'm clear ma'am, at the

20   Sheraton, there was a convention.

21       MS. FOLDI:                Right.

*I'm not sure if this is*
*Howard or AG*

33

1    MR. CROSSE: *Howard A G*    You were there, Dot Kashner was

2    there, Ms. Shannon is there, Virginia Taylor is there, there are round tables,

3    angular tables?

4            MS. FOLDI:                    Round tables.

5            MR. HOWARD: *A G*          Round tables.  Okay.  And the

6    ladies who are unit 1 members are, the most of them are around a table.

7            MS. FOLDI:                    Right.

8            MR. HOWARD: *A G*          And there was spaces, you said

9    they could have squeezed a couple more chairs, but if you didn't do it it wouldn't

10   have been a squeeze.

11           MS. FOLDI:                    Right.

12           MR. HOWARD: *A G*          Okay.  And apparently there was

13   some open space by the unit 3 table for the ladies.

14           MS. FOLDI:                    Right.

15           MR. HOWARD: *A G*          And these two ladies, Ms. Taylor

16   and Ms. Shannon took up those two chairs, took up those two chairs with some

17   of the unit 3.

18           MS. FOLDI:                    We told them to sit with us.

19           MR. HOWARD: *A G*          Okay.  And at some point after

20   that you went to Ms. Kashner and asked her who Ms. Shannon was.

*after  June  mayo  then*

*White*

34

1        MS. FOLDI:                          We were, in that room at that

2    time, there was Dot and I and Virginia. And Virginia is picking at the candy at

3    the table. And Dot said I had asked who she was, and it was she was married

4    to a black man. Well...

5                  MR. HOWARD:                     Where is Ms. Shannon when you

6    are seeing....

7                  MS. FOLDI:                      She wasn't there, I think she went

8    to the ladies room. That is it.

9                  MR. HOWARD:                     Was there anything about the

10   black man's veteran's status said at that point? Did the comment strike you as

11   odd at the time?

12               MS. FOLDI:                        Yes.

13               MR. HOWARD:                       Did you ask Ms. Kashner why

14   she said that?

15               MS. FOLDI:                        No at the time, I also had a very

16   bad ear infection which has no bearing on that. And it just aggravates me that

17   people are treated badly.

18               MR. HOWARD:                       Okay. For whatever reason.

19               MS. FOLDI:                        For whatever reason.

20               MR. HOWARD:                       Mr. White, are you familiar with

21   Ms. Shannon?

35

| | | |
|---|---|---|
| 1 | MR. WHITE: | Not for me, I only met her just this |
| 2 | one time to my knowledge. | |
| 3 | MR. HOWARD: | Riding on the van? |
| 4 | MR. WHITE: | That one day only. |
| 5 | MR. HOWARD: | Okay.  Are you a member of the |
| 6 | disabled American veterans? | |
| 7 | MR. WHITE: | Yes I am. |
| 8 | MR. HOWARD: | Unit One? |
| 9 | MR. WHITE: | Unit one yes. |
| 10 | MR. HOWARD: | Chapter One? |
| 11 | MR. WHITE: | Chapter One. |
| 12 | MR. HOWARD: | Can you describe for us what |
| 13 | happened the one time that you rode with Ms. Shannon on the van? | |
| 14 | MR. WHITE: | Yes I can.  It was approximately |

15   late April, I mean February or early April, I arrived to the Wilmington VMAC from

16   Philadelphia.  I was taking radiation over there and I get back like 11:30 each

17   day.  And I made arrangements with the chapter to ride back with them instead

18   of riding through one bus and get home late, and they would pick me up at

19   11:30.  And this particular day I get off the van, walk into the lobby, I did not see,

20   I don't see, he walked up to me and said hi Mr. White, I've been waiting for you.

1    MR. HOWARD:             That is Mr. Redels you are talking

2    about now.

3    MR. WHITE:              Right.  He said go get in the van,

4    I'm going up to see Margo and I'll be down in a minute.  I walked up to the van, I

5    saw a figure sitting on the front seat, I pulled the back door lever, I heard a click

6    sound, the door had locked, I kept pulling the door and it did not unlock.  I

7    walked around to the driver's side, I tried it again, and it locked.  I beat on the

8    window [inaudible] looked around and I heard a click sound again and the door

9    opened.  I got in the van and I said why you locked the door?  And the person

10   said do you realize this van is going to Dover and besides that seat is for Margo.

11   I said I have as much right to ride on these damn vans as you and Margo, I'm a

12   disabled veteran.  And then she started on, and then she said something else

13   and at one point she called me a boy and I called her a boy.  I said bitch, don't

14   call me a boy, something to the effect.  Well she said I want to tell you one thing,

15   she said all my grandchildren are black.  I said that is your problem.  And we left

16   the VA, she instructed Mr. Redels to go to the store to get a soda, and he went

17   down to get the soda.  She parked in front of the store.  She was in the store

18   about less than one minute, came back, got back on the seat, he said where is

19   mine, she said I did not know you wanted one.  He proceeded to drive back to

20   Dover.  Rebel was not in the car when we was arguing.  He said he can testify to

21   that, but he was not in the car.  And we, and that was it, nothing else coming

1    back from Dover, I mean from Wilmington into Dover. And I was in the van on

2    the second time with her with Mr. Stanfield and that was a joke conversation that

3    she instigated. Mr. Stanfield did not instigate this thing and it was a joke thing

4    about [inaudible].

5              MR. HOWARD:                    What do you mean by that Mr.

6    White?

7              MR. WHITE:                      I mean by this, he said that we

8    were going to Atlantic to a convention and asked me if I needed a ride. I said no

9    because my daughter is coming over and she is going to take the wife and I over

10   and we are going to go early. Well he said I have plenty of room in my truck.

11   He said in fact he said I might drive with the [inaudible] and he asked Ron if he

12   had a ride, and he said no I'm not sure. He said well you can take my truck and

13   drive it if you like, he said we'll get you there one way or the other. [inaudible].

14   And he and Rob was laughing and joking all the way down, and Ms. Shannon

15   butted in and she laughed too and she was joking along with them. And at

16   some point two weeks later I get a complaint letter that I said, I don't see this at

17   all, I said Mr. Stanfield said nothing, him and Ron were joking like they always

18   do in the van.

19             MR. HOWARD:                    Alright.  Somebody wanted your

20   input about a complaint concerning what Mr. Stanfield said.

21             MR. WHITE:                      Right.

1    MR. HOWARD:                And your recollection of the event

2    and the encounter there was nothing wrong, nothing, no bad manners, no wrong

3    comments.

4    MR. WHITE:                None whatsoever.    It was all

5    jokes, just like a military soldier in the  battlefields joking, that was all that came

6    out of it and Mr. Rebel went along with it, he was laughing and joking too.'

7    MR. HOWARD:                Okay.    And later somehow it

8    blossomed into a ...

9    MR. WHITE:                Not a complaint.  And I read, and

10   when I read it I took it and tore it up, I said this is terrible.

11   MR. HOWARD:                And    you    acknowledge    Ms.

12   Shannon instigated that whole thing.

13   MR. WHITE:                She sent a letter, wanted me to

14   write a letter to the NAACP to back her up.  And I said I will not get involved in

15   this crap.  I said this is not right.

16   MR. HOWARD:                Going back to the first time you

17   had words with her, did you ask her any questions which would have prompted

18   her to tell you that her grandchildren are black?

19   MR. WHITE:                No, anything at all.    The only

20   thing I asked her was why she locked the door when I heard the click sounds.

1             MR. HOWARD:          And you found out she locked the

2   door to keep you out of the van because it was going to Dover.

3             MR. WHITE:          She said it was going to Dover

4   and she said Margo, but Mr. Redels tell me last night that she locked the door

5   because she was afraid that I was going to rape her.  That she had told him as

6   late as last night.

7             MR. HOWARD:          As late as last night that she had

8   told Mr. Redels that ...

9             MR. WHITE:          He told that to me last night.

10           MR. CROSSE:          Objection.  Mr. Redels was here,

11   this was never mentioned.

12           MR. HOWARD:          I  didn't  ask  a  question  that

13   prompted a response.  It is out there at this point isn't it, so alright.  Did you

14   make, Ms. Shannon has told us in her recollection of the event that you called

15   her a FWB, those are the initials for an expression I would rather not use but I

16   think we all know what it means.  Did you make any reference to her race during

17   your exchange with her?

18           MR. WHITE:          No sir I did not due to the fact

19   that I've said, her feet was on the front seat, I did not know whether she was fat

20   or skinny, I could see her, so I did not see her until she got out of the van to go

21   into the store and I wouldn't know what [inaudible] I did not know, I did not her

1    call FWB as you said. I did call her a bitch, I did that. I said why are you telling

2    me your problems. That was when she called me a boy, the word bitch from

3    me, I sure did.

4                    MR. HOWARD:                    I take it if you had to do it all over

5    again, you might have behaved a little different.

6                    MR. WHITE:                    Well if she called me a boy I

7    might, it might trigger the same thing to me again because I don't like being

8    called a boy. I was in the military like for 25 years, a disabled veteran retired,

9    [inaudible] I'm not a boy.

10                    MR. HOWARD:                    Did you have occasion to relay

11    what happened in this event with Ms. Shannon to the officers of the Camden

12    chapter?

13                    MR. WHITE:                    No I don't think I did talk with

14    them. I talked with Margo. She called me up one day after this happened, Ms.

15    Shannon called me one day and left a message on my telephone said that she

16    had no problem, she wanted to apologize, which she said tonight she did not

17    contact me, but during the convention that they went to Vegas I believe during

18    the month of August she did call my home and I know nobody else was home,

19    but she left a long message on my telephone.

20                    MR. HOWARD:                    Did you prepare a written

21    statement at some point and sign it concerning the events?

41

| 1 | MR. WHITE: | I sure did. |
| 2 | MR. HOWARD: | Who did you submit that to? |
| 3 | MR. WHITE: | I gave it to Mr. Lardizzone. |
| 4 | MR. HOWARD: | Okay.   May I approach the |

5   witness? Is this the statement that you prepared?

| 6 | MR. WHITE: | That is my signature so I'm sure |

7   this is the statement.

| 8 | MR. HOWARD: | Okay.   I'll show this to Mr. |

9   Crosse.

| 10 | MR. CROSSE: | I'm going to make an objection n |

11   that it is going in as an exhibit wasn't listed but to get everything before the

12   board, I will just note it before the record.

| 13 | MR. HOWARD: | We offer, and I would ask that |

14   maybe perhaps at some point a photocopy can be made and that original can be

15   returned to me.

| 16 | BOARD: | This will be respondent's 1. |
| 17 | MR. HOWARD: | And that is all I have for Mr. |

18   White.

| 19 | MR. CROSSE: | Mr. White? |
| 20 | MR. WHITE: | Yes sir. |

42

| | | |
|---|---|---|
| 1 | MR. CROSSE: | In the situation involving Mr. |
| 2 | Stanfield, correct? | |
| 3 | MR. WHITE: | Uh huh. |
| 4 | MR. CROSSE: | Mr. Stanfield was speaking to |
| 5 | Ronnie, was that correct? | |
| 6 | MR. WHITE: | I was involved in it also sir |
| 7 | because he asked me how I was going to get to Atlantic City. | |
| 8 | MR. CROSSE: | But when they asked about |
| 9 | dragging you and so on you were speaking to Ronnie. | |
| 10 | MR. WHITE: | Yes, yes sir. |
| 11 | MR. CROSSE: | So that if they called Ronnie a |
| 12 | boy, you wouldn't be offended, right? | |
| 13 | MR. WHITE: | If he would have called Ronnie a |
| 14 | boy, would I have been offended? | |
| 15 | MR. CROSSE: | Right. |
| 16 | MR. WHITE: | It wouldn't have offended me |
| 17 | because him and Ron was joking. | |
| 18 | MR. CROSSE: | So if he is not saying about tying |
| 19 | you and dragging you to Atlantic City, you wouldn't be offended and you would | |
| 20 | think it was a joke, correct? | |
| 21 | MR. WHITE: | If he was … |

43

1           MR. CROSSE:                    Yes or no.

2           MR. WHITE:                     No, no.  Rephrase, if he ask this

3    question again I would...

4           MR. HOWARD:                    I  object.    In  our  jurisdiction

5    witnesses can explain and then answer or answer and explain...

6           MR. CROSSE:                    No, no, no, you answer first and

7    then you explain.

8           MR. HOWARD:                    You  shouldn't  be  cutting  the

9    witnesses off.

10          COMMISSIONER:                  Could  I  have  a  sense  of  order

11   please.  And just move on.

12          MR. CROSSE:                    Sir, you agree with me, and this

13   is a question that requires a yes or a no answer, that when Mr. Stanfield was

14   talking about pulling someone in the back of the truck, he was not speaking

15   directly to you, he was speaking to Ronnie.

16          MR. WHITE:                     That question would be yes, he

17   was speaking to Ronnie.

18          MR. CROSSE:                    Absolutely.  So you can sit here

19   and tell these ladies, these ladies that it was a joke because he wasn't speaking

20   to you. Correct?

| | | |
|---|---|---|
| 1 | MR. WHITE: | Not correct because I said I was |

listening to the conversation and that was a joke, the conversation all the way

from Wilmington, all the way from Wilmington they started out joking.

4               MR. CROSSE:                     Let's go the other way. When Mr.

5 Stanfield or anyone else was calling someone a boy, I know that for most black

6 men if they are not speaking to you it is unlikely that you would be offended.

7 You would agree with that?

8               MR. WHITE:                     Not wholehearted because Mr.

9 Stanfield never used the word boy.

10             MR. CROSSE:                     I'm using an example. You told

11 us here that you were 25 years in the army. If somebody calls you a boy, you

12 would get upset. Right?

13             MR. WHITE:                     When Ms. Shannon called me a

14 boy it upset me, yes it did.

15             MR. CROSSE:                   Absolutely. So if Ms. Shannon

16 called another black man a boy, putting aside the fact that she isn't speaking to

17 you, you probably wouldn't get upset. You may be get upset in general as a

18 black man that a white person is calling, but if she isn't speaking to you, you

19 wouldn't probably get upset would you?

20             MR. WHITE:                     No, I defend myself only.

21             MR. CROSSE:                   So you would defend yourself.

45

| 1 | MR. WHITE: | Only, yes, I'm defending myself |
| 2 | yes. | |
| 3 | MR. CROSSE: | You were here and you heard |
| 4 | Ronnie testify, didn't you? | |
| 5 | MR. WHITE: | I sure did. |
| 6 | MR. CROSSE: | Did he seem like he was upset to |
| 7 | you that he didn't receive an apology for like three or four months? | |
| 8 | MR. WHITE: | If I can also in the affirmative... |
| 9 | MR. CROSSE: | Did Ronnie seem upset? |
| 10 | MR. WHITE: | He seems confused, not upset. |
| 11 | MR. CROSSE: | So you didn't think that he was a |
| 12 | little upset that it took four months to get that apology. | |
| 13 | MR. WHITE: | It did not take four months sir, it |
| 14 | came down to about three weeks. | |
| 15 | MR. CROSSE: | Three weeks to get it, if your |
| 16 | number is right. but I thought I heard him say three or four months. | |
| 17 | MR. WHITE: | Well that is what he said, but he |
| 18 | brought the letters to my house along with the NAACP letter from Ms. Shannon | |
| 19 | and it was not four months, it was like three weeks. | |

1          MR. CROSSE:                    So you are saying that even

2     though the people weren't speaking directly to you, that it was a joke as far as

3     you saw.

4          MR. WHITE:                     As far as I saw it was a joke in a

5     conversation, they was joking like veterans do in the van all the way, going and

6     coming.

7          MR. CROSSE:                    Now, did the situation regarding

8     this joke of pulling someone happen before or after you had the confrontation

9     with Ms. Shannon?

10         MR. WHITE:                     Probably a couple weeks later

11    because I got on the van on the same day around the same time and she was

12    on the van and Mr. Stanfield was also on the van, and Rebel was driving.

13         MR. CROSSE:                    So you would agree with me that

14    your view of this conversation would somehow be a little affected b y the fact

15    that this same woman had called you a boy about three weeks ago.

16         MR. WHITE:                     In view of this conversation that

17    something that she testified to.

18         MR. CROSSE:                    Yes.

19         MR. WHITE:                     Not really because she was

20    joking with Ray and Ronnie all the way, with them and not with me, she never

1       said one word to me and I never said anything to her.   She was in the

2       conversation with Ray and Ronnie, she was joking along with them.

3                   MR. CROSSE:              That is all I have.

4                   MR. HOWARD:              I don't have any additional

5       questions.

6                   MR. HOWARD:              Could you state your name out

7       loud please.

8                   MS. KASHNER:             My name is Dorothy Kashner,

9       KASHNER.

10                  MR. HOWARD:              Ms. Kashner, are you affiliated

11      with disabled American veterans that is located in, the facility located in

12      Camden?

13                  MS. KASHNER:             Yes.

14                  MR. HOWARD:              And how are you affiliated?

15                  MS. KASHNER:             I am the auxiliary state adjutant.

16                  MR. HOWARD:              Are you also a member of that

17      particular chapter?

18                  MS. KASHNER:             I am with Unit One.

19                  MR. HOWARD:              And where is that physically

20      house?

21                  MS. KASHNER:             in Camden.

48

| | | |
|---|---|---|
| 1 | MR. HOWARD: | Camden, alright.   Do you know |
| 2 | Ms. Shannon sitting here? | |

3       MS. KASHNER:              Yes I do.

4       MR. HOWARD:              And how do you know her?

5       MS. KASHNER:              She came to our meetings a

6   couple of times before she could become a member, Unit One, and I think

7   Ronnie Redels had introduced and said that we had an auxiliary and that is why

8   she had come.

9       MR. HOWARD:              Now in your capacity in the

10   auxiliary, are you, do you have any authority whatsoever over who uses the

11   actual facility?

12       MS. KASHNER:              I have no authority.   The DAV

13   owns the facility, they also have the accommodations for the vans as well.  The

14   auxiliary has no say in that.

15       MR. HOWARD:              You don't get a vote?

16       MS. KASHNER:              No.

17       MR. HOWARD:              You are not, your advise or

18   consent is absolutely irrelevant to the management of the facility and the use of

19   the vans.

20       MS. KASHNER:              We have no say in that.

1          MR. HOWARD:                    What exactly do you do?  What

2    exactly does an auxiliary person do?

3          MS. KASHNER:                   An auxiliary person helps take

4    care of the veterans and their families.

5          MR. HOWARD:                    You are not in any way, shape or

6    form, involved in management.

7          MS. KASHNER:                   No.

8          MR. HOWARD:                    Okay.    Now you heard some

9    things said by other witnesses because you have been present in the room that

10   attributed comments to you.  You heard Ms. Foldi say something, and you also

11   heard Ms. Taylor say something.  First let's start with Ms. Taylor.  How would

12   you describe your relationship with Ms. Taylor?

13         MS. KASHNER:                   Our relationship was quite good

14   up until the state convention.  She, the auxiliary has their meetings, unit

15   meetings and when she came to the state convention she had not been voted

16   in, elected as a state delegate and she was quite upset about that, and she had

17   also brought Ms. Shannon too.

18         MR. HOWARD:                    Neither   one   of   them   were

19   delegates?

20         MS. KASHNER:                   No, neither one, none of them

21   had been elected as delegates to the convention?

1        MR. HOWARD:              And so why would they have

2        come?

3        MS. KASHNER:            Well   just   to   support   the

4        convention.

5        MR. HOWARD:               Okay.  But it was Ms. Taylor who

6        was upset at you because she wasn't a delegate?

7        MS. KASHNER:            Probably, because I was the unit

8        adjutant and when we had elections in April she was not there.  Ms. Shannon

9        and also Mrs. Taylor were only to two meetings the whole year.  I have

10      documentation on that.

11      MR. HOWARD:             Well let's just talk, let's talk about

12      the allegation.  I mean there is a claim that you described her, when somebody

13      asked you who is this lady, you described her as somebody who used to be

14      married to a black man.  Did you ever say that?

15      MS. KASHNER:            I don't recall saying that.  I met

16      Ms. Shannon or Ms. Allen at the time at the commissary and she volunteered

17      that information to me.

18      MR. HOWARD:             Alright.  Let's talk about that for a

19      second.  The first time that you met Ms. Shannon she had a different last name,

20      it was Allen.

21      MS. KASHNER:            That is correct.

1    MR. HOWARD:                And how is it that you met her?

2    MS. KASHNER:               She came to a unit meeting.

3    MR. HOWARD:                Well   you   talked   about   the

4    commissary a second ago.

5    MS. KASHNER:               The commissary is for privileges

6    for people that have retired from the military and I am too.

7    MR. HOWARD:                So you saw her at a meeting and

8    you saw her at the commissary.

9    MS. KASHNER:               That is correct.

10    MR. HOWARD:                And   you   had   a   casual

11    conversation at the commissary?

12    MS. KASHNER:               Yes.

13    MR. HOWARD:                And did you ask a question which

14    would have given rise to that subject matter?

15    MS. KASHNER:               Not that I recall.  I know that she

16    just mentioned that she had been married to a black man and I told her that was

17    her business.

18    MR. HOWARD:                Is that how you feel now?

19    MS. KASHNER:               Yes, that is her business.

20    MR. HOWARD:                Now   you   have   been   named   in

21    this complaint as somebody who has deprived her of services or the use of the

1    facility and I think you told us that that is not possible because you don't have

2    any authority to grant access to the facility or to provide services.

3                    MS. KASHNER:                    No I don't.

4                    MR. HOWARD:                    That is all I have for Ms. Kashner.

5                    COMMISSIONER:                    Mr. Crosse?

6                    MR. CROSSE:                    Thank you Commissioner Harris.

7    Ma'am, at the convention, did you have to be a delegate to attend or could you

8    attend if you were a member of DAV?

9                    MS. KASHNER:                    You can attend if you are a DAV

10   auxiliary member or a DAVer.

11                   MR. CROSSE:                    Was     there    a     special    rule

12   regarding sitting at the table with was it delegates only?

13                   MS. KASHNER:                    The table was pretty full at the

14   time because we were entitled to 8 delegates and they were at the table.  Now,

15   if you are not a delegate or an alternate you should be sitting at a different place

16   from the bar.

17                   MR. CROSSE:                    Now, do you know the lady, Ms.

18   Foldi?

19                   MS. KASHNER:                    Yes.

20                   MR. CROSSE:                    How long have you known her?

53

1      MS. KASHNER:                I have probably known her about

2      three years maybe.

3                  MR. CROSSE:              Now, her testimony was that she

4      asked who is this person and that you said she is married to a black man.

5                  MS. KASHNER:             I don't recall saying that because

6      my job is to make sure I get everything done of the convention. I do not recall

7      that.

8                  MR. CROSSE:              So you have no recollection of

9      that?

10                 MS. KASHNER:             No I don't.

11                 MR. CROSSE:              And I would presume you have

12     no recollection of the conversation that Ms. Taylor heard where that was

13     mentioned.

14                 MS. KASHNER:             I do not recall that.  There may

15     have been a conversation where we said that if people were not going to

16     cooperate, they shouldn't be there.

17                 MR. CROSSE:              Was there ever a conversation

18     where it was said that she shouldn't be riding the bus because one, she is

19     married to a black guy, and 2, she remarried or something like that where her

20     eligibility was discussed?

1          MS. KASHNER:                    Not that I recall.  I know that the

2   DAV has say on who rides the vans and it is supposed to be for veterans.  She

3   is a veteran's wife that has passed away.  But it is supposed to be primarily for

4   veterans.  And if there is room in the van then the auxiliary members can be

5   taken as well.

6          MR. CROSSE:                     So   there   may   have   been   a

7   conversation where it was discussed that she was not a veteran but had been

8   married to a veteran.

9          MS. KASHNER:                    That is possible.

10          MR. CROSSE:                     And at this convention was Mr.

11   Lardizzone, excuse me for mispronouncing your name, and Mr. Wischmann

12   there?

13          MS. KASHNER:                    Yes.

14          MR. CROSSE:                     And now even though we have

15   separate rooms for the ladies and gentlemen, are there times when the, both

16   groups mingle and speak to each other?

17          MS. KASHNER:                    Yes.

18          MR. CROSSE:                     And you do recall or you are

19   pretty sure that Virginia Taylor was at that meeting?

20          MS. KASHNER:                    Yes she was there.

21          MR. CROSSE:                     I have no further questions.

55

1     BOARD:                           I have one.   I would just like to

2     know are you the adjutant of the unit?

3     MS. KASHNER:                     No, for the state.

4     BOARD:                           For the state.

5     MS. KASHNER:                     I am also the adjutant for the unit

6     as well.

7     BOARD:                           Okay.   Do you have any input to

8     the DAV adjutant for the unit members that Ms. Shannon was a member of?

9     MS. KASHNER:                     No.

10    BOARD:                           You have no input?

11    MS. KASHNER:                     I only have input as far as the

12    auxiliary is concerned.

13    BOARD:                           Well what is your job as the

14    adjutant.

15    MS. KASHNER:                     My job as the adjutant is to take

16    care of the minutes and take care of the state convention preparing that and

17    getting ready for that.

18    BOARD:                           Thank you.

19    COMMISSIONER:                    You may be excused.

20    MR. HOWARD:                      Mr. Lardizzone, you do occupy

21    an officer's status in your organization?

1         MR. LARDIZZONE:              Yes, I'm past state commander

2    and now I'm the department adjutant.

3         MR. HOWARD:                  What does that mean that you

4    are the department adjutant?

5         MR. LARDIZZONE:              The department adjutant is the,

6    runs the department, he advises the commander on what his duties are. All mail

7    that comes from national headquarters comes to the adjutant and the adjutant

8    advises the commander what he should do.

9         MR. HOWARD:                  Your signature is contained on

10   the notice Ms. Shannon received that is in evidence, I think it is petitioner's first

11   exhibit dated August 27. You signed off as the adjutant. You remember that

12   don't you?

13        MR. LARDIZZONE:              Yes sir.

14        MR. HOWARD:                  Okay. That correspondence was

15   generated after I take it a number of conversations administrative meetings and

16   so forth. Is that right?

17        MR. LARDIZZONE:              Yes, we brought it to the attention

18   of our national headquarters in Washington.

19        MR. HOWARD:                  What I want you to do, the hour is

20   getting late.

21        MR. LARDIZZONE:              Right.

1      MR. HOWARD:              The    events    involving    Ms.

2   Shannon began and then she was ultimately given this letter.

3      MR. LARDIZZONE:          Yes sir.

4      MR. HOWARD:              I  want  you  to  tell  us  your

5   involvement.  And what role you played in terms of being an officer with this

6   organization.

7      MR. LARDIZZONE:          Well  as  the,  I'm  also  the

8   department service officer.  I'm in charge of transportation network in the whole

9   state.

10     MR. HOWARD:              Okay, good.

11     MR. LARDIZZONE:          When we had the complaint from

12  one of the drivers about Ms. Shannon, Allen?

13     MR. HOWARD:              It was Sharon Allen then?

14     MR. LARDIZZONE:          No, it was changed.  I'm not sure

15  when...

16     MR. HOWARD:              Just so the record is straight, if

17  somebody refers to Ms. Allen or Ms. Shannon, they are talking about the same

18  person.

19     MR. LARDIZZONE:          Right.  Since we were having a

20  problem, our dispatcher called us from Camden to Reno and we went in a

58

1    meeting with our national people because we were having some problems and

2    …

3    MR. HOWARD:              Problems with who?

4    MR. LARDIZZONE:        With Sharon.

5    MR. HOWARD:              Okay.

6    MR. LARDIZZONE:        Being    disruptive    and    telling

7    veterans they couldn't sit in the front seat.  When we brought that to the attention

8    of our national headquarters, the vans are bought through donations, and our

9    department raised enough money to buy two vans and one van was donated by

10    the state of Pennsylvania to us.  The vans are for the veterans.  If there is room

11    for a person who is on champa they can get a ride.

12    MR. HOWARD:              What is champa?

13    MR. LARDIZZONE:        She    comes    under    champa

14    because her husband was a veteran, well was not a veteran but died on active

15    duty in a war.

16    MR. HOWARD:              Okay.

17    MR. LARDIZZONE:        And  so  she  was  entitled  to

18    champa. She was removed from champa when she remarried, but then the VA

19    reopened it again and she reapplied.  So she is still entitled to use the VA system

20    if they have room.

21    MR. HOWARD:              Okay.

1    MR. LARDIZZONE:           Because  the  veteran  is  the
2    priority.

3    MR. HOWARD:            Right,  okay,  well  something
4    happened to call her attention to you and other members of the disabled
5    American veterans.

6    MR. LARDIZZONE:           Probably because we notified our
7    national headquarters when we had our meeting with them. They, we told them
8    what was happening. They told us and gave us a letter in writing which we have
9    is not to have any contact with her because we were getting into a contest.

10    MR. HOWARD:            I'm not understanding.

11    MR. LARDIZZONE:           Not  a  contest,  but  there  was
12    arguments going back and forth on who cold ride the van, giving the dispatcher a
13    hard time,. We talked to our national people and they said that we should have
14    no conversations with her, break away from her, let her ride one of the other vans
15    instead of the Dover van because two of the drivers wanted to quit, and we
16    notified the VA that we were having a problem and we said that the Dover van
17    would not transport her, but she could get a ride with the Seaford van which is
18    our van also.

19    MR. HOWARD:            How many drivers did you have
20    at the time?

21    MR. LARDIZZONE:           I think four.

60

1    MR. HOWARD:    Four, and two of the four were

2    going to quit.

3    MR. LARDIZZONE:    Right.

4    MR. HOWARD:    Had    you    received    other

5    complaints from veterans riding on the van?

6    MR. LARDIZZONE:    One.

7    MR. HOWARD:    One.    Now did you convene a

8    meeting to determine whether or not you were going to admit Ms. Shannon

9    access to your facility and the use of your van?

10    MR. LARDIZZONE:    Yes we notified our advocate and

11    we explained what had happened and because our national headquarters talked

12    to the VA and the judge advocate said that he would write up a letter and brought

13    it to the department executive committee and he brought it up and that he would

14    make a motion that her, that she would not be allowed on our property or on our

15    building, and the executive committee I think at that time was 14 members which

16    was a quorum and the members voted yes.

17    MR. HOWARD:    A unanimous vote.

18    MR. LARDIZZONE:    Yes.    Even Ronnie Redels there

19    and he voted yes.

20    MR. HOWARD:    Mr. Redels was present.

1    MR. LARDIZZONE:    Yes.  He is the first [inaudible] of

2    the department.  He was on the line.

3    MR. HOWARD:    Alright.  Mr. Lardizonne, did racial

4    animus in any way play any part in the decision to bar Ms. Shannon from the

5    premises or from riding in the van?

6    MR. LARDIZZONE:    No.  We are not allowed to use

7    any discrimination.

8    MR. HOWARD:    Alright.  Well your organization is

9    multi-racial, isn't it?

10    MR. LARDIZZONE:    Yes sir.

11    MR. HOWARD:    Tell us about that.

12    MR. LARDIZZONE:    One of our best black people, I

13    don't know if anybody ever heard of him, Jesse Brown, was a disabled American

14    veteran that ran the program down in Washington, D.C. for the disabled

15    American veterans and we just had a building, a VA hospital named for him in

16    Chicago and we just changed our scholarship program to the Jesse Brown

17    Scholarship.

18    MR. HOWARD:    Well let's talk about your, right

19    here in Camden, Delaware.  Is Camden multi-racial?

20    MR. LARDIZZONE:    Pardon me?  Oh yes.  All the

21    organizations are multi-racial.

1          MR. HOWARD:                    Did any, how did you become

2    aware that Ms. Shannon had once been married to an African American.

3          MR. LARDIZZONE:                I think Ronnie told me.

4          MR. HOWARD:                    Ronnie Redels.

5          MR. LARDIZZONE:                I think so. I said that didn't make

6    no difference. I mean, who you marry, I mean, I'm Sicilian and my first wife was

7    a regular Italian and but then when she passed way, I married a girl from Atlanta,

8    so I mean it didn't matter what she was. I mean I don't care, I mean race

9    shouldn't be involved in it.

10         MR. HOWARD:                    And in this particular situation,

11   certainly Ms. Shannon is a Caucasian lady.

12         MR. LARDIZZONE:                Yes. And I think, and she is a

13   very nice person, I mean as far as I'm concerned. It is just that I can't jeopardize

14   closing down the Dover van because of one individual. So when we talked to the

15   VA we told the VA that she could ride the DAV van or we can probably make

16   arrangements to the post 28 American legion, VFW post also, let's see, and the,

17   well the Salisbury van wasn't running, Salisbury just stopped running and they

18   just started again.

19         MR. HOWARD:                    Since Ms. Shannon's exclusion

20   from your premises and loss of eligibility to ride your vans, have African

21   Americans been on the premises?

63

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | Yes. |
| 2 | MR. HOWARD: | Have African Americans been |
| 3 | transported in the van? | |
| 4 | MR. LARDIZZONE: | Yes, every day. We have, Mr. |
| 5 | White rode the van today and I'm not sure who else was on the van. | |
| 6 | MR. HOWARD: | And as far as you are concerned, |
| 7 | the executive committee that ultimately decided to exclude Ms. Shannon from | |
| 8 | riding the vans and from the premises, acted in accordance with your bylaws and | |
| 9 | regulations? | |
| 10 | MR. LARDIZZONE: | Yes sir. |
| 11 | MR. HOWARD: | And also the regulations that |
| 12 | pertain to the use of the van as transportation. | |
| 13 | MR. LARDIZZONE: | Yes sir. |
| 14 | MR. HOWARD: | Did any member, black, white, or |
| 15 | other, at any point in time while this decision was being made, make reference to | |
| 16 | Ms. Shannon's prior marriage to an African American? | |
| 17 | MR. LARDIZZONE: | No sir. |
| 18 | MR. HOWARD: | That is all I have for this witness. |
| 19 | MR. LARDIZZONE: | Could I have one more item sir? |
| 20 | MR. HOWARD: | Yes. |

64

1    MR. LARDIZZONE:    Mr. Ed White was on the

2    executive committee representing chapter one.

3    MR. HOWARD:    So Mr. White who previously

4    testified was there and part of that decision-making process?

5    MR. LARDIZZONE:    Yes sir.

6    MR. HOWARD:    Any other African Americans?

7    MR. LARDIZZONE:    We have plenty. We have one

8    black gentleman, Henry Smith, who was a Tuskegee airman.

9    MR. HOWARD:    And was he part of the executive

10    committee?

11    MR. LARDIZZONE:    No, he belongs to our chapter,

12    attends all the chapter meetings.

13    MR. HOWARD:    That is all.

14    MR. CROSSE:    Mr. Lardizzone, we have had

15    testimony here from Mr. Redels who is one of your drivers and the lady from

16    Seaford and none of them say there was any problem with Ms. Shannon. Who

17    are the drivers that you say had a problem?

18    MR. LARDIZZONE:    We have a statement from one

19    driver.

20    MR. CROSSE:    Gives us a name.

21    MR. LARDIZZONE:    Maureen Salvatore.

*Mr. Laskit gave me a statement about this day.*

1          MR. CROSSE:              And he or she drives from

2     where?

3          MR. LARDIZZONE:          Dover.

4          MR. CROSSE:              And what was his or her

5     complaint?

6          MR. LARDIZZONE:          A complaint about a veteran that

7     had a heart attack and stroke and he was told to get out of the front seat of the

8     van so she could sit in the front seat.

9          MR. CROSSE:              And that was his complaint.

10         MR. LARDIZZONE:          Yes sir.

11         MR. CROSSE:              Who is in control of the seating?

12         MR. LARDIZZONE:          The driver.

13         MR. CROSSE:              And so was this gentleman male,

14    he was a male?

15         MR. LARDIZZONE:          Yes sir, he was a veteran.

16         MR. CROSSE:              A male veteran and he

17    complained because ms. Shannon wanted to sit in the front seat.

18         MR. LARDIZZONE:          Yes sir.

19         MR. CROSSE:              Was that one time or several

20    times?

21         MR. LARDIZZONE:          As far as I know, one.

66

1    MR. CROSSE:                Who else made a complaint?

2    MR. LARDIZZONE:            Our dispatcher.

3    MR. CROSSE:                And who was that dispatcher?

4    MR. LARDIZZONE:            Gladys Bishop.  There was a

*[handwritten: No confrontation]*

5    confrontation between her and Sharon.

6    MR. CROSSE:                And what was that complaint

7    about?

8    MR. LARDIZZONE:            We have a statement from

9    Sharon, I mean from Gladys.

10   MR. CROSSE:                I spoke with Gladys last night and

11   she said there was no problem.

12   MR. LARDIZZONE:            I have no idea.

13   MR. CROSSE:                So you are saying you have a

14   complaint from one dispatcher and one driver, assuming that is true, and

15   because of that, you were going to shut down the van from Dover?

16   MR. LARDIZZONE:            If we lose our volunteer drivers,

17   then the van can't run and that jeopardized the veterans that need rides to the

18   VA hospital.

19   MR. CROSSE:                Now, so let's say that happened

20   with the van, in the letter that you have you also banned her from the building,

21   activities and everything else in this county.

67

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | The building is disabled American |

veterans. It is private property. We are authorized to ban anybody. It doesn't

matter if you belong to the DAV, it doesn't matter if you belong to the auxiliary, it

doesn't matter if you rent a building.

MR. CROSSE:    Okay.

MR. LARDIZZONE:    If you cause a problem, we have

the rights to stop access to anybody to our building or our property.

MR. CROSSE:    Okay.    So, let's assume that

there is a problem with the van, you are telling us that you would also ban the

person from any activity that your organization is carrying on.

MR. LARDIZZONE:    I can't understand.

MR. CROSSE:    If you say there is a problem with

the van, like the problem with the person complaining to the driver or dispatcher,

you choose then to ban them not only from the van but from any activity.

MR. LARDIZZONE:    No, no, no.

MR. CROSSE:    That is what you did in that letter,

isn't it?

MR. LARDIZZONE:    It was more than one incident.

MR. CROSSE:    Didn't this letter say that she...

68

1          MR. LARDIZZONE:          I didn't ban her.  Our executive

2  committee banned her.  I act, as the state adjutant, I acted on the authority of the

3  executive committee.  They voted to ban her from the property.

4          MR. CROSSE:          So someone suggested that you

5  ought to ban her from the van and the property.

6          MR. LARDIZZONE:          Just that she was not allowed to

7  ride in the Dover van, it is not permanent.

8          MR. CROSSE:          Now you have no recollection of

9  a conversation that Ms. Virginia Taylor overheard?

10         MR. LARDIZZONE:          No.

11         MR. CROSSE:          None at all?

12         MR. LARDIZZONE:          I would never use those words.  I

13  wasn't brought up that way.

14         MR. CROSSE:          Now, your letter indicates that

15  there was conduct not conducive to the best interest of the organization or

16  contrary to maintenance and proper order and decorum within the organization,

17  and you cite the women's rules.

18         MR. LARDIZZONE:          No I didn't.

19         MR. CROSSE:          Who cited the women's rules?

20         MR. LARDIZZONE:          I didn't cite, we didn't cite the

21  women's rules.

1    MR. CROSSE:                    Doesn't it say that you are

2    following here article 16?

3    MR. LARDIZZONE:              No, we have our own rules.  We

4    are not...

5    MR. CROSSE:                    So it is your rules, and are the

6    numbers the same?

7    MR. LARDIZZONE:              No.

8    MR. CROSSE:                    So it just so happens, I mean I'm

9    looking at your letter, it says article 16 section 16(1), paragraph 1(c).

10    MR. LARDIZZONE:              Our national regulation might

11    have some of the same wording, but our book is different.  That is an auxiliary

12    national reg.

13    MR. CROSSE:                    Right, but she is being....

14    MR. HOWARD:                   Mr. Crosse, just for the sake of

15    the record, Mr. Crosse is upholding a paper back with a blue cover.

16    MR. CROSSE:                    Disabled    American    Veterans

17    Auxiliary.

18    MR. LARDIZZONE:              Which has nothing to do with us.

19    MR. CROSSE:                    How is it then sir then your letter

20    is citing the women's...

70

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | We quoted out of our national |
| 2 | regulations. | |
| 3 | MR. CROSSE: | So that if I got the men's |
| 4 | regulations, this 16(1)(c) would be the same number | |
| 5 | MR. LARDIZZONE: | It might have the same thing, I |
| 6 | can't answer that. | |
| 7 | MR. CROSSE: | Okay. |
| 8 | MR. LARDIZZONE: | I don't read the auxiliary's book. |
| 9 | MR. CROSSE: | But would you accept my |
| 10 | representation that it is the same number. | |
| 11 | MR. LARDIZZONE: | I don't know. |
| 12 | MR. CROSSE: | Okay. Was there any hearing |
| 13 | done by your executive committee? | |
| 14 | MR. LARDIZZONE: | She never asked for one. |
| 15 | MR. CROSSE: | So you could just do the banning |
| 16 | and there is no investigation to find out if the allegations are accurate? | |
| 17 | MR. LARDIZZONE: | Well she received a letter, she |
| 18 | could have came to us and asked for a hearing. | |
| 19 | MR. CROSSE: | So you punish first and then have |
| 20 | a hearing afterward. Isn't that how it is working? You ban first and then she | |
| 21 | should come and say you are wrong. | |

1    MR. LARDIZZONE:              Well if she had problems, she

2    should have came to us and said she was having problems. She talked to our

3    national people.

4    MR. CROSSE:               Now in your testimony here

5    tonight, you said she is a very nice person but she just has a problem with

6    wanting to be in the front seat.

7    MR. LARDIZZONE:            If, nobody gets an assigned seat.

8    The van is for the veterans. The veteran is the priority. Now we had a disabled

9    veteran that had a heart attack and stroke, and she told the man to get out of the

10    front seat. We notified the VA hospital of that affect, and that is what, we asked

11    what their advise was, and they said it is your drivers even though the van is

12    donated to the VA, if you don't want to lose your drivers ...

13    MR. CROSSE:               Take this action.

14    MR. LARDIZZONE:            Take this action.

15    MR. CROSSE:               Would you agree with me that

16    that is a drastic action?

17    MR. LARDIZZONE:            Not necessarily.

18    MR. CROSSE:               Did anyone speak to Ms.

19    Shannon to find out why if she actually asked this guy why she asked for the

20    front seat? So what you are telling me is you got the complaint, you called the

21    national and you said we've got a lady here that wants the front seat, what to do.

72

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | No, no. |
| 2 | MR. CROSSE: | What to do and they said put her |
| 3 | off on the van, put her out of your organization. | |
| 4 | MR. LARDIZZONE: | No they didn't.  No they did not. |
| 5 | No they did not. | |
| 6 | MR. CROSSE: | Was there any backwards and |
| 7 | forwards, or did anybody talk to Ms. Shannon, did anybody investigate?  None of | |
| 8 | that happened. | |
| 9 | MR. LARDIZZONE: | We went by what our dispatcher |
| 10 | told us and our driver.  We got statements from the driver and from the | |
| 11 | dispatcher. | |
| 12 | MR. CROSSE: | When was that? |
| 13 | MR. LARDIZZONE: | In August. |
| 14 | MR. CROSSE: | This was in august. |
| 15 | MR. LARDIZZONE: | Yes sir. |
| 16 | MR. CROSSE: | That is all. |
| 17 | MR. HOWARD: | I just want to make sure we are |
| 18 | clear though, because I'm learning a little bit about your hierarchy.  You had an | |
| 19 | executive committee meeting that involved people from the entire state? | |
| 20 | MR. LARDIZZONE: | Yes.  All chapters. |
| 21 | MR. HOWARD: | All chapters? |

73

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | Yes sir. |
| 2 | MR. HOWARD: | Okay. And that executive |

3    committee is responsible for the management of the property that sits in

4    Camden?

| | | |
|---|---|---|
| 5 | MR. LARDIZZONE: | Yes sir. |
| 6 | MR. HOWARD: | Because it is owned by the ... |
| 7 | MR. LARDIZZONE: | Department of Delaware |

8    Disabled American Veterans Incorporated.

| | | |
|---|---|---|
| 9 | MR. HOWARD | Okay. So you convened a state- |

10   wide meeting of the executive committee and addressed this issue.

| | | |
|---|---|---|
| 11 | MR. LARDIZZONE: | Yes sir. |
| 12 | MR. HOWARD: | Okay. Now were there members |

13   of that executive committee that would know Sharon Shannon?

| | | |
|---|---|---|
| 14 | MR. LARDIZZONE: | Ronnie Redels did and so did Ed |

15   White.

| | | |
|---|---|---|
| 16 | MR. HOWARD: | Were you there? |
| 17 | MR. LARDIZZONE: | Yes sir, I was there. |
| 18 | MR. HOWARD: | You knew ... |
| 19 | MR. LARDIZZONE: | It was a regular meeting. |
| 20 | MR. HOWARD: | But how many members didn't |

21   know her?

74

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | I'm not sure. |
| 2 | MR. HOWARD: | Well it was 14. |
| 3 | MR. LARDIZZONE: | Some people probably seen her |

at the department convention in June maybe once, but I don't know if they knew

her.

6       MR. HOWARD:                    Okay.  Well, is it fair to say that a

7   number of those people in the executive committee do not regularly attend any

8   functions at the chapter hall in Camden?

9       MR. LARDIZZONE:                Repeat.

10      MR. HOWARD:                    Is it fair to say that a number of

11  the people at this executive committee meeting don't have anything to do with

12  chapter meetings in Camden.

13      MR. LARDIZZONE:                They don't have nothing to do

14  with the chapter.

15      MR. HOWARD:                    Okay.

16      MR. LARDIZZONE:                You can't confuse the chapter

17  and the department.  I think that is what we were having here.

18      MR. HOWARD:                    I agree.

19      MR. LARDIZZONE:                The ladies is a unit.

20      MR. HOWARD:                    And it is just in Camden.

75

1      MR. LARDIZZONE:          Right.  No, each chapter has their

2  own place where they meet.  It just so happens that chapter one is here in Dover,

3  so we used the department headquarters building because we take care of the

4  building.

5      MR. HOWARD:          And where is that?

6      MR. LARDIZZONE:          In Camden.  And unit one also

7  uses the building. But it can't conflict with the department's meeting which is

8  once a month on a Wednesday.

9      MR. HOWARD:          Alright, so this decision to ban

10  this lady from the building in Camden was a decision made by the state.

11      MR. LARDIZZONE:          Yes.

12      MR. HOWARD:          State.     Maybe I asked this

13  already, but in that executive committee meeting, did anybody discuss her

14  relationship 30 years ago with an African American?

15      MR. LARDIZZONE:          No sir.  Before the vote we asked

16  if anybody in the executive committee has any questions before they voted.

17  Because I mean they could vote no or they could vote yes. And nobody had any

18  questions.

19      MR. HOWARD:          And this is not, this building is not

20  a public accommodation.

21      MR. LARDIZZONE:          No sir.

76

 1          MR. HOWARD:              And the vans are not a public

 2  accommodation.

 3          MR. LARDIZZONE:          No, strictly for veterans.

 4          MR. HOWARD:              Or if you are otherwise qualified.

 5          MR. LARDIZZONE:          Strictly.  Well in Sharon's case it

 6  would be champa if there is room.

 7          MR. HOWARD:              But I as a member of the public

 8  can't ride.

 9          MR. LARDIZZONE:          No sir.  There is no charge to a

10  veteran.  And the drivers are volunteers.  The only thing they get is a free lunch

11  at Elsmere and they get a free lunch once a year.

12          COMMISSIONER:            Sir, can I ask you how many

13  complaints did you have on Ms. Shannon?

14          MR. LARDIZZONE:          I think it was approximately four.

15          COMMISSIONER:            Approximately    four.    The

16  gentleman that was, had some previous injuries, had a heart attack or something

17  like that nature, did he form a complaint?

18          MR. LARDIZZONE:          He ended up in the hospital.  We

19  couldn't get a statement from him ma'am.

20          COMMISSIONER:            Did he file a complaint?

1          MR. LARDIZZONE:          With the dispatcher, with the

2     driver.

3          COMMISSIONER:          I'm sorry?

4          MR. LARDIZZONE:          With the driver and the

5     dispatcher.

6          COMMISSIONER:          The person that was suffering as

7     a result of being removed from the seat, did he file a complaint?

8          MR. LARDIZZONE:          Right.  He made a complaint to

9     the driver and the dispatcher.  Yes he told the driver and the dispatcher and the

10    driver wrote a statement up.

11         COMMISSIONER:          Is this a different gentleman that

12    we heard the testimony that gave up his seat riding to...

13         MR. LARDIZZONE:          I don't know ma'am.  Because I

14    don't ride the van, I have no idea.

15         COMMISSIONER:          Did you get two similar

16    complaints?  Did you get, I'm trying to find the complaint that we heard testimony

17    to tonight.  And I'm confused you know whether or not we have, you said you

18    have four complaints, could you tell me, give me the four complaints, the nature

19    of them.

1       MR. LARDIZZONE:                    Well, the complaint was that what

2       happened with Ray Stanfield, it took me three months to find out what happened

3       on the van.

4                       COMMISSIONER:                     Now who was that?

5                       MR. LARDIZZONE:                    Ray Stanfield, the problem that

6       was on the van, it took me three months to get out of Ronnie what happened on

7       the van that day.

8                       COMMISSIONER:                     Okay, but was there a complaint

9       filed?

10                      MR. LARDIZZONE:                    After I confronted him.

11                      COMMISSIONER:                     How did you get it?

12                      MR. LARDIZZONE:                    Because it came in to my office, it

13      just came from Coatesville saying that there is a problem.  I said what is the

14      problem?  I've been asking, did anything happen on that van that I don't know

15      about?  And that is when he finally told me.  I said okay, who else was in that

16      van?  And he said Mr. White.  I got on the phone and I called Mr. White up.  I

17      said Mr. White can I come over and talk to you, I need to get some information.  I

18      went to see Mr. White.  He gave me the information.  I said okay.  As the state

19      commander, I said at that time, I was the state commander, I said if we give the

20      individual a letter reprimand and you get a formal and written apology or a written

21      apology would you accept it?  He said yes, but it is not necessary.  I said well I

1    think it is necessary. I called our national headquarters and let them know what

2    had happened. I told them what we were going to do. I went back to the office,

3    and I asked Ronnie, I said would you take an oral and a written apology and he

4    said yes.

5             COMMISSIONER:            But this...

6             MR. LARDIZZONE:          I called Mr. Stanfield up and I

7    said I need to see you right away.   I said that I'm telling you now that you are

8    going to get a letter reprimand and that you have to give an oral and a written

9    apology to both individuals. If you refuse to do it then we will go to the executive

10   committee and we will take more drastic action.

11            COMMISSIONER:            But this  inquiry  that  you  are

12   pursing at this point, is a result of somebody having said to you that there was an

13   incident?

14            MR. LARDIZZONE:          I kept hearing rumors.

15            COMMISSIONER:            You heard rumors, so it was not

16   an actual complaint.

17            MR. LARDIZZONE:          Right.

18            COMMISSIONER:            It was you following up on ...

19            MR. LARDIZZONE:          Well when the man came back

20   from Coatesville, he had gone there for treatment because he does have PTSD

1    and that is when he finally told me that there was a problem, an incident

2    happened on the van.

3    COMMISSIONER:    But the driver didn't form a formal

4    complaint nor did the individual.

5    MR. LARDIZZONE:    Well he was the driver.

6    COMMISSIONER:    He was the driver.    Okay.

7    Number 2 complaint.   That is number 1.

8    MR. LARDIZZONE:    And then we had, she's always

9    demanded that she ride in the front seat.  Well, some veterans like to ride in the

10   front seat too, and the way I feel is that the veterans should have the priority

11   where he sits.

12   COMMISSIONER:    Okay. Was there a complaint.

13   MR. LARDIZZONE:    It is a Windstar.   The VA came

14   outside and it measured between the, on the driver's side of the van, the step up

15   and measured the side to the back of the Windstar, and it was less than an inch

16   difference

17   COMMISSIONER:    Okay.  Was there a complaint, a

18   formal complaint to that?

19   MR. LARDIZZONE:    Yes.

20   COMMISSIONER:    Filed by?

1                MR. LARDIZZONE:          The VA said there was no reason

2   why she couldn't ride in the back of the van.  Because we brought it to the VA's

3   attention.

4                COMMISSIONER:            Okay.  Number 3.

5                MR. LARDIZZONE:          The one where we had with the

6   gentleman that was the, that had the heart attack and stroke.

7                COMMISSIONER:            Okay.  Who filed that complaint?

8                MR. LARDIZZONE:          The driver and it was brought to

9   the attention of the state commander and to the dispatcher.

10              COMMISSIONER:            Out of those three complaints,

11   which one could you identify was the one that Ms. Shannon, you know, asked

12   someone to leave the seat.

13                MR. LARDIZZONE:          The last one.  The one where the

14   veteran had a stroke and a heart attack.

15                COMMISSIONER:            Okay.  So that is number 4, what

16   is that?  What was the nature of that?  That was the nature that she, did the

17   person leave the seat?

18                MR. LARDIZZONE:          The  VA  hospital  got  very

19   disturbed about that.  And we notified our national headquarters.

20                BOARD:                    Being  an  adjutant  of  the  DAV

21   department that all of these complaints that came from you, the four complaints

82

1    that came from you, your recommendation to the executive board, did that have

2    the bearing on what the executive board did and voted on?

3             MR. LARDIZZONE:        It was brought to the attention of

4    our judge, we told our judge advocate what the complaints were, we showed him

5    what we had.

6             BOARD:              Who is we?

7             MR. LARDIZZONE:        I did being state commander to

8    our judge advocate.  And so, and we talked to our national headquarters what

9    their recommendations were.

10           BOARD:            So everything that was done was

11    done, the complaints carried forward by you as an adjutant of that department.

12    That is what...

13            MR. LARDIZZONE:        It    was    brought    to    the    state

14    commander.

15            BOARD:            Yeah, but you brought that to

16    them.

17            MR. LARDIZZONE:        Well    the    state    commander

18    notified the judge advocate.

19            BOARD:            That resulted in this letter.

20            MR. LARDIZZONE:        Yes.

1      BOARD:                              Okay.  So what I'm trying to get

2  at is nothing was really investigated to see if she was really guilty of this stuff.

3  Everything was carried directly to them so they voted on something that was

4  brought and statements that was brought that was never, probably was never

5  confirmed.

6      MR. LARDIZZONE:                     I guess so.

7      COMMISSIONER:                       I have another question sir.  How

8  many drivers are we talking about again to refresh my memory.  How many

9  drivers are we talking about with these four incidents?

10     MR. LARDIZZONE:                     Two.

11     COMMISSIONER:                       Two drivers.  How many drivers

12 did we have here tonight to give testimony?

13     MR. LARDIZZONE:                     Just one.

14     COMMISSIONER:                       And the one that we did hear said

15 that he had no problem.

16     MR. LARDIZZONE:                     Right, Ronnie is a good driver.

17     COMMISSIONER:                       I'm sorry.

18     MR. LARDIZZONE:                     Ronnie   tries   to   work   with

19 everybody.

20     COMMISSIONER:                       Okay.  That is fine.  But what I'm

21 getting to is….

84

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | He is the number one driver. |
| 2 | COMMISSIONER: | Okay. And he said he had no |
| 3 | problem with Ms. Shannon. | |
| 4 | MR. LARDIZZONE: | He never has a problem with |
| 5 | anybody. | |
| 6 | COMMISSIONER: | But now tell me you had two |
| 7 | drivers. Who is this other driver that had some complaints? | |
| 8 | MR. LARDIZZONE: | Ms. Salvatore. |
| 9 | COMMISSIONER: | Who? |
| 10 | MR. LARDIZZONE: | Ms. Salvatore. She is not on |
| 11 | your list. | |
| 12 | COMMISSIONER: | Is there a reason why? |
| 13 | MR. HOWARD: | We didn't subpoena anybody that |
| 14 | was outside. | |
| 15 | COMMISSIONER: | Okay. But wouldn't that driver, if |
| 16 | the complaints, if you file complaints and you took it to the level, and you took it | | |
| 17 | to national, I'm trying to find the smoking gun that was just the catalyst of no | | |
| 18 | more tolerance, zero tolerance now because we just had it. What was the | | |
| 19 | smoking gun here that says this is it? No more? | | |
| 20 | MR. LARDIZZONE: | Harassment, and then she was |
| 21 | harassing us all the time, she was calling me at my home at all times of hours. | | |

1               COMMISSIONER:          I haven't heard that testimony.

2    Could you elaborate?

3               MR. LARDIZZONE:        She's called my house many

4    times night time complaining, harassing me.

5               COMMISSIONER:          So could you, you know, share

6    with us, you know, your, because now your previous experience with Ms.

7    Shannon, you know, could you give me some sense to make me feel that maybe

8    personally you've just had it with her and could it be...

9               MR. LARDIZZONE:        No, no.

10               COMMISSIONER:          Could you give me some

11    indication of what your feelings are to Ms. Shannon. Somebody said she was a

12    nice lady.

13               MR. LARDIZZONE:        I have no animosity to her. None

14    at all.

15               COMMISSIONER:          But everything here kind of ...

16               MR. LARDIZZONE:        The department can change.

17               COMMISSIONER:          But most of the complaints

18    involve seating on a van. And I don't see the drivers that would be able to

19    substantiate to my level of understanding that there was a serious issue. And I'm

20    just trying to, you know, collaborate what it really is. I hear a seating, I hear that

21    she was aggressive. I've heard a little bit about her being a complainer, but

1    basically I haven't heard what it is that caused the drastic action that says not

2    only excluding from riding in the van but also you are not allowed on the

3    premises.

4                 MR. LARDIZZONE:              Just the Dover van.   She is still

5    getting rides.

6                 COMMISSIONER:               I'm sorry?

7                 MR. LARDIZZONE:              She is still getting transportation

8    from the DAV.

9                 COMMISSIONER:               No, we are talking about your site

10   because this is the catalyst of where the complaints come.  I'm trying to get a feel

11   for them.  The premises and the exclusion from being able to facilitate.

12                MR. LARDIZZONE:              She harassed our dispatcher and

13   our dispatcher called the Camden police department on her.

14                COMMISSIONER:               I haven't heard that.

15                MR. HOWARD:                 Well that is the thing.    May I

16   conduct some ...

17                MR. CROSSE:                 Well I think I would like to get

18   before you get there because ...

19                MR. HOWARD:                 Did you already have your cross

20   examination?

21                MR. CROSSE:                 Yes.

87

| | | |
|---|---|---|
| 1 | MR. HOWARD: | So it would be my turn wouldn't |
| 2 | it? | |
| 3 | BOARD: | Mr. Lardizzone, you were once |
| 4 | the state commander. | |
| 5 | MR. LARDIZZONE: | Yes sir. |
| 6 | BOARD: | When did you stop being the |
| 7 | state commander? | |
| 8 | MR. LARDIZZONE: | June. |
| 9 | BOARD: | Of '04? |
| 10 | MR. LARDIZZONE: | Yes sir. |
| 11 | BOARD: | Okay.    And that is when Mr. |
| 12 | Wischmann became the state commander? | |
| 13 | MR. LARDIZZONE: | Yes sir. |
| 14 | BOARD: | And    these    incidents,    these |
| 15 | statements and so forth, were they written up after June of '04? | |
| 16 | MR. LARDIZZONE: | My attorney has the .... |
| 17 | BOARD: | You have the statements.    And |
| 18 | they have been introduced into evidence. | |
| 19 | MR. HOWARD: | They   are   not   going   to   be |
| 20 | introduced. | |

1    made through the judge advocate and the commander can go to the executive

2    committee and say we want to change this or anything and they can change it.

3    Nothing is in stone.

4              BOARD:              Alright.

5              MR. LARDIZZONE:              Maybe  we  used  the  wrong

6    terminology.  Our judge advocate is supposed to be, he is 87 years old, he is a

7    retired paralegal.

8              BOARD:              Okay.   And the apology to the

9    dispatcher relates to which incident?

10             MR. LARDIZZONE:              The last two incidents when we

11   were in Reno.

12             BOARD:              In Reno?

13             MR. LARDIZZONE:              I was in Reno when it happened.

14   She wrote us up a statement.

15             BOARD:              When did that happen?

16             MR. LARDIZZONE:              August.

17             BOARD:              Alright.  And what incident is that

18   when you were in Reno and the dispatcher wrote up a complaint.  What incident

19   is that?

20             MR. LARDIZZONE:              That was when the World War II

21   veteran.

1    BOARD:                          The one with the heart attack and

2    the stroke and he needed to sit in the front and there was some claim by Ms.

3    Shannon.

4    MR. LARDIZZONE:                 She had, right.

5    BOARD:                          Again, if you could wait a second.

6    MR. LARDIZZONE:                 I'm sorry.

7    BOARD:                          It is okay.   The complaint is at

8    that point is Ms. Shannon asserted herself strongly about sitting in the front and

9    yet there was a vet whom you described being your first passenger priority.

10    MR. LARDIZZONE:                 Right.

11    BOARD:                          To   all   others   that   might   be

12    entitled to ride, he should have been the one sitting up front.

13    MR. LARDIZZONE:                 Yes sir.

14    BOARD:                          Under   those   conditions   of   the

15    heart attack and the stroke.  Okay.  I think I understand it.  I'm not sure how.

16    COMMISSIONER:                   Who wants to go first?

17    MR. HOWARD:                     Mr. Lardizzone, you were asked

18    a question about the quality of investigation.  In fact it was suggested that no

19    investigation was done. But that is not what happened. In each event, you went

20    to the people involved and took their statements.

21    MR. LARDIZZONE:                 Yes sir.

1          MR. HOWARD:                 Now, did you ask Ms. Shannon

2     for her input in these events?

3          MR. LARDIZZONE:             We sent, the incident with Ray

4     Stenfield we sent her a letter, well we didn't send it, Mr. Stanfield sent her a letter

5     of apology and she refused it.

6          MR. HOWARD:                 Okay.  How about the event with

7     Mr. White.  That is one, that was an event too where they exchanged epitaphs.

8          MR. LARDIZZONE:             Right.   The VA notified us that

9     there was an incident on the van.

`0          MR. HOWARD:                 Right.  Did you investigate that by

11    talking to Mr. White and Ms. Shannon?

12         MR. LARDIZZONE:             Yes sir.

13         MR. HOWARD:                 Okay.   So you did investigate

14    that.

15         MR. LARDIZZONE:             Yes sir.   I talked to Mr. White

16    about it.  but not me

17         MR. HOWARD:                 The invent involving the front seat

18    passenger who had a heart attack and a stroke, you spoke directly to the driver,

19    correct?

20         MR. LARDIZZONE:             Yes sir.

1        MR. LARDIZZONE:              Yes sir.

2        MR. CROSSE:                  Mr. Lardizzone, you were asked

3    a question by your counsel whether or not you spoke to Ms. Shannon and you

4    didn't answer it. You answered some other question. He said did you speak to

5    her? And you …

6        MR. LARDIZZONE:              No sir I did not.

7        MR. CROSSE:                  And so you never spoke and got

8    her word.

9        MR. LARDIZZONE:              No sir.

10        MR. CROSSE:                  You spoke to the complainant.

11        MR. LARDIZZONE:              Yes sir.

12        MR. CROSSE:                  Let's go back to these four

13    complaints. You gave the situation involving Ronnie and Mr. Stanford. Could

14    you tell this commission why that argument is attributed to Ms. Stenfield. I think,

15    don't you call it Ronnie's complaint? Why is that somehow her problem or she is

16    saddled with that?

17        MR. LARDIZZONE:              She was in the van. She is the

18    one who went to Mr. White saying that she wanted to go to the NAACP without

19    coming to us and let us know what happened. I kept hearing rumors and three

20    months after the incident I was told the truth. I can't go on hearsay. I mean if a

1     person comes to the commission here, they can not do anything unless they hear

2     the facts. Well I couldn't take action on anything until I got the facts.

3                  MR. CROSSE:                So you got the facts from Ron?

4                  MR. LARDIZZONE:            Once I got the facts I took action.

5     I called my national headquarters, I talked to our national inspector general and I

6     told him what had happened, and I said this is what action I would like to take if it

7     is okay with the two individuals.    And the inspector general said yes, that would

8     suffice. Once I took the action, I notified, I notified my supervisor in Philadelphia,

9     and I notified the national inspector general in Kentucky, he said case closed. Shannon

10    then called the inspector general after the case was closed and he said as far as

11    I'm concerned the case is closed. She also called my supervisor in Philadelphia

12    and he told her the case was closed.

13                 MR. CROSSE:                Are you finished?  And that was

14    Ronnie's complaint. That is what you called it at first and you are attributing that

15    to Shannon.

16                 MR. LARDIZZONE:            Ronnie  never  actually  made  a

17    complaint.

18                 MR. CROSSE:                Alright.    Now,  let's  clear  up

19    another thing. Let me ask this. The heart attack and stroke World War II veteran

20    that wasn't from being asked to switch seats. He, this is a veteran that you are

1    describing who had a heart attack and a stroke but it wasn't from Sharon asking

2    him to switch seats?

3         MR. LARDIZZONE:              No, no.

4         MR. CROSSE:                  So does it look to me that there

5    are two complaints about asking to sit in the front seat, one unspecified because

6    we don't know who that is. You said it is Ronnie's complaint right in the front

7    seat, heart attack stroke and then another thing with the dispatcher. So you have

8    one unspecified. Who was that veteran? Do you know who that is?

9         MR. LARDIZZONE:              No sir. As far as her riding the

10   front seat, this didn't just start with the Dover van, this started back with the

11   Seaford van when she was first being given a ride out of Seaford before we even

12   got a van here in Dover. This is going over two years.

13        MR. CROSSE:                  Now you heard ...

14        MR. LARDIZZONE:              Because Frank Stanfield was the

15   driver that took her almost every time she had to go to Elsmere.

16        MR. CROSSE:                  We had testimony from Seaford

17   driver here today.

18        MR. LARDIZZONE:              But she didn't take Sharon there

19   all the time. Mr. Stanfield did when he lived down in Seaford?

20        MR. CROSSE:                  Is this the same Stanfield that

21   made the statement?

98

1    MR. LARDIZZONE:            Yes sir.  Yes sir.

2    MR. CROSSE:                Okay.  Now one other thing.  You

3    said it took three months to get the facts, so that is ...

4    MR. LARDIZZONE:            On that incident, yes sir.

5    MR. CROSSE:                So I remember speaking to Mr.

6    White when he had said maybe it was three weeks...

7    MR. LARDIZZONE:            It could have been three weeks, it

8    could have been three months.  Because I know when Ronnie went into the

9    hospital and when he came back and seeing me, he said something is wrong,

10   and I said what is wrong?  I tell you the door is always open.  What is the

11   problem?  I need to know the truth Ronnie, I said I don't want to hear no more

12   bull.  Tell me the truth.  And he said okay Mr. Paul, I'll tell you the truth.  And

13   when he told me the truth, I said I need to get it verified.  I can't just take one

14   person's word and he said Mr. White was in the van. So I talked to Mr. White,

15   because there was two African Americans with a white driver, I think Ronnie was

16   driving I think.  It was, Ronnie was drying, yes.

17   MR. CROSSE:                One other area for me.  We are

18   using adjutant general commander, lot of big words, sounds like we are

19   commanding, how many people, tell me how many people are involved in the

20   Dover chapter?

21   MR. LARDIZZONE:            The chapter?

1                 MR. CROSSE:             Yes.

2                 MR. LARDIZZONE:       You have a commander, you

3   have a sea advise commander, you have a first string commander, you have a

4   chaplain, you have a treasurer and an adjutant.

5                 MR. CROSSE:             Those are the officers.   How

6   many Indians?

7                 MR. LARDIZZONE:       Indians? In our chapter, 500.

8                 MR. CROSSE:             500.   Okay. So when you use

9   those numbers, you are talking about some big numbers.

10               MR. LARDIZZONE:       Yes sir.

11               MR. CROSSE:             And that chapter is state wide?

12               MR. LARDIZZONE:       No, Dover.

13               MR. CROSSE:             Just in Dover.   You've got 500

14   disabled American veterans. Okay. Thanks.

15               MR. LARDIZZONE:       We have 3000 in the department.

16               COMMISSIONER:        I have one other question I would

17   like some clarification.

18               MR. LARDIZZONE:       Yes ma'am.

19               COMMISSIONER:        I've heard it say that Ms.

20   Shannon was a troublemaker.   And I have a concern because it has been

21   brought up a couple of times that she initiated some kind of, attempting a

1        complaint with NAACP.  I would like to know what factor did that play in this

2        whole scenario that maybe someone became a little testy because I am going to

3        go to the NAACP.

4                    MR. LARDIZZONE:          No ma'am.   That did not come

5        into a factor.  That was between her and Mr. White.  I had nothing to do with that.

6                    COMMISSIONER:            Okay.  But it did reach your desk.

7                    MR. LARDIZZONE:          No.  The letter never reached my

8        desk.

9                    COMMISSIONER:            How did you know about it?

10                   MR. LARDIZZONE:          Mr. White told me.

11                   COMMISSIONER:            You, talk to me then a little bit

12       about the troublemaker.  How is she perceived to be a troublemaker?

13                   MR. LARDIZZONE:          I    didn't    say    she    was    a

14       troublemaker.

15                   COMMISSIONER:            Somebody.  You didn't?  Well did

16       you hear testimony tonight?

17                   MR. LARDIZZONE:          She    is    disruptive    and    she

18       threatened our dispatcher and caused a problem with some of the passengers.

19                   COMMISSIONER:            Well did you hear that it was

20       alleged that she was you know going to file some kind of complaint, was initiating

21       something about the NAACP?

1    MR. LARDIZZONE:                No.  No sir, no ma'am.

2    COMMISSIONER:                 And you got no word or no notice

3    or notification that somebody was concerned about those kind of complaints.

4    MR. LARDIZZONE:                We   never   seen   anything   in

5    writing.  Nobody ever told me that.

6    BOARD:                         With regard to testimony and you

7    checking things out before you went to the executive committee, you testified that

8    you went to Mr. White, Mr. Stanford, you talked to the man with the stroke and

9    the heart attack.

10   MR. LARDIZZONE:                I   did   not   physically   talk   to   him

11   ma'am.

12   BOARD:                         Okay.  But each one of those four

13   incidents,  you  spoke  to  somebody  directly  involved  with  those  incidents.

14   Correct?

15   MR. LARDIZZONE:                They gave us a statement except

16   for the one with the heart attack and stroke.  Our dispatcher and our driver.

17   BOARD:                         Gave who a statement?

18   MR. LARDIZZONE:                Gave it to us.

19   BOARD:                         And who asked for it?

20   MR. LARDIZZONE:                She volunteered to give it to us.

21   She came right to the building, we were there.

102

1    BOARD:                                Yeah, but in order to get to

2    investigate these incidents, who, you did the investigating. Correct? Like you

3    made the calls, you called Mr. White, you called Mr. Stanford, you talked to Mr.

4    ...

5    MR. LARDIZZONE:                       That was on that one incident

6    where it was supposed to have been racial. That was the one incident that I

7    investigated.

8    BOARD:                                Okay. All I want to know is you

9    told us that you checked out these incidences before you presented these.

10   MR. LARDIZZONE:                       On what they gave me in writing.

11   BOARD:                                But what I seem to think I'm not

12   hearing did you also investigate each of these incidents with Ms. Shannon?

13   When somebody came to you with regard to the Mr. Stanford incident, did you,

14   you got Mr. Stanford's side, or somebody's side there, did you also get Ms.

15   Shannon's side?

16   MR. LARDIZZONE:                       No ma'am.

17   BOARD:                                Okay. With regard to the Mr.

18   White incident, I heard that you went to Mr. White's house immediately about

19   that.

20   MR. LARDIZZONE:                       That was the same incident.

21   BOARD:                                Did you go to Ms. Shannon's?

88

1       BOARD:                          Okay.    Alright.    You have two

2    drivers, Mr. Redels and Ms. Salvatore, correct?

3       MR. LARDIZZONE:                 And I don't know the other

4    drivers, what is the other driver's name?  I don't know the other driver.  I don't

5    know all the drivers names.  Was it just those two?

6       BOARD:                          So was it Mrs. Salvatore that

7    made all the issues then, the complaints, because that is where I'm lost.

8       MR. LARDIZZONE:                 She made, she made the main

9    complaint.

10      BOARD:                          You    said    two    drivers,    four

11   incidents.  So it was Ms. Salvatore and, it is starting to make sense to me now.

12      BOARD:                          Who at the VA hospital gave you

13   the impression that the VA was disturbed with whatever was taking place on this

14   van with respect to access to seating.

15      MR. LARDIZZONE:                 She was making complaints to

16   the VA, Sharon was making complaints to Karen Cavanaugh and to the patient

17   advocate.

18      BOARD:                          At the VA.

19      MR. LARDIZZONE:                 Yes sir.

20      BOARD:                          And you were having subsequent

21   conversations?

1    MR. LARDIZZONE:                   They were calling us.

2    BOARD:                            Okay.  Can I ask you to wait until

3    I'm done with the question.

4    MR. LARDIZZONE:                   I'm sorry.

5    BOARD:                            That is okay.  I understand.  It is

6    a nerve wracking experience.

7    MR. LARDIZZONE:                   And I haven't got my hearing aid,

8    so, that is why I'm looking straight trying to catch it all.  I'm sorry.

9    BOARD:                            That is alright.  You also said at

10   one point in your testimony that it is not permanent.

11   MR. LARDIZZONE:                   We can change it.

12   BOARD:                            What would it take to make, to

13   change it?  What would it take to change it?

14   MR. LARDIZZONE:                   Probably a letter of apology to the

15   dispatcher and to the driver?

16   BOARD:                            From Ms. Shannon?

17   MR. LARDIZZONE:                   Pardon me?

18   BOARD:                            From Ms. Shannon?

19   MR. LARDIZZONE:                   Yes.  And to the, it we'll get to the

20   executive committee and ask them what they want to do.  They can, the

21   executive committee can overturn us anytime.  I mean the recommendation was

103

1          MR. LARDIZZONE:      No.

2          BOARD:            With regard to the dispatcher,

3 when the dispatcher came to you and made a complaint, did you go to Ms.

4 Shannon and ask her what exactly happened there?

5          MR. LARDIZZONE:      No ma'am.

6          BOARD:            The man with the stroke and the

7 heart attack, that was the dispatcher issue? Am I getting those confused?

8          MR. LARDIZZONE:      Yes.

9          BOARD:            Okay.

10          MR. LARDIZZONE:      It got very confusing there for a

11 while. I'm sorry.

12          BOARD:            You told us there was four

13 incidents.

14          MR. LARDIZZONE:      As far as I know.

15          BOARD:            And as best as I could I wrote

16 them down trying to follow them. And what I got out of them was the Stanford

17 incident was the one where apparently there was a discussion or a conversation

18 on the bus jokingly sort of about dragging somebody behind the bus just to get

19 them to the convention.

20          MR. LARDIZZONE:      Right. That was district 4 in New

21 Jersey.

104

1    BOARD:                          Yes.    That was one incident as

2    we look at these four, right?

3         MR. LARDIZZONE:            Right.

4    BOARD:                          And with regard to that incident,

5    you did talk to some folks about that conversation and obviously got an apology

6    for somebody.

7         MR. LARDIZZONE:            Yes,    both    individuals.    Mr.

8    Stanfield sent an apology to Ms. Shannon, she refused the letter.

9    BOARD:                          Right, because in my opinion, or

10   the way I look at this thing, it was really to Ms. Shannon's credit that she felt

11   something was uncomfortable and she brought it to your attention.

12        MR. LARDIZZONE:            She    never   brought   it   to   my

13   attention.

14   BOARD:                          It came to the attention somehow

15   because you all went and investigated it.

16        MR. LARDIZZONE:            It came to my attention when

17   Ronnie finally told me what had happened on the van.

18   BOARD:                          Okay.    But   there   was   also

19   some...

20        MR. LARDIZZONE:            She never came to me ma'am.

1    BOARD:                         Some information that came to us

2    that Ms. Shannon did write a letter or did try to tell somebody about that

3    conversation. And that is how the rumors started. Did I miss this? I'm trying to

4    get this and I don't want ...

5    COMMISSIONER:                  You are doing fine.

6    BOARD:                         I guess the reason that I feel a

7    little confused is one of the things that you told us, you testified was that you

8    don't go on hearsay. And yet where I'm really lost is it appears that you didn't

9    really talk to Ms. Shannon about these things, so how did you get her side of the

10   story if it wasn't hearsay?

11   MR. LARDIZZONE:                I guess I was wrong.

12   BOARD:                         Thank you.

13   COMMISSIONER:                  I just have one additional

14   question and that is is there any point where Ms. Shannon was not complying?

15   MR. LARDIZZONE:                What do you mean?

16   COMMISSIONER:                  You know, going back to moving,

17   giving up a seat or whatever the facilitation was on the bus or the van, was there

18   ever a point where she was not complying, that she just insisted on doing

19   whatever she wanted to do? Did she always comply?

20   MR. LARDIZZONE:                She always insisted that she had

21   to sit in the front seat.

106

1    COMMISSIONER:    Did she not give up the seat on

2    the occasions when she was asked to?

3    MR. LARDIZZONE:    I don't know.

4    BOARD:    You    did    mention    in    your

5    testimony, I shudder to bring this up that you did talk to Ms. Shannon on several

6    occasion because she would call you. Is that correct?

7    MR. LARDIZZONE:    Yeah, and a lot of times I hung up

8    on her.

9    BOARD:    What did she get to say to you

10    before you hung up on her, if anything?

11    MR. LARDIZZONE:    Saying    that she wasn't being

12    treated right on the van and that she had to sit in the front seat of the van. And I

13    said it is first come first served, and the van was for veterans. Like if she would

14    try to ride the van today she probably wouldn't have gotten a ride because it is

15    filled up six veterans.

16    BOARD:    Alright. When were these phone

17    conversations? Were they before this letter?

18    MR. LARDIZZONE:    yes Mam Yes sir. Way before.

19    BOARD:    And    when    you    had    these

20    conversations when Ms. Shannon was complaining to you as you describe it, her

107

1    need to sit in the front, did you also discuss with her at that time the incident with

2    Mr. White?

3              MR. LARDIZZONE:              No. That was never brought up.

4              BOARD:                        Did she tell you anything about

5    that incident with Mr. White?

6              MR. LARDIZZONE:              No.    That    was    before    this

7    incident.

8              BOARD:                        Did    she    tell    you    in    your

9    conversations with you, did she say anything about this dispatcher incident?

10             MR. LARDIZZONE:              No sir.

11             BOARD:                        In this letter, the statement that

12   Mr. White gave you that he admits that he called her the "B" word and that would

13   be considered conduct, her conduct in your letter according to the conduct that

14   caused her to get banded.  Why wasn't Mr. White banded because of his

15   conduct?

16             MR. LARDIZZONE:              That incident was before that.

17   The complaint was handled by the VA.

18             COMMISSIONER:                I    have    another    question.    It

19   appeared that there are more than one individual involved in these.  Do I get a

20   sense, or do I hear that somebody else was written up for anything?

21             MR. LARDIZZONE:              Not that I know of.

1        COMMISSIONER:              Any of these other individuals?

2        MR. LARDIZZONE:            Oh, Mr. Sanfield.

3        COMMISSIONER:              And what action was taken?

4        MR. LARDIZZONE:            I got Mr. Sanfield a letter of

5    reprimand.

6        COMMISSIONER:              Reprimand?

7        MR. LARDIZZONE:            Uh huh.

8        COMMISSIONER:              Was anybody treated similar to

9    the drastic kind of action, has anybody else, maybe I should ask this, how many

10   times have you banned someone from your vehicle?

11       MR. LARDIZZONE:            This is the first time it has ever

12   happened.

13       COMMISSIONER:              First time ever.

14       MR. LARDIZZONE:            To us, in Delaware.

15       COMMISSIONER:              In unit one. And could you give

16   me some sense of what those incidents involved that caused you to make that

17   drastic decision?

18       MR. LARDIZZONE:            With the veterans? The two

19   veterans?

20       COMMISSIONER:              Any time that you have ejected

21   someone from the premises or from a bus and say no more.

109

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | We told people that went to the |
| 2 | building to leave the premises. | |

3    COMMISSIONER:         What   were   some   of   the
4    circumstances?

5    MR. LARDIZZONE:         They  were  causing  a  problem,
6    drinking, teenagers.

7    COMMISSIONER:         Okay.   But  it  has  never  been
8    something that related to driving a bus, riding a vehicle, riding a bus or a van that
9    caused  such  a  scenario  aside  from  say  a  physical  fight  or  some  physical
10   encounter is what I am listening for.  What would be a drastic scenario?

11   MR. LARDIZZONE:         I don't know.  I mean I know a lot
12   of departments have banned people from the vehicle.  I know other VA hospital
13   out of state have banned people from the van for incidents.  Our hospital didn't
14   want to do that.  That is their prerogative.  They own the van.  But we had, we
15   volunteer the drivers so they told us we could do that.

16   BOARD:  *Carol*         This is like when I look at this
17   letter it says this is to include the property located at ...

18   MR. LARDIZZONE:         Not the van ma'am.

19   MR. HOWARD:         The  van  is  not  written  in  that
20   letter.

110

1  BOARD:  It says any meetings or functions,

2  right, but what I'm trying to get at is whether it is the van or not. I think what

3  Commissioner Harrison is trying to ask you is what would lead you to and it

4  appears to have totally asked Ms. Shannon to cease her membership to stop

5  coming to any functions, any meetings, going to the convention, any of those

6  things other than the transportation.

7  MR. LARDIZZONE:  That is two definitions.

8  BOARD:  That is why we are little

9  confused. You can maybe shed some light on that to us. What would make you

10  decide....

11  MR. LARDIZZONE:  She is still being given

12  transportation by the van, just not the Dover van.

13  BOARD:  Right.

14  MR. LARDIZZONE:  As far as the properties are

15  concerned, that is our right. That is private property.

16  BOARD:  But what would be your reason

17  for doing that? That is all we want to know.

18  MR. LARDIZZONE:  Well because the incidents that

19  we had with her, that caused the problem with the dispatcher and the driver and

20  everything, we felt that we were having problems and we decided to talk to our

1       judge advocate in our national headquarters and they said we had the right to

2       ban anybody from our property.

3                 COMMISSIONER:         Was there an incident involving

4       something other than on the van? That is what I'm trying to get to. Was there an

5       incident involving the property?

6                 MR. LARDIZZONE:       No. It was on the property.

7                 COMMISSIONER:         Beg your pardon?

8                 MR. LARDIZZONE:       It was at our headquarters

9       building. It was on our property when it happened. When the incident happened

10      with the dispatcher, it was on our property.

11               COMMISSIONER:         The vehicle was on the property.

12               MR. LARDIZZONE:       No, the vehicle was not there.

13               MR. HOWARD:          Mr. Wischmann you've been

14     sitting there chomping at the bit to tell your part of this thing, so I'm going to get

15     you that. You presently occupy the office of commander of the DAV department

16     of Delaware state wide?

17               MR. WISCHMANN:       Yes I do.

18               MR. HOWARD:          Okay. And were you a member

19     of the executive committee that voted to send the August 27th letter to Sharon

20     Shannon?

1         MR. WISCHMANN:              I was the commander at the time.

2    I couldn't have voted being the commander, but I was there present with the

3    executive committee.

4         MR. HOWARD:                 Did you occupy any leadership

5    role in connection with the vans we are talking about?

6         MR. WISCHMANN:              I am the assistant service officer

7    for the state which falls under my jurisdiction. Plus also at the time, when we first

8    started up the program, I was the initial dispatcher and then this past year when I

9    took over commander in June, I had Ms. Bishop go ahead and take over the

10   dispatcher office and take a little bit of the weight off of me as far as me doing too

11   much.

12        MR. HOWARD:                 Okay.   So you are intimately

13   familiar with all the details. So why don't you start in the beginning and give us,

14   you all have only been operating these vans for one year.

15        MR. WISCHMANN:              Yeah, we started, it was roughly

16   May of last year.

17        MR. HOWARD:                 May of 2003.

18        MR. WISCHMANN:              Uh huh.

19        MR. HOWARD:                 So a year and a half now.

1    MR. WISCHMANN:           Yeah.   And Ronnie Redels he

2    was our initial driver, and at the time you know we just started getting into it.  And

3    Ms. Shannon, she was one of the ones who did ride up with Ronnie.

4           MR. HOWARD:              She was a regular passenger.

5           MR. WISCHMANN:           She was a regular passenger.

6    She did live down by Mr. Redels, right around the corner, maybe within a quarter

7    of a mile form Nr. Redel's house.  And part of the problem that came up in the

8    summertime with myself and ...

9           MR. HOWARD:              This is summer of 2003.

10          MR. WISCHMANN:           This is 2004, when myself and

11   Paul was out in Reno when a dispatcher called us up, was that she was having

12   problems with Ms. Shannon meeting the driver at the Magnolia firehouse which is

13   one of our pick up points.  The thing with that was, Ms. Shannon said Ronnie

14   picks me up at my house. Well Gladys being the new dispatcher, she says your

15   house is not a pick up point because the only time a veteran or an eligible person

16   who rides the van will get picked up at their house is if they are blind, legally blind

17   or they are physically unable to get in, you know, to get to the pick up point.  For

18   a while, you know, Mr. Redels was picking up Ms. Shannon at her hours, you

19   know, because after her hip surgery, I said go ahead.  But then after a point if

20   she can drive to our convention in her car, she can drive a mile and a half down

21   the road to the firehouse to get picked up.  That is why the dispatcher was

114

1    sticking to her guns saying you need to go.  That is when everything started

2    snowballing.

3           MR. HOWARD:                    So the friction started there.

4           MR. WISCHMANN:                 Uh huh.

5           MR. HOWARD:                    What is next?

6           MR. WISCHMANN:                 Okay.    As  far  as  the  four

7    problems, one of the problems the initial thing was with Mr. Stanfield, the other

8    one was with Mr. White.  The third one was with the veteran who had the heart

9    attack and stroke and the fourth one was the incident with the dispatcher at the

10   Camden DAV building.

11          MR. HOWARD:                    Something  actually  happened  at

12   the building.

13          MR. WISCHMANN:                 At   the   building.   What   had

14   happened was apparently Ms. Shannon had sent something down, had the

15   therapist send a piece of paper down to Ms. Bishop stating that she had to sit in

16   the front seat because she had hip surgery, so on and so forth.  All it was was a

17   piece of paper just scribbled on says she has to sit in the front seat. Well Ms.

18   Bishop was at the building at the time by herself with a friend of hers just doing

19   some paperwork and Ms. Shannon came up and confronted her about getting

20   this paperwork.  Well Ms. Bishop didn't want to go ahead and get into the whole

21   situation with her...

1          MR. CROSSE:                    Could object here?

2          MR. HOWARD:                    Sure.

3          MR. WISCHMANN:                 This is how the...

4          MR. CROSSE:                    I object here.  This gentleman did

5    not see this whole thing and I remember an objection where I had second hand

6    hearsay.  He doesn't know what happened.

7          MR. HOWARD:                    Let  me  change  my  question

8    because then I think it will be relevant.

9          COMMISSIONER:                  Thank you.

10         MR. HOWARD:                    What information did you rely on

11   in making these decisions?

12         MR. WISCHMANN:                 Okay. What information I relied

13   on?  Okay, part of it was I did talk to the therapist.  I physically talked to the

14   therapist.

15         MR. HOWARD:                    Okay.

16         MR. WISCHMANN:                 He   said   he   did   send   the

17   paperwork down and I told him, I said well, there is no assigned seating in the

18   van.  Part of the reasons for the decision was our national headquarters, they

19   were the ones, they got phone calls form Ms. Shannon, two or three phone calls.

20   They were getting tired of her phone calls.  They told us what we needed to do

21   was cut ourself away from her.  In order to do that, the only way we see fit as far

116

1       as, they said don't talk to her, they told us, if she calls, hang up on her. That is

2       why the complaint is in the form because when she called I was doing exactly

3       what my national officers and people above me were telling me to do, hang up on

4       her, don't have a confrontation with her. That is why I hung up on her. So we did

5       that by what they told us to do. The other problems were like I said were with the

6       four incidences, our national headquarters knew about all these things.  Our

7       national adjutant knew about it, our national inspector general who is a lawyer

8       knew about it. They were the ones that told us you need to cut your ties with her,

9       you know if that means banning her form the building, ban her from the building.

10      So that is what we did.  But what we did, the way we did it, we brought it to our

11      executive committee, our executive committee was the one we presented the

12      facts to them.

13                      MR. HOWARD:              This    is    the    state    executive

14      committee.

15                      MR. WISCHMANN:          The   state   executive   committee.

16      The unit and the chapter has nothing to do with this. This is a whole separate

17      thing.   She is going against the department of Delaware. That is the state

18      department, that is not a chapter, that is not a unit.  And the thing is when they

19      told us to do that, we brought this up to our state executive committee, presented

20      the facts to them, presented what national told us to do, and they based their

21      decision as far as banning her from the property and any future department

1   functions on that. And if national told us, I mean, it is just like okay you are in the

2   army, you've got to listen to the people above you. If you don't' listen to them,

3   the next time you have a problem and you go to them, what are they going to do

4   for you. They are going to say hey, you ain't going to listen to us, we ain't telling

5   you nothing.

6       MR. HOWARD:            Let me slow you down a little bit

7   because I want to get back to this event that occurred on the property. Now, I

8   am not offering, to speak to Mr. Crosse' objection, I'm not offering the information

9   that Mr. Wischmann gathered for the truth asserted. He had information and he

10  made decisions based on that information, and that is the issue I think before the

11  board. Whether the dispatcher lied to him or not is not the issue. It is what he

12  did and how he reacted to it. So I think he recitation of what he was told is

13  relevant for that reason. And it does not constitute hearsay because it goes to

14  what motivated him and his role in this scenario.

15      BOARD:                 For that limited purpose it is

16  Okay.

17      MR. HOWARD:            Now there is an even that

18  happened on the premises. Things are getting hot now. You took steps to

19  interview this dispatcher because there had been a confrontation.

20      MR. WISCHMANN:         Yeah, what she told me was

21  happened was Ms. Shannon came to the building to get this paperwork. She told

1    her she didn't have it because she didn't want you know, we had told her to, don't

2    talk to her, you know, we are not supposed to have any confrontation with her.

3    So more or less she was doing what she was told by me to do, me being the

4    commander, her being you know the dispatcher. I told her you know, we are not

5    supposed to have any you know, any interconnection with Ms. Shannon you

6    know, no conversations, you know, no nothing. So that is more or less what she

7    was trying to do was to avoid the confrontation. So she told her no, she didn't

8    have the paper work. Well Ms. Shannon decided she was going to stay on the

9    property. Ms. Bishop came out, she confronted her a little bit about this piece of

10    paper that the therapist had sent down state and oh, it was medical records, all it

11    was was a piece of paper that said she needed to sit in front of the van. There

12    was nothing medically on there, you know, as far as any confidentiality. So that

13    is what Ms. Bishop told her, she said I don't have it. Well here Ms. Shannon

14    didn't want to leave, so Ms. Bishop, she went down, she went down to the

15    Camden deli, pulled in the parking lot and see Ms. Shannon was still there and

16    called the Camden cops on her. The Camden police came up. By that time Ms.

17    Shannon was gone, so Ms. Bishop came back up and the only thing we didn't get

18    was the police thing, you know, from the police report.

19                    MR. HOWARD:              And in terms of....

20                    MR. WISCHMANN:           But Ms. Bishop felt you know that

21    she was being, she was threatened, because Ms. Shannon was waiting there.

1          MR. HOWARD:                    So in terms of the information,

2     that information you now had and that was the last draw as far as your

3     organization is concerned.

4          MR. WISCHMANN:             Uh huh.

5          MR. HOWARD:                    And that is when you got in

6     contact with the national and then ultimately the executive committee met and

7     made this vote. Now, I asked Mr. Lardizzone the same question. Your building

8     is privately owned.

9          MR. WISCHMANN:             Yes.

10         MR. HOWARD:                    By your corporate entity. It is not

11    open to the public.

12         MR. WISCHMANN:             The only thing we have open to

13    the public and that is, we have, you know, we have casino nights and we have

14    rentals. The people pay the money for the admission to the casino night, I mean

15    which is a three dollar admission, they come in. Ms. Shannon, if she were to

16    come up there on casino night and pay three dollars, we ain't going to turn her

17    away, but she is going to pay cards. You know, if she wanted to rent the

18    building, as long as she pays the $50.00 an hour, not a problem.

19         MR. HOWARD:                    Okay. And likewise the vans, Mr.

20    Lardizonne told us, they are not public means of transportation.

1              MR. WISCHMANN:          No, they are owned by the

2    federal government, by the VA.

3              MR. HOWARD:          By the VA. Intended solely for?

4              MR. WISCHMANN:          For veterans and any eligible

5    people that carried for the VA.

6              MR. HOWARD:          Are you satisfied as the state

7    commander that these decisions made regarding Sharon Shannon were

8    permitted by your bylaws and your regulations?

9              MR. WISCHMANN:          Yes.

10            MR. HOWARD:          And are you satisfied that as an

11    entity, you acted within the parameters of that?

12            MR. WISCHMANN:          Yes I did.

13            MR. HOWARD:          Okay. Now, I haven't heard you

14    say and I'm asking this directly, at any point in your role in this decision-making

15    process, did the fact that this woman 30 years ago was married to a black man

16    have anything to do with anything.

17            MR. WISCHMANN:          No. for the record, I have two

18    nephews who are mixed race, black and white, a deceased brother in law who

19    was black, so I mean, that doesn't matter to me. I mean, this discrimination BS is

20    what it is. I mean it is baloney. Like I said, that has nothing to do with it.

1         MR. HOWARD:              You sound like you are insulted

2    by it anyway.

3         MR. WISCHMANN:           I am.

4         MR. HOWARD:              Mr. Lardizonne told us that your

5    state wide your membership is racially diverse.

6         MR. WISCHMANN:           Yes it is, and even our chapter is.

7         MR. HOWARD:              On a broad spectrum?

8         MR. WISCHMANN:           Yes.

9         MR. HOWARD:              That is all.

10        MR. CROSSE:              I have a couple of questions.

11   You have testified today that this lady, Ms. Shannon is calling you to complain or

12   discuss something and you are saying your national office has told you to hang

13   up on her and that is what you were doing.

14        MR. WISCHMANN:           Exactly.

15        MR. CROSSE:              So the national office told you,

16   you got a complaining person, don't talk to them.

17        MR. WISCHMANN:           Yep.

18        MR. CROSSE:              You've heard testimony today

19   that she is a person also that is eligible to use your van. Correct?

20        MR. WISCHMANN:           Yes.

122

| | |
|---|---|
| 1 | MR. CROSSE:                    The gentlemen said if there is |
| 2 | space and she is a widow of a veteran she could use this van. |
| 3 | MR. WISCHMANN:              Uh huh. |
| 4 | MR. CROSSE:                    So when you say you are private, |
| 5 | she is a person that could use this facility and could get accommodations on |
| 6 | there. |
| 7 | MR. WISCHMANN:              Yes she is and she is still riding |
| 8 | our vans. |
| 9 | MR. CROSSE:                    Right.  She is riding the Seaford |
| 10 | van. |
| 11 | MR. WISCHMANN:              Which is still a DAV van.  I mean |
| 12 | if you are standing out of the bus stop, it ain't the same bus that is going to pick |
| 13 | you up every time, so what is the difference I mean you are still getting a ride |
| 14 | from the DAV. |
| 15 | MR. CROSSE:                    Alright.    Now,   and   all   this |
| 16 | information you will agree with me is decided on by the executive committee |
| 17 | without speaking to Ms. Shannon. |
| 18 | MR. WISCHMANN:              Exactly. |
| 19 | MR. CROSSE:                    Let me hand you this document. |
| 20 | I've handed you a document that says to whom it, it is dated April the 4th. Correct. |
| 21 | It says to whom it may concern. |

1      MR. WISCHMANN:          You mean August 4th?

2      MR. CROSSE:              August 4th.    Please allow Ms.

3  Shannon access to the front seat of the vehicle for her trips to Wilmington VA.

4  This is necessary because of her recent hip surgery and possible injuries that

5  could result from pathological motion and positions with attempts to access more

6  remote seating in the vehicle.   Thank you for your consideration.   This is the

7  physical therapist.  Correct?

8      MR. WISCHMANN:          Yes.

9      MR. CROSSE:              Is this the guy that you called?

10     MR. WISCHMANN:          This is the guy I talked to.

11     MR. CROSSE:              This is, the guy told you that he

12  wrote this letter.

13     MR. WISCHMANN:          Yes he did.

14     MR. CROSSE:              So Ms. Shannon didn't make this

15  up.

16     MR. WISCHMANN:          No she didn't.

17     MR. CROSSE:              And you verified that a physical

18  therapist sent you this and said she should try to get a seat in the front and …

19     MR. WISCHMANN:          Yes he did and I also told him we

20  could not accommodate her at all times.

1          MR. LARDIZZONE:            They were calling us.

2          BOARD:                     Okay.  Can I ask you to wait until

3    I'm done with the question.

4          MR. LARDIZZONE:            I'm sorry.

5          BOARD:                     That is okay.  I understand.  It is

6    a nerve wracking experience.

7          MR. LARDIZZONE:            And I haven't got my hearing aid,

8    so, that is why I'm looking straight trying to catch it all.  I'm sorry.

9          BOARD:                     That is alright.  You also said at

10   one point in your testimony that it is not permanent.

11         MR. LARDIZZONE:            We can change it.

12         BOARD:                     What would it take to make, to

13   change it?  What would it take to change it?

14         MR. LARDIZZONE:            Probably a letter of apology to the

15   dispatcher and to the driver?

16         BOARD:                     From Ms. Shannon?

17         MR. LARDIZZONE:            Pardon me?

18         BOARD:                     From Ms. Shannon?

19         MR. LARDIZZONE:            Yes.  And to the, it we'll get to the

20   executive committee and ask them what they want to do.  They can, the

21   executive committee can overturn us anytime.  I mean the recommendation was

93

| | | |
|---|---|---|
| 1 | MR. HOWARD: | You spoke directly to the |
| 2 | dispatcher. | |
| 3 | MR. LARDIZZONE: | Yes sir. |
| 4 | MR. HOWARD: | And you did take their statements |
| 5 | and use that information in your decision-making process. | |
| 6 | MR. LARDIZZONE: | Yes sir. |
| 7 | MR. HOWARD: | So there was an investigation. |
| 8 | MR. LARDIZZONE: | Yes sir. |
| 9 | MR. HOWARD: | And the fourth event, because |
| 10 | I've lost my place a little bit, there was a fourth event, that is the one with Mr. | |
| 11 | Stenfield. | |
| 12 | MR. LARDIZZONE: | Yeah, well that was the first one. |
| 13 | MR. HOWARD: | First event, Mr. White was the |
| 14 | second event, the front seat passenger with the stroke and heart attack, the third | |
| 15 | event, and the fourth event was? | |
| 16 | MR. LARDIZZONE: | The confrontation with the |
| 17 | dispatcher, where Sharon threatened the dispatcher and the dispatcher called | |
| 18 | the Camden police department. | |
| 19 | MR. HOWARD: | Physically threatened her. |
| 20 | MR. LARDIZZONE: | That is what she said. |
| 21 | MR. HOWARD: | That is what your dispatcher said. |

1    MR. CROSSE:                So you then made what would

2    sound like a medical transportation decision that you can't accommodate her.

3    MR. WISCHMANN:                Put it this way. Talking with the

4    VA, if a person cannot get into the van and sit in any seat except the driver's

5    seat, that they must be able to sit in any seat in that van. If not, they do not have

6    to get a ride, because the thing is, what if we had five patients the same day with

7    the same situation Ms. Shannon did. Who is all sitting in the front seat? You

8    cannot all sit on each other's lap up in the front seat. It ain't going to work. The

9    thing is with the vans, we had to change our ruling with the VA, we went along

10   with the VA, we gave them a list of our recommendations which now, the rules

11   for riding in the van are on VA letterhead, not on the DAV letterhead. One of the

12   things that it states in there, it states in there that you must be able to sit

13   anywhere in that van except the driver's seat. There is no assigned seating.

14   Because the thing is too, along with that, if a person is physically, I mean we

15   cannot take people in wheelchairs. I mean if they are physically unable to get

16   into the van, we cannot transport them.

17   MR. CROSSE:                So you are telling us that

18   because of this incident, you changed the regulations.

19   MR. WISCHMANN:                Yes we did. Well the VA

20   changed the regulations.

21   MR. CROSSE:                You have to sit wherever...

125

1        MR. WISCHMANN:              The VA changed the regulations.

2    Yes.  I mean you also got to look at safety reasons too. You get in an accident,

3    people need to evacuate that vehicle, I mean you need to be able to get into the

4    vehicle, you know, and get in and out of the thing as quick as possible.  And the

5    thing is the VA you know we more or less had a talk with them and the thing is

6    some of these patients, you know, have a physical disability that you know they

7    can't sit anywhere, but one certain place in the van, then we can't help them out.

8        MR. CROSSE:                I  would  like  to  move  this  into

9    evidence.

10        MR. HOWARD:                I have no objection.

11        BOARD:                     Petitioner 2.

12        COMMISSIONER:             I  have  one  question  as  to  how

13    you see this request.  Did you see this as something other than the therapist

14    attempting to suggest to you reasonably if at all that you could accommodate her

15    just a reasonable request, did you review that they were asking for something

16    different than that, if you have accommodation, please allow Ms. Shannon to

17    utilize the front seat.  Did you see that they would be demanding enough to say

18    you know whatever comes, you know, eject whoever from the seat and give it to

19    her?  Because maybe she could have a choice at this moment to call and cancel

20    because I can't be accommodated today.  Did you see that this was more than a

21    request for accommodation?

1    MR. WISCHMANN:              The way I looked at this, this

2    date, you know, please allow her access to the front seat to the trips to the VA

3    medical.  This is necessary which means yes she has to sit there.  That is the

4    way I looked at it.

5    COMMISSIONER:              But she could have a choice of

6    saying I can't go today because ....

7    MR. WISCHMANN:              We have had occasions with Ms.

8    Shannon calling the last minute and canceling and that was another problem,

9    one of the also reasons that was with the van situation, the building situation.  I

10   mean we've also worked with the VA too with the new policies, we need at least

11   48 hour notice on the cancellation.  The thing is because of certain incidences

12   now we've had to revamp the whole you know whole bunch of rules and this and

13   that that may have been in place for three, four, five years.

14   COMMISSIONER:              Did you ever accommodate her,

15   did you ever give her that option or that privilege that would have...

16   MR. WISCHMANN:              Put it this way, I don't have the

17   paperwork...

18   COMMISSIONER:              Okay.  Excuse me. That would

19   have allowed her to put you at some state of inconvenience because you had

20   assigned her that seat.  You are talking about a cancellation and how she might

21   do it immediately.  But if you never gave her that seat, or you never held that seat

1    for her, how would that jeopardize, or how would that put you at a state of

2    inconveniences.

3        MR. WISCHMANN:    Okay, let me, the date of this

4    letter, this was I think roughly about the same time we were coming back from

5    our convention.  At that time, previously prior to that was when our national

6    officers told us to not, you know, cut the strings with her.  I could not tell you if

7    she was accommodating any on that van after that because like I said, that was

8    around the same time frame, you know, when we were coming back and we had

9    previously talked to them.  And when we got back, we talked to the VA.  Like I

10   said, I talked to the dispatcher and said we are not supposed to associate with

11   her. What Ms. Shannon was supposed to do at the time was to call the VA HSC

12   person who was Ms. Brennan who was here earlier and line up her appointments

13   through her.  She would tell Ms. Brennan when her appointments were and Ms.

14   Brennan was then going to call down to us and let us know when she needed a

15   ride.  That never happened.  Ms. Shannon did not, she was still calling our office.

16   Ms. Bishop got tired of getting phone calls at home.  She got tired of getting

17   phone calls at the office all the time.  One of the conversations that Ms. Shannon

18   brought up to Ms. Bishop....

19       MR. CROSSE:    Objection.

*I never was told/Michael maybe about appointments to*

1        MR. WISCHMANN:                Okay.  Fine.  But the thing was,

2    the thing was that there was a whole bunch of different things.  I mean it wasn't

3    just one little incident.

4        COMMISSIONER:                That is what we've been trying to

5    get to all night.

6        MR. WISCHMANN:                And we were going by what our

7    national officers had told us.

8        COMMISSIONER:                Then could you then share with

9    us how many more incidents that we don't know about.  We have four.  Are there

10   more?

11       MR. WISCHMANN:                There may be two other ones.  I'll

12   be honest with you.  There was a time when Ms. Shannon called up on a Friday

13   afternoon wanting a ride to her personal doctor in Dover.  She talked to Paul, Mr.

14   Lardizonne explained to her that the vans do not run on Fridays and the vans are

15   not there to take patients to their personal doctors.  They are there to take the

16   patients up to the VA medical center and any clinic that the VA is associated with

17   up there.  Mr. Lardizonne called me up, this is a Friday morning, asked me if I

18   could help Ms. Shannon out.  What we did, I told him I didn't have anything to do,

19   I took our service officer van which we are not supposed to do either and I

20   transported her down to Kent General Hospital, you know to get her records.  I

21   had to walk in and get her ex-rays, you know she was unable to walk through the

1   hospital, and so I walked in and got her ex-rays and stuff for her and then took

2   her over to I guess it was an MRI clinic or whatever. I spent 4 ½ hours of one of

3   my Friday afternoons. Didn't ask for anything, didn't bother me. I was helping

4   out a veteran or a veteran's wife. I mean if I was prejudiced or a racist or

5   whatever, I wouldn't be, you know, and I felt because she was married to a black

6   man, did I, did I have a problem with that, would I have done that? No. The

7   thing is as far as you know, as far as this racial, that is all it is, it is crap. The

8   thing was we had, you know, four incidents is definite and like I said, there was

9   probably a few other incidences, we did not document every stinking little thing.

10  But the thing was there were occasions when she would wait until the last minute

11  to cancel a ride. There was times when she did not show up for the ride, that the

12  driver was waiting on her and she never showed up. After a while, it is like what

13  is going on here. So that is why, like I said, she is not, the thing is right now, we

14  got four drivers.

15          COMMISSIONER:              I   think   you   answered   my

16  question.

17          MR. WISCHMANN:            Yeah, two of our drivers in Dover

18  don't want to transport her.

19          COMMISSIONER:             Let's entertain another question.

20          BOARD: Dixon           My only thing here is that the

21  opportunity request all veterans, disabled veterans have some problems no

1   matter what, they have some problems that allow them to be on the van

2   someplace, not a specific seat.

3          MR. WISCHMANN:                    Right.

4          BOARD:                            First you made a statement that

5   caused a safety problem.  But you got somebody up there anyway.  So it is a

6   safety problem any way you go.

7          MR. WISCHMANN:                    No, what I was saying was the

8   safety problem, now we are to the point if a person cannot really get up, we had

9   to step it up.  I mean now, I mean we've had individuals who would come in, they

10  would roll up to the vehicle in a wheelchair, he would actually lift himself up into

11  the vehicle because the drivers are not supposed to asset the patients getting up,

12  because if the drivers get hurt, they are volunteers, they are not covered by any

13  medical or anything, so the thing is now what we've done is you know the

14  patients have to be able to physically be able to get into that van.  Because we

15  used to take and put wheelchairs in the back, we don't do it anymore.

16         BOARD:                            You are dealing with veteran's

17  disabilities.

18         MR. WISCHMANN:                    Uh huh.  Exactly.

19         BOARD:                            Disabled veterans.  What you did

20  here is dismissed her from getting any benefits or going anywhere.

21         MR. WISCHMANN:                    Put it this way.

131

| | | |
|---|---|---|
| 1 | BOARD: | That is what you did. |
| 2 | MR. WISCHMANN: | Okay. If you say so. |
| 3 | BOARD: | Okay. Because of her conduct of |

4    the national constitution and bylaws. You didn't dismiss her because of her not

5    being authorized to be on the premises of the establishment.

| | | |
|---|---|---|
| 6 | MR. WISCHMANN: | Okay.   If you read our national |

7    bylaws...

| | | |
|---|---|---|
| 8 | BOARD: | Let me finish here. |
| 9 | MR. WISCHMANN: | Go ahead. |
| 10 | BOARD: | And the other thing is you being |

11   the state commander did not give national the whole picture.

| | | |
|---|---|---|
| 12 | MR. WISCHMANN: | National knew the whole picture. |
| 13 | BOARD: | No they didn't. |
| 14 | MR. WISCHMANN: | Yes they did. |
| 15 | BOARD: | They got what the pictured from |

16   you.

| | | |
|---|---|---|
| 17 | MR. WISCHMANN: | They talked to her too. |
| 18 | BOARD: | They got the picture form you. |

19   Okay? Your name was on the signature block representing the national because

20   you are the state commander.

132

| | | |
|---|---|---|
| 1 | MR. WISCHMANN: | National has nothing to do with |
| 2 | our property. We have control on our property. | |
| 3 | BOARD: | You just told me that national |
| 4 | made the statement. | |
| 5 | MR. WISCHMANN: | We went by their suggestions. |
| 6 | BOARD: | They didn't know the whole |
| 7 | picture. | |
| 8 | MR. WISCHMANN: | Yes they did. |
| 9 | BOARD: | If you went by their suggestion, in |

10  the end you are ultimately responsible for the decisions because it is your

11  property.

12          MR. WISCHMANN:          It is our property.  It is not

13  national's property. It is the state department.

14          BOARD:          There    have    been    some

15  discussions here that maybe you guys weren't the right people to talk to or

16  whatever. But as you sit here and say that, pretty clearly to us that this was your

17  property and your decision.

18          MR. WISCHMANN:          Exactly.

19          BOARD:          Okay.

20          COMMISSIONER:          Any cross?

1    BOARD:                      So whether you [inaudible] that

2    doesn't really matter, it is just your property and your decision. And I just have

3    one, one little last question that I'm not too clear about here. I hear what you are

4    saying. It totally makes sense to me that you can't guarantee somebody the front

5    seat, and yet it appears that one of these four issues is all about that. It is all

6    about the person with the stroke and heart attack should have had the front seat.

7    Could you please explain that to me?

8    MR. WISCHMANN:              Okay. Like I said, right now the

9    rules have changed. If they can't sit anywhere in that van, they are not allowed

10   in the van.

11   BOARD:                      But that was before ...

12   MR. WISCHMANN:              At that time that was before all

13   these changes were done with the VA. I mean we have [inaudible] for more

14   mistakes in the past. That was one of the things, we had to revise some of the

15   rules in the van because we ran into problems.

16   BOARD:                      That because one of the issues

17   that was apparently one of the reasons that Ms. Shannon has been told that she

18   can no longer partake of the facilities and enjoyment and the camaraderie of your

19   unit. We were told there were four of them, four issues that became the reason

20   for this letter. Right? And that was...

1          MR. WISCHMANN:              Like I said there was a few other

2    ones, but I could not elaborate on them because I was cut off, so needless to say

3    about what our article 16-1, you know, where it says you know as far as causing

4    like discord among the members and that, that was mainly the main reason. That

5    was more or less, you know, she was part of the reason where we were having

6    members going after other members so to speak.  I mean there was a little

7    animosity because she was fueling the fire on one side and the all of a sudden, it

8    was like nuh uh, we didn't need that discord in the organization.

9          BOARD:                       Have you had any discussions

10   with the Delaware authority for specialized transit and their Para transit services

11   that they have up and down the state for people with medical problems and need

12   to have...

13         MR. WISCHMANN:              We mention that to people when

14   they call.

15         BOARD:                       Alright...

16         MR. WISCHMANN:              If they say they got a wheelchair,

17   we tell them you know call Para transit.

18         BOARD:                       Okay. They also have, as you

19   described it, you had problems with late cancellations, have you ever talked to

20   them about their policies that they have adopted with their years of experience in

21   running these transit services, about how to deal with that and....

1          MR. WISCHMANN:          This is the VA, this is the VA

2    transit. All we supply is the drivers. We supply the drivers and the dispatcher,

3    and we go by their rules. That is something you would have to talk to with the VA

4    on that as far as they ...

5          BOARD:          Just so that we are clear, the

6    veteran's administration is the state.

7          MR. WISCHMANN:          That is federal government.

8          BOARD:          So if for instance, there is an

9    issue with respect to whether or not you are complying with VA regulations on

10    how to provide the volunteer services in operating the VA vans, that is an issue

11    for the civil rights Office of the Veteran's Administration to deal with under title VI

12    of the Civil Rights Act of 1964 as far as you know.

13          MR. WISCHMANN:          Uh huh.  I mean we go by their

14    regulations that they pass down.

15          BOARD:          Again,  your  testimony  as  I

16    understand it is that you had a series of contacts with Ms. Shannon, people in the

17    unit, in the chapter at Camden, had contacts with Ms. Shannon that weren't the

18    most pleasant, and having whatever those contacts were, you ran it up, you got

19    advice from the national office that said, under these circumstances, cut her out

20    of here, but the state wide department of the DAV, the alternative to the problem

21    that Ms. Shannon was causing with at least one driver in the Dover volunteer

1    driver there, was have her obtain services from the Department from using a

2    Seaford driver and a Seaford van which was still part of the department, DAV,

3    but was with a driver that didn't have a problem with Ms. Shannon and at least on

4    some occasions Ms. Shannon's interest in sitting in the front seat could be

5    accommodated.  Is that basically what you are saying?

6                        MR. WISCHMANN:            Uh huh.

7                        BOARD:                    You constantly kept saying she is

8    still getting a ride.

9                        MR. WISCHMANN:            She is.  She is still getting a ride.

10   Our thing is too is our drivers bounce around.  We do have, I mean as far as our

11   Dover drivers, they don't' all drive the same day each week, they rotate around.

12   The thing is we got two drivers out of five, four or five, that do not want to

13   transport her.  So we cannot say yeah, okay, you can go up on Monday in our

14   van because this driver is driving.  It might be a different driver, so the thing is, to

15   alleviate that problem, that is why the Seaford van is transporting her.

16                       BOARD:                    Alright.  Now how does any of

17   that square with, how does any of that square with not permitting her to use the

18   building in Camden?

19                       MR. WISCHMANN:            Like I said, she was causing

20   discord amongst the members and that is part of our national bylaws, 16,

21   paragraph 16.1 that we could suspend, you know....

94

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | Yes sir. |
| 2 | MR. HOWARD: | And the dispatcher is a |
| 3 | volunteer? | |
| 4 | MR. LARDIZZONE: | Yes sir. |
| 5 | MR. HOWARD: | Okay. |
| 6 | MR. LARDIZZONE: | She is 100 percent disabled |
| 7 | veteran. | |
| 8 | MR. HOWARD: | Alright. And your investigating |
| 9 | you asked all those people what happened, and they told you what happened. | |
| 10 | MR. LARDIZZONE: | Yes sir. |
| 11 | MR. HOWARD: | And to the exclusion of whatever |
| 12 | story Ms. Shannon might have told you, you took, your organization took action. | |
| 13 | MR. LARDIZZONE: | Yes sir. |
| 14 | MR. HOWARD: | Did racial animus in any way at |
| 15 | any time play any role in any of these events? | |
| 16 | MR. LARDIZZONE: | No sir. |
| 17 | MR. HOWARD: | And in fact in these events you |
| 18 | were getting statements and accepting them as fact from African Americans. | |
| 19 | MR. LARDIZZONE: | Yes sir. |
| 20 | MR. HOWARD: | So we did have investigations |
| 21 | each and every time. | |

1       BOARD:                          Alright.    And has anyone else

2   been treated in that fashion?

3           MR. WISCHMANN:              I'm sure it has been otherwise it

4   wouldn't be in the national bylaws.

5       BOARD:                          I meant by the Camden?

6           MR. WISCHMANN:              This is the state of Delaware

7   house.   This ain't Camden.

8       BOARD:                          Alright.

9           MR. WISCHMANN:              See that is the other thing people

10  are getting confused on.

11      BOARD:                          So has the state ever essentially

12  blackballed...

13          MR. WISCHMANN:              I could not answer that.    Mr.

14  Lardizonne probably could because he has been in the organization a lot longer

15  than me.

16      BOARD:                          Okay.

| | | |
|---|---|---|
| 1 | BOARD: | Alright.    And  has  anyone  else |
| 2 | been treated in that fashion? | |
| 3 | MR. WISCHMANN: | I'm sure it has been otherwise it |
| 4 | wouldn't be in the national bylaws. | |
| 5 | BOARD: | I meant by the Camden? |
| 6 | MR. WISCHMANN: | This  is  the  state  of  Delaware |
| 7 | house.    This ain't Camden. | |
| 8 | BOARD: | Alright. |
| 9 | MR. WISCHMANN: | See that is the other thing people |
| 10 | are getting confused on. | |
| 11 | BOARD: | So has the state ever essentially |
| 12 | blackballed... | |
| 13 | MR. WISCHMANN: | I  could  not  answer  that.    Mr. |
| 14 | Lardizonne probably could because he has been in the organization a lot longer | |
| 15 | than me. | |
| 16 | BOARD: | Okay. |



88

1    BOARD:                        Okay.    Alright.    You have two

2    drivers, Mr. Redels and Ms. Salvatore, correct?

3           MR. LARDIZZONE:              And  I  don't  know  the  other

4    drivers, what is the other driver's name?  I don't know the other driver.  I don't

5    know all the drivers names.  Was it just those two?

6           BOARD:                        So  was  it  Mrs.  Salvatore  that

7    made all the issues then, the complaints, because that is where I'm lost.

8           MR. LARDIZZONE:              She  made,  she  made  the  main

9    complaint.

10          BOARD:                        You    said    two    drivers,    four

11   incidents.  So it was Ms. Salvatore and, it is starting to make sense to me now.

12          BOARD:                        Who  at  the  VA  hospital  gave  you

13   the impression that the VA was disturbed with whatever was taking place on this

14   van with respect to access to seating.

15          MR. LARDIZZONE:              She  was  making  complaints  to

16   the VA, Sharon was making complaints to Karen Cavanaugh and to the patient

17   advocate.

18          BOARD:                        At the VA.

19          MR. LARDIZZONE:              Yes sir.

20          BOARD:                        And you were having subsequent

21   conversations?

89

| 1 | MR. LARDIZZONE: | They were calling us. |
| 2 | BOARD: | Okay. Can I ask you to wait until |
| 3 | I'm done with the question. | |
| 4 | MR. LARDIZZONE: | I'm sorry. |
| 5 | BOARD: | That is okay. I understand. It is |
| 6 | a nerve wracking experience. | |
| 7 | MR. LARDIZZONE: | And I haven't got my hearing aid, |
| 8 | so, that is why I'm looking straight trying to catch it all. I'm sorry. | |
| 9 | BOARD: | That is alright. You also said at |
| 10 | one point in your testimony that it is not permanent. | |
| 11 | MR. LARDIZZONE: | We can change it. |
| 12 | BOARD: | What would it take to make, to |
| 13 | change it? What would it take to change it? | |
| 14 | MR. LARDIZZONE: | Probably a letter of apology to the |
| 15 | dispatcher and to the driver? | |
| 16 | BOARD: | From Ms. Shannon? |
| 17 | MR. LARDIZZONE: | Pardon me? |
| 18 | BOARD: | From Ms. Shannon? |
| 19 | MR. LARDIZZONE: | Yes. And to the, it we'll get to the |
| 20 | executive committee and ask them what they want to do. They can, the | |
| 21 | executive committee can overturn us anytime. I mean the recommendation was | |

1          MR. HOWARD:                    You    spoke    directly    to    the

2     dispatcher.

3          MR. LARDIZZONE:               Yes sir.

4          MR. HOWARD:                    And you did take their statements

5     and use that information in your decision-making process.

6          MR. LARDIZZONE:               Yes sir.

7          MR. HOWARD:                    So there was an investigation.

8          MR. LARDIZZONE:               Yes sir.

9          MR. HOWARD:                    And  the  fourth  event,  because

10    I've lost my place a little bit, there was a fourth event, that is the one with Mr.

11    Stenfield.

12         MR. LARDIZZONE:               Yeah, well that was the first one.

13         MR. HOWARD:                    First  event,  Mr.  White  was  the

14    second event, the front seat passenger with the stroke and heart attack, the third

15    event, and the fourth event was?

16         MR. LARDIZZONE:               The     confrontation     with     the

17    dispatcher, where Sharon threatened the dispatcher and the dispatcher called

18    the Camden police department.

19         MR. HOWARD:                    Physically threatened her.

20         MR. LARDIZZONE:               That is what she said.

21         MR. HOWARD:                    That is what your dispatcher said.

94

| | | |
|---|---|---|
| 1 | MR. LARDIZZONE: | Yes sir. |
| 2 | MR. HOWARD: | And the dispatcher is a |
| 3 | volunteer? | |
| 4 | MR. LARDIZZONE: | Yes sir. |
| 5 | MR. HOWARD: | Okay. |
| 6 | MR. LARDIZZONE: | She is 100 percent disabled |
| 7 | veteran. | |
| 8 | MR. HOWARD: | Alright. And your investigating |
| 9 | you asked all those people what happened, and they told you what happened. | |
| 10 | MR. LARDIZZONE: | Yes sir. |
| 11 | MR. HOWARD: | And to the exclusion of whatever |
| 12 | story Ms. Shannon might have told you, you took, your organization took action. | |
| 13 | MR. LARDIZZONE: | Yes sir. |
| 14 | MR. HOWARD: | Did racial animus in any way at |
| 15 | any time play any role in any of these events? | |
| 16 | MR. LARDIZZONE: | No sir. |
| 17 | MR. HOWARD: | And in fact in these events you |
| 18 | were getting statements and accepting them as fact from African Americans. | |
| 19 | MR. LARDIZZONE: | Yes sir. |
| 20 | MR. HOWARD: | So we did have investigations |
| 21 | each and every time. | |

To Whom It May Concern,                                    06-522

I am writing this statement in behalf Sharon Shannon. Ihave been active
in the D.A.V.A. for some twenty seven years.I recently was second junior
vice commander,  in the D.A.V.A. from 2001 to 2003 of Unit 1 Dover branch.

I met Sharon Sharon at a D.A.V.A.meeting in 2003. We talked to eachother
after several meetings, and got acquainted. My husband and I talked to
Sharon about riding the D,A,V.van,to V.A. hospital in Wilmington,De. .
My husband was the van cooridnator for the Dover area. Sharon would our
home to see if there was a seat available, and she was always considerate
of all the veterans she did not want to bump them off.

Mr. Reels (driver)  stopped at our home to pick up the next day schedule
for the van.  Sharon was a patient on the van and Mr. Revels was going to
drop Sharon off at the firehouse in downtown Magnolia.
Sharon was very upset about an incident that happened that day on the van
with Mr. E. White.

A conversation took place between Mr. Revels and my husband Bradley E.
Bowhall, Sr. now deceased, Sharon and I were present at the time.There
hqd been problems in the D.A.V.,regarding Mr. Revels, being refferd as
the "token nigger"  of the D.A.V. behind his back.It was being said by
the commander and the adjutant of the D.A.V.Dover , De. Unit I.
My husband was very upset because he stated they were doing the same thing
to Sharon Shannon only she was being refferd to as the "nigger lover." Then
Sharon's problems began. The commander told my husband not to let Sharon
ride on the van. Then serious problems began, she was barred from riding
the van for no good reason. This is against D.A.V. by-laws.  The D.A.V.
never talked to her about the incidents. Sharon Shannon was "black balled"
out of the organizion.



*Anita D. Bowhall 6/3/07*

Anita D. Bowhall (D.A.V.A.Life Member
28 Cardington Court
Clayton, De.   19938
302-6591714

FILED

JUN - 5 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD Scanned

Anita D. Bowhall
28 Cardington Court
Clayton, De. 19938

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
844 N. King Street, Lockbox 18
Wilmington, Delaware 19801-3570



7006 0810 0001 0054 3959

CERTIFIED MAIL

7006 0810 0001 0054 3959



0000    19801



U.S. POSTAGE
PAID
DOVER, DE
19904
JUN 04, '07
AMOUNT
$3.06
00070251-23